UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 04-33526-TEC |
| | ) Chapter 11 |
| | ) |
| DEMAS WAI YAN, aka Dennis Yan, | ) |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |
| | ) |
| DEMAS WAI YAN, aka Dennis Yan, | ) Adv. No. 05-3257 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DONG FU, aka Tony Fu, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| WEI SUEN, | ) Adv. No. 05-3257 |
| | ) |
| Plaintiff, | ) <u>TRIAL, PHASE 2</u> |
| | ) <u>VOLUME III</u> |
| v. | ) |
| | ) |
| DEMAS YAN, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| STELLA CHEN, | ) Adv. No. 05-3236 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DEMAS WAI YAN aka DENNIS YAN, | ) |
| | ) |
| Defendant. | ) Friday, December 2, 2005 |
| _____ | ) San Francisco, California |

Appearances listed on the next page.

PALMER REPORTING SERVICES
P. O. Box 30727, Stockton, California 95213-0727 (800) 665-6251

Case: 05-03257    Doc# 52    Filed: 06/16/06    Entered: 06/16/06 00:49:50    Page 1 of 46

Appearances:

For Demas Yan:                Law Offices of Mark J. Romeo
                              By:  Mark J. Romeo, Esq.
                              130 Sutter Street, Seventh Floor
                              San Francisco, California  94104
                              (415) 395-9315


For Wei Suen:                 Corporate Counsel Law Group
                              By:  John Chu, Esq.
                              505 Sansome Street, Suite 475
                              San Francisco, California  94111
                              (415) 788-4315


For Tony Fu:                  Tony Fu, *pro se*


For Stella Chen:              Stella Chen, *pro se*


Digital Court                 United States Bankruptcy Court
Reporter:                     Clerk of the Court
                              Jane L. Galvani
                              235 Pine Street, 23rd Floor (94104)
                              Post Office Box 7341
                              San Francisco, California  94120-7341
                              (415) 268-2366


Certified Electronic          Palmer Reporting Services
Transcriber:                  P. O. Box 30727
                              Stockton, California  95213-0727


                    Proceedings recorded by digital recording;
            transcript produced by federally-approved transcription service.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 2 of 46

<u>I N D E X</u>

Arguments:

Closing on behalf of Plaintiff Suen:          page  5

Closing on behalf of the Debtor:             page 18

Closing in Rebuttal on behalf of
 Plaintiff Suen:                              page 39

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 3 of 46

1    Friday, December 2, 2005                    10:57 o'clock a.m.

2                    P R O C E E D I N G S

3         THE COURT:  All right.  Now we have a final argument.

4    I tried to get in early, but...

5         MR. ROMEO:  Good morning, Your Honor.

6         THE COURT:  This case became much more complicated,

7    the one you just heard, because it was an Arizona bankruptcy,

8    so...  Good morning.

9         MR. CHU:  It was so complicated I couldn't — I

10   couldn't even follow along, Your Honor.  There was too much

11   going on.  Good morning, Your Honor.  John Chu appearing on

12   behalf of plaintiff, Wei Suen.

13        MR. ROMEO:  Good morning, Your Honor.  Mark Romeo

14   appearing for Demas Yan.

15        MR. FU:  Good morning, Your Honor.  Tony Fu for

16   myself.

17        THE COURT:  Okay.

18        MS. CHEN:  Good morning, Your Honor.  Stella Chen.

19        MR. CHU:  Stella Chen is here also, Your Honor.

20        THE COURT:  Okay.  Well, I'm hearing argument only on

21   phase 2.

22        MR. CHU:  Yes.

23        THE COURT:  And I appreciate everybody being here.

24        MR. FU:  Would you allow me for — ten minutes?

25        THE COURT:  I hadn't counted on — I don't have — I

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 4 of 46

1  don't have an hour and ten minutes, because we have — we're

2  taking somebody to lunch.  I don't know how you want to do this.

3         MR. FU:  I — I — I wrote something I —

4         THE COURT:  Well, let me hear what the claims are

5  involving you.  First let me hear from the other parties.

6         I think, Mr. Chu, you need to go first.

7         MR. CHU:  Thank you, Your Honor.

8         <u>CLOSING ARGUMENT ON BEHALF OF PLAINTIFF SUEN</u>

9         MR. CHU:  This is a dispute about the October 18, 2000

10 agreement.  The agreement, as I have argued and as the Court has

11 noted previously, speaks for itself.  The terms are pretty

12 straightforward.

13        On the face of the agreement Mr. Fu got a 25-percent

14 ownership interest in the Chenery property.  Mr. Yan was

15 required to pay for permits, condo papers, and the first

16 $300,000 of construction costs.  Mr. Fu was required to pay all

17 remaining construction costs.  The — Mr. Fu was also given the

18 right to determine whether the property would be sold or rented.

19 And that's it as far as the face of the agreement.

20        I think the agreement was contem- — was entered into

21 in contemplation of the construction of a condominium unit on

22 the property.  That's clear.  But there's — nowhere on the face

23 of the agreement is Mis- — was Mr. Fu required to provide any

24 contracting services.

25        There is no provision in the agreement that required

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 5 of 46

1   him to work; there is no provision in the agreement that

2   required him to provide anything other than money.  There was no

3   provision that allowed Mr. Yan to fire Mr. Fu.

4           This was not a general contracting agreement.  In

5   fact, it — it doesn't read anything like a contracting

6   agreement.  In fact, Mr. Fu is even given what is a normal

7   incident of ownership, the right to sell the property, the right

8   to rent the property.

9           I don't think there's a dispute about the agreement.

10  The parties' testimony didn't contradict the face of the

11  agreement.  Mr. Fu testified that he didn't think he was

12  required to provide any contracting services.

13          In fact, his conduct was consistent with that thought.

14  He went out and obtained bids from general contractors to see if

15  they could build the unit for a — an acceptable price.  The

16  price ended up being too high for his tastes, so he undertook a

17  lot of the construction work himself.

18          He did a lot of things that the general contractor on

19  the project normally would have done.  But he did those things

20  as an owner, not as a contractor.

21          Mr. Yan, I think his testimony was consistent with

22  that understanding.  He testified that he didn't think Mr. Fu

23  was entitled — entitled to any payment from the joint venture

24  funds for his services.  He testified that the only payment Tony

25  was entitled to was the 25-percent ownership interest.  And —

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 6 of 46

1   and he also admitted that the agreement didn't require him to be

2   the contractor.

3         I think Mr. Yan's testimony was that, well, that was

4   the spirit of the agreement that he provide the services.

5   Otherwise, why would I need him?  Well, I could have hired

6   someone else.  Well, he says, why — why would I need Tony if he

7   weren't going to do the work?  Well, the — the answer is pretty

8   obvious from the face of the agreement.  He's putting up the

9   money for the construction.

10        Mr. Yan was limited his risk as far as the

11  construction venture to $300,000 plus the condo papers and

12  permits.  That was the deal.  And Mr. Fu was going to put up the

13  rest of the money for the project.

14        Regardless of how the project got completed, whether

15  Mr. Fu paid someone else to put — put the property up — put the

16  building up, or whether he did it himself, it's — it's the same

17  result in the end.  Mr. Yan gets the condominium for — for that

18  limited investment.

19        Now if it turns out that his secret intent was to have

20  Tony build — build the project himself, that's between Mr. Yan

21  and himself.  Under California law, and I think it's not

22  controversial, a party can — a party's subjective intent or

23  understanding cannot be used to establish an intent independent

24  of the express written terms of an agreement.  I've got a couple

25  California cases' cites if — if — I'll read into the record.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 7 of 46

1    *Sunniland Fruit, Inc. versus Verni*, 233 Cal.Ap.3d 892

2  at page 898.  That's a 1991 case.  Also *Beard versus Goodrich*,

3  110 Cal.Ap.4th 1031 at page 1038.  That's a 2003 case.

4    Now here the express written term of the October 18th,

5  2000 agreement required Mr. Fu to pay money.  That's it.  Mr.

6  Yan cannot claim that this was a personal services contract

7  after the fact.

8    Now Mr. Yan has argued that Mr. Fu should not have

9  been entitled to any payment under that contract because —

10  because of Business and Profession Code 7031, which precludes an

11  unlicensed general contractor from filing an action or

12  maintaining an action for the collection of compensation for the

13  performance of any act or contract where — where a license is

14  required by this chapter.

15    That code section does not apply to this contract.

16  Mr. Fu did not need a contractor's license to enter into a

17  contract where his only obligation was to invest money.

18    The — the work that Mr. Fu put into the property, the

19  contracting work: arranging for the subcontractors, paying for

20  materials, paying laborers.  He didn't bill anyone for that

21  work.  He's not maintain — he didn't maintain a contract to

22  collect for that work.  So on its face the Business and

23  Profession Code section should not apply to this agreement.

24    There is also a case, Supreme — California Supreme

25  Court case, *Hydrotech Systems Limited versus Oasis Waterpark* —

Case: 05-03257    Doc# 52    Filed: 06/16/06    Entered: 06/16/06 00:49:50    Page 8 of 46

1    *Waterpark*, 52 California 3d. 988.

2              THE COURT:  988?

3              MR. CHU:  988, Your Honor.  It's a 1991 case.

4              It provides that an agreement doesn't fall within the

5    ambit of Section 7031 if the plaintiff's involvement as an

6    unlicensed contractor was merely incidental to the overall

7    agreement or transaction between the parties.  I think that —

8    that would apply 100 percent here also, Your Honor.  Any work

9    that Mr. Fu put into the property for contracting services was

10   incidental to the contract.

11             He — he did — he was not required to — for the — to

12   provide those service in — in order to effect the contract.  He

13   — all he had to do is pay money.  The project could have been

14   completed by a third-party general contractor.  There is nothing

15   in the contract that required him to provide the services.  So

16   any services that he provided here were incidental.

17             I think the most dramatic illustration of that is what

18   would have happened if the — if the project would have gone

19   south.

20             There were deeds of trust on the property at the time

21   the October 18, 2000 agreement was entered into.  Let's say that

22   Mr. Fu put a half million dollars into the property.  But for

23   some reason there was a default on the deed of trust and — and

24   the lender foreclosed out Mr. Fu's interest in the property.

25   That — that'd be it.  Mr. Fu wouldn't have been entitled to go

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 9 of 46

1    back to Mr. Yan and say:  Hey, you owe me a half million dollars

2    for — a half million dollars for the contracting services I put

3    into the property.  That wasn't the deal.  The deal was that he

4    put the money in, he's — he's a part-owner.

5         I'd like to move on to what — what constituted

6    proceeds, assuming that we get to the point where the — the

7    contract stands on its face, the — the general — the general

8    contractor's license law does not apply.  We have to determine,

9    well, what are the proceeds that Mr. Fu would have been entitled

10   to at the end of the project.

11        I don't think there is a dispute there at all, either,

12   Your Honor, at least not according to the evidence.  Mr. Fu

13   testified that his understanding of what "proceeds" was under

14   that contract would have been the gross sales price of the — of

15   the project minus costs of sale, but — but not subtracting out

16   any liens that were against the property.

17        The — the history of that is — I — I guess goes back

18   to the Winky Wong deal where Mr. Yan and Mr. Fu would have

19   gotten half of the property but they would not have been

20   responsible for the deeds of trust that Mr. Wong had against the

21   property at the time they did the three-way deal.

22        So when Mr. Yan, I guess stepped into Mr. Wong's shoes

23   that didn't alter Mr. Yan's — Mr. Fu's entitle- — entitlement to

24   25 percent of the gross.

25        THE COURT:  What is the evidence that under the Winky

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 10 of
46

1    Wong deal that the — the gross proceeds' concept?

2              MR. CHU:  Mr. Fu's testimony to that effect.  Mr. Fu

3    testified that when they entered into the Wong deal the — the

4    understanding between him and Mr. Yan, as partners, was that

5    they were going to get 50 percent of the value, of the gross

6    value of the property, which — which makes sense.

7              The — the — I guess the estimation was that six- —

8    according to the testimony, Mr. Wong's property was worth about

9    $600,000 at the time they entered into the deal.  And the two

10   partners, Mr. Yan and Mr. Fu, thought it would probably cost

11   about $600,000 to put the condominium on.  That would be a

12   roughly 50- — 50-50 investment between the two of them, but —

13             THE COURT:  And what was the — what was the purchase

14   price when — when Mr. Yan bought it from Mr. Wong?

15             MR. CHU:  When — I guess that would have been about a

16   year later.  Mr. Yan purchased the property for 738,- gross.

17             THE COURT:  And what liens did — what liens were there

18   associated with that purchase and what liens did Mr. Wong have?

19             MR. CHU:  Mr. Wong had deeds of trust in favor of

20   World Savings and Bank of America that Mr. Yan —

21             THE COURT:  Assumed?

22             MR. CHU:  — assumed, not — not a formal assumption

23   but —

24             THE COURT:  But subject to?

25             MR. CHU:  — subject to, yeah.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 11 of
46

1        And I think the gross — the gross amount of those two

2   liens at the time he assumed was 450,000.  I don't have the —

3        THE COURT:  I remember from the first —

4        MR. CHU:  — exhibits in front of me.

5        THE COURT:  — phase there was something about this.

6        MR. CHU:  Well, I think Mr. — Mr. Yan introduced his

7   sales agreement as an — as an exhibit in this phase, his — his

8   purchase agreement with Mr. Wong.  I don't have the exhibit

9   reference in front of me.

10        THE COURT:  Okay.

11        MR. ROMEO:  It's Exhibit JJJ, Your Honor.

12        THE COURT:  JJJ.  Okay.  Go ahead, please.

13        MR. CHU:  And I think one of Mr. Yan's last pieces of

14   testimony were that he thought in his mind he was responsible

15   for the mortgage.  And because he thought this was like a

16   general contracting agreement with — with Mr. Fu where — where

17   he — where Mr. Fu is going to be paid some money but Mr. Fu is

18   not going to be liable for mortgages.  So he testified he

19   thought he was responsible for the mortgages, which is

20   consistent with what Mr. Fu thought.  He — that he was not

21   responsible for the mortgages.

22        The mortgages — that makes sense, too, Your Honor.  I

23   mean Mr. Yan was record owner of the property.  He could have

24   put — he could have encumbered the property to the hilt, carving

25   into the — into the equity and then — at the end I don't think

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 12 of
46

1  Mr. Fu's expectation was that he get 25 percent of, you know, a

2  small piece of equity at the end, so assumption of the mortgage

3  in that deal would have made no sense at all.

4        Finally, I think Mr. Fu also testified that he — he

5  would accept responsibility for 25 percent of the taxes and

6  insurance, and — and he did not dispute Mr. Yan's request for —

7  for those, those items.

8        I think in the second of — I think in Exhibit III Mr.

9  Yan had put in a bill for 25 percent of taxes and — and

10  something to that effect.  And at trial Mr. Fu testified that

11  those were okay with him and they're okay with — so — we had no

12  — we would have had no problems with those, Your Honor.

13        Now getting to the — the more difficult piece of the

14  case, at least in my view, is the — is the partnership

15  accounting.  Here you have direct — direct — direct contrary

16  views as to — as to how the accounting was supposed to work.

17        Mr. Fu testified that he had an oral agreement with

18  Mr. Yan where Mr. Yan was supposed to put the construction cost

19  money into the Bank of America account and that this was

20  supposed to be the exclusive means by which they're — they were

21  going to keep track of how much money he put in.

22        Mr. Yan denied that.  He testified that he was

23  entitled to pay costs separately only where Mr. Fu instructed

24  him to do so.  Well, if the Court accepts Mr. Fu's testimony,

25  Mr. Yan's contributions would total 235,000, the amount of his

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 13 of 46

1   actual deposits into the Bank of America account minus the

2   $36,000 in checks that Mr. Yan signed.

3          This — I think the accounting pretty much turns on the

4   credibility of the two witnesses.  And here I would respectfully

5   submit that Mr. Yan's version of the accounting method is

6   totally unbelievable.  First of all, for — it'd be totally

7   unworkable for Mr. Fu to instruct Mr. Yan to pay expenses.  I

8   mean how would they ever keep track of it?

9          There — there would have to be some — some way for —

10  to document these oral requests, and it'd be much simpler for —

11  for the money just to be put into the account for Mr. Fu to debt

12  disburse.  I think in — in Mr. Yan's deposition he had testified

13  that he was supposed to put money into the account and Mr. Fu

14  was supposed to withdraw the money.  I think that's consistent

15  with Mr. Fu- —

16          MR. ROMEO:  Your Honor, I have to object, because I

17  don't think he introduce the deposition at trial.  I think

18  referring to Mr. Yan's deposition testimony, when it's not in

19  evidence, is improper.

20          THE COURT:  Well, —

21          MR. CHU:  I believe that piece of testimony was on the

22  excerpts that Mr. Fu had asked the Court to read.

23          THE COURT:  Okay.  I'll — I'll check it.

24          MR. CHU:  Okay.

25          Mr. Fu's version, I think, makes practical sense.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 14 of 46

 1  It's a — it's — it's an easy system to implement.  Money goes

 2  in; Mr. Fu writes the checks for the construction costs out of

 3  the Bank of America account — account.  There's no controversy

 4  down the road.

 5          As far as credibility for these alleged charges for

 6  construction costs, I think there's a clear instance of Mr. Yan

 7  trying to charge Mr. Fu for a cost that was obviously not a

 8  construction — a Chenery construction cost.

 9          If the Court looks at Exhibit AA, there was the $8,000

10  charge on March 23rd, 2001 that Mr. Yan tried to impose on Mr.

11  Fu for an $8,000 clean-up cost or — or some sort of cost that

12  was attributable to 543 - 23rd Avenue.  Mr. Fu had the

13  documentation for that and Mr. Yan removed that charge on his

14  next accounting, Exhibit III.  That's the kind of problem that

15  would be engendered by having this sort of system where Mr. Yan

16  can claim that Mr. Fu asked him to pay this or that, and then he

17  can charge it to his construct- — construction costs.

18          That's the exact sort of problem that Mr. Fu's system

19  was designed to prevent.

20          THE COURT:  How much did Mr. Yan put into this

21  project?

22          MR. CHU:  Two hundred thirty-five thousand minus the

23  36,000 that he signed checks on.

24          THE COURT:  Why minus the 35,-?

25          MR. CHU:  Minus the 36,-, Your Honor.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 15 of
46

1          THE COURT:  Thirty-six.

2          MR. CHU:  Well, this gets to the second — this goes

3     into the second part of the accounting method.  According to the

4     accounting method, the informal accounting method that Mr. Fu

5     testified as to, checks that Mr. Yan wrote out of the Bank of

6     America account were not to be counted against the 300,000 that

7     he was supposed to put in.  It's — it's sort of a crude,

8     informal system, but it works.

9          Mr. — there were four nine — $9,000 checks that Mr. Fu

10    specifically had Mr. Yan sign.  He — Mr. Fu prepared the checks

11    made payable to himself.  But instead of just signing the check

12    himself, he went to the extra time and effort to have Mr. Yan

13    sign them.  Without some sort of extrinsic factor you would

14    think that's the strangest thing that ever happened.  Why, why

15    would you have another person sign a check that you had signing

16    authority to sign yourself?

17         Mr. Fu testified that, well, the reason he did that

18    was because if he signed the check himself that amount would

19    count towards the $300,000 contribution.  I asked Mr. Yan:  Why

20    did you sign that check when — when Mr. Fu could have signed it

21    himself?  And he came up with reasons that made no sense to me.

22         I think he said that, well, yes, Tony wanted to pay

23    the laborers with the money, so I signed the check for him.

24    Well, if Tony wanted to pay the laborers this money, he could —

25    Tony could have signed the check himself and used the money to

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 16 of 46

1   pay the laborers.  That made no sense to me.

2           He had no explanation at all as to why he would — he

3   would actually sign that check.  So I don't believe it.

4           THE COURT:  Okay.  You have five minutes, by the way.

5           MR. CHU:  I have five minutes?

6           THE COURT:  Yeah.  We started — you've gone 25

7   minutes.

8           MR. CHU:  The — the second piece of evidence as to

9   this signature-signing accounting method was Mr. Fu going to the

10  Toyota dealership with two checks.  If — if Mr. Fu had gone to

11  the Toyota dealership to buy a truck, why would he — why would

12  he use two checks to pay the dealer?  That's just the strangest

13  thing.  And they're two consecutive checks; they're executed the

14  same, same time, same date.  So I think that supports the

15  existence of this informal signature accounting method also.

16  Let me speed up.

17          Finally I think the — Mr. Yan has raised claims that

18  funds were embezzled or diverted.  Those — those claims are

19  total red herrings in this case.  First of all, I think the most

20  obvious piece of, I guess, contrary evidence that there was no,

21  no embezzlement is this.

22          Mr. Yan claims that Mr. Fu embezzled money that he —

23  he signed the check for himself.  He — he signed four $9,000

24  checks payable to Mr. Fu.  He knew full well that Mr. Fu is not

25  entitled to any pay for services on the project.  He signs a

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 17 of
46

1   check; then he claims that Mr. Fu embezzled the funds.  That

2   makes no sense.

3        Second, Mr. Yan never asked Mr. Fu for any sort of

4   accounting on — on the project.  And that makes sense under the

5   — under the way the deal was structured.

6        Mr. Yu- — Mr. Yan really didn't need to care how much

7   money was being spent on the project because he — he was capped.

8   He put in 300,000.  If Mr. Fu had to spend another half million

9   or one million it didn't matter to him.

10       Also Mr. Yan shouldn't be surprised that Mr. Fu was

11  using the partnership funds just to pay his credit cards.  Mr.

12  Yan knew that Mr. Fu was using his credit cards for construction

13  costs.  He admitted that.

14       I'll save — I'll save my remaining few minutes from

15  rebuttal, Your Honor.

16       THE COURT:  Okay.  Thank you.

17            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18       MR. ROMEO:  Your Honor, I want to mostly comment upon

19  the — on the evidence at the trial.  Most of our legal

20  contentions are in the brief, and I don't have anything to add

21  to those.

22       THE COURT:  Okay.

23       MR. ROMEO:  Let's talk, first of all, about the — the

24  licensing issue.  The statute in question is 7031, which says

25  that you shall not be compensated for an act or a contract for

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 18 of 46

1   performing general contracting services.  And we've stated in

2   our brief — I know that he has — Mr. Fu has taken the position

3   that, as an owner, that he some kind of an owner-builder

4   exemption.

5          But when you look through our brief, you'll see that

6   those are fairly limited in scope and they would not apply here

7   because we're building a multiunit structure for sale.  So I

8   don't think there's any dispute that owner — that an

9   owner-builder exemption wouldn't apply.

10         But what are the acts — what are the acts that

11  constitute general contracting in this case?  Well, there's a

12  number of pieces of evidence.  And let's start, first of all,

13  with the permits that were pulled for this project.

14         Mr. Fu was a bit evasive about what was on his hand- —

15  what was in his handwriting and what was his signature.  But

16  it's pretty clear in the major permits, the original permits

17  that were pulled for this project, that his com- — his company,

18  San Francisco Contractors Association, and his license number

19  appear on all of those permits starting in 2000 and going

20  throughout up until 2001, at some point — Mr. Yan testified that

21  — that Tony Fu continued to have permits prepared — or permit

22  applications prepared by designating Mr. Yan as an

23  owner-builder.

24         Second, Mr. Yan's — or Mr. Fu's testimony, again,

25  although he tried to be a bit evasive about it, was that he — he

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 19 of
46

1    had the primary responsibility — he eventually acknowledged that

2    he had the primary responsible.  And I also introduced his

3    deposition specifically discussing where he says that he,

4    quote/unquote, built the project, that Dennis Yan's role was to

5    put in the money and I'm going to build that project.

6         And those deposition cites are in the record, but just

7    to repeat them:  Pages 189 to 190; pages 170 to 171; and pages

8    191 to 192.  The specific line numbers are in the record.

9         We introduced an Exhibit III, his statement under

10   penalty of perjury in his document assigning his claim — proof

11   of claim in this case.  It says:  As a joint owner with general

12   contracting experience, I also had the primary responsibility

13   for hiring contractors and purchasing building materials for the

14   property.

15        Mr. Yan doesn't have any substantial building

16   experience.  He wasn't a licensed contractor.  And Mr. Fu

17   acknowledged that he was acting essentially in the scope and

18   place of a general contractor in this project.

19        So he comes within the statute and he doesn't come

20   within the owner-builder exemption.  And the licensing thing is

21   not merely a — a mere technicality.  It's an important public

22   policy.  The California Supreme Court case cited in our brief

23   says:  Yes, it doesn't, in fact, lead to a sometimes harsh

24   result, but this is the law; this is what the legislature wants.

25        And Mr. Fu was acting — acting as a general contractor

1    to the point that, for example, as far as the expenses that were

2    paid in this case, Mr. Fu was the one that was keeping track of

3    them.  Mr. Fu was identifying those people that Mr. Yan was

4    supposed to pay to meet the expenses on this project.

5            I think that the — I think that the licensing issue is

6    established.  We do have the license history.  And it was

7    interesting that Mr. Yan — or Mr. Fu was evasive, both in his

8    deposition — evasive and untruthful in his deposition and in his

9    testimony on the stand about his license status.  He insisted

10   repeatedly that he had inactivated his license in 1999 and that

11   he had never used it again after a project with Florence Fung

12   (phonetic).

13           Well, clearly that wasn't true because we could see in

14   the licensing record, Exhibit EEE, that Mr. Fu did, in fact,

15   file an application to inactivate his license in — in September

16   1999, and then he reactivated it in October 1999, something like

17   six weeks later.  And so he did have an active license, although

18   he denied that fact.

19           And the reason he denies that fact is he's not very

20   comfortable with the idea that he was, in fact, acting as a

21   general contractor on — on this particular project.  We think

22   the licensing defense is established in this case.

23           With regard to the contract with Mr. Fu and Mr. Yan, I

24   think we can all agree that that contract is not a comprehensive

25   document.  It clearly doesn't have everything in it that it

Case: 05-03257    Doc# 52    Filed: 06/16/06    Entered: 06/16/06 00:49:50    Page 21 of
46

1   should have or that the parties, by their own testimony, said

2   that they anticipated.  It's a pretty simple agreement.  It's

3   bare bones, but — and I think — I agree with Mr. Chu that in

4   large part what the contract says is for is undisputed.

5          The important point I'd like to make about that

6   contract is this:  Is it — it is a contract between Mr. Fu and

7   Mr. Yan.  And Mr. Wong's contract, as you recall from phase one,

8   they deliberately executed an agreement, a subsequent agreement,

9   on October 9th, 2000, 11 days before this new agreement, that

10  terminated the Winky Wong contract.

11         So I don't think that the Winky Wong contract is

12  something that draws — that gets pulled into an interpretation

13  of a new agreement between Mr. — Mr. Fu and Mr. Yan.

14         Moreover, I believe that if you look at that contract,

15  that that contract — that contract is a conditional, not an

16  absolute grant of ownership.

17         Mr. Fu and Mr. Yan both have promises to perform in

18  order for that contract to be fulfilled.  I do not think Mr. Fu

19  can come in to court and say that because that contract was

20  signed that — that he simply vested a 25-percent ownership in

21  that property on the day it was signed.

22         I believe that the parties' testimony and the contract

23  itself contemplated that Mr. Fu would, in fact, have to perform

24  and provide legal consideration for the vesting of that

25  ownership.  And in this case, because of the licensing defense

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 22 of
46

1    and because of some other matters that we'll get to, we don't

2    believe that he did so.  We don't believe that he performed that

3    contract, and we don't — we submit that the grant of ownership

4    is conditioned upon receipt of legal consideration.  That did

5    not happen in this case.

6            With regard to the matter of proceeds, I think that

7    the proceeds in this case can be understood to be the seller's

8    proceeds, not the gross price of the — the project.  Mr. Fu

9    tried to put an interpretation on that, but what it really came

10   down to, if you listen to his testimony pretty carefully, was

11   that — I think that what he was testifying to was some kind of

12   an expectation.  I'll return to the matter of proceeds in a — in

13   a minute.

14           What did the contract — what did the contract create?

15   I think it created, and the relationship contemplated, at least

16   a joint venture, possibly a partnership.  They both — there's

17   been testimony, you know, that they have used the term

18   "partner."  And, you know, on its face, to look at it, one might

19   say that:  Yes, this creates at least a joint venture, possibly

20   a partnership.  In either case they have a fiduciary duty as

21   joint venturers or partners under California law.

22           This comes to the matter of the embezzlements of the

23   San Francisco building professionals that count.  I want to talk

24   about, first of all, the account was set up and the — the

25   agreement, I think everybody agrees here, the construction

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 23 of
46

1  costs, meaning what Mr. Fu had told me out of his own mouth on

2  the stand in this case, it means:  Labor, materials, the — the

3  common — I think a common conception, no special — no special

4  meaning, apart from what people in general in the industry would

5  consider construction costs where the agreement did carve out

6  something that wasn't a construction cost.  It was the condo

7  lawyers' fees, the engineering fees, things of that nature that,

8  although they were hard costs, the parties deliberately excluded

9  those from construction costs.

10      Mr. Fu has also insisted that the only contributions

11 that count with respect to the San Francisco building

12 professionals account are Mr. Yan's deposits into the account.

13 It's undisputed that he deposited $235,000 into that account.

14      Mr. Yan has also asked for and substantiated credit

15 for a total of $367,537 in total construction expenses.  Mr. Yan

16 summarized those expenses in Exhibit KK and further

17 substantiated those by reference to Exhibit LL.  If you read the

18 two together, it's a perfect seamless record of what — what

19 expenses were paid by Mr. Yan.

20      By the way, I don't recall, in cross-examination,

21 those particular exhibits ever being questioned or impeached in

22 the least, except in the one instance, which was kind of ironic,

23 which is the $4,000 check to Ming Fong, which had the payee —

24 that was the courtesy check on the AmEx account.  It had the

25 payee written in someone else's handwriting besides Mr. Yan.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 24 of
46

1        Ironically, Mr. Yan had that entered on page 2 of

2   Exhibit LL as a flooring expense.

3        How did Mr. Yan know what expenses to pay?  Well,

4   because Mr. Fu was the general contractor, and he admitted that

5   he was keeping track of the expenses.  Mr. Yan was paying what

6   Mr. Fu told him to do.  Therefore, it's disingenuous of Mr. Fu

7   to come in and testify that only deposits in the account count

8   towards a credit towards Mr. — Mr. Yan's 300,000.  It's

9   contradicted by a number of other pieces of evidence.

10        Number one is not only did Mr. Fu say that he directed

11   and told Mr. Yan what expenses were to be paid, but the interim

12   accountings that were submitted to Mr. Fu in the course of

13   construction, those being Exhibits HH and II respectively, dated

14   February and September 2002, contain items that were paid

15   outside of the SFBP account.

16        And Mr. Yan was helpful enough in Exhibit LL to also

17   indicate, in the last two columns of his spreadsheet, those

18   items of expenses which were — appeared in those interim

19   accountings in 2002 and are also on his spreadsheet and which

20   also include, among them, items that weren't paid through the

21   SFBP account.

22        So the notion that there's an oral agreement that only

23   these deposits count is not supported at all in the evidence.

24   This is — this is Mr. Fu backing into some kind of story to

25   hammer down the amount that he thinks Mr. Yan contributed to

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 25 of
46

1   this project.

2        The — as I said, if you look at these two exhibits,

3   they were never impeached.  They're very clear.  And it's very

4   interesting that on the other side we never got a clear

5   accounting from Mr. Fu as to what he spent on the project, not

6   necessarily — not maybe that it was necessary, but he's — he

7   brought a stack of receipts.  And yet after — after years of

8   dispute between these two parties he's never provided an

9   accounting to prove that he actually really put in any money

10  into this project.

11       And, in fact, on redirect, when Mr. Chu was asking him

12  about it after we had presented Exhibit QQ and — which was an

13  abstract of a number of extremely questionable items in his — in

14  his stack of receipts, which he says was for the Chenery

15  project, he admitted in questions by his own lawyer that there

16  is a factor of at least 25-percent error rate in those receipts.

17       He said:  Well, maybe it wasn't 400,000; maybe it was

18  more like 300,000 that he actually spent out of — out of his own

19  pocket, which leads to an interesting point, because Wei Suen in

20  his testimony said that he paid Mr. Yan — Mr. Fu $400,000 for

21  the assignment of this contract.

22       So it makes me think that poor Mr. Suen if, in fact,

23  he paid that money kind of got taken a little bit because he's

24  paid 400,000 when there was really 300,000 there.

25       And, by the way, Mr. Suen testified that he had those

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 26 of 46

1  checks available, never produced them. This is characteristic

2  of their case constantly, is that there's always a failure to

3  produce stronger, available evidence. He didn't do it with his

4  construction accounting; he didn't do it with substantiating

5  that, as — as alleged in his proof of claim that for

6  consideration he took an assignment of this contract from Tony

7  Fu.

8       The other debit that they seek to impose against Mr.

9  Yan on the accounting is the $36,000 that was supposedly paid in

10 satisfaction of an obligation for the sale of a lot at 190

11 Majestic Avenue.

12      The first — the first thing that I'd like the Court to

13 note is that, as Mr. Yan testified and there was no impeachment

14 on this whatsoever, the first time Mr. Yan heard about this

15 Majestic deal and those four checks was in this litigation. In

16 June 2005 when this proof of claim was filed with the Court Mr.

17 Fu was deposed and testified about it.

18      It sounds so much like this, the pattern that we saw

19 in the first phase of the trial where somewhere in the middle of

20 litigation a surprise theory about a loan in Hong Kong with a

21 briefcase full of cash pops up and suddenly becomes the focus of

22 the litigation. This is just another example.

23      There is no written agreement that Mr. Fu could

24 present us with that dealt with this Majestic. There's no

25 comment in — when he received these accountings from Mr. Yan

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 27 of 46

1   there's no comment on those accountings about these — these

2   items, these checks are — are due to Majestic.

3            And, by the way, there's no comment on these

4   accountings about, gee, these don't count because you paid them

5   outside the SFBP account.  It's pretty clear he went through

6   these accountings.  He numbered each line.  He knows what's in

7   those accountings.  He never one in writing or verbally objected

8   that, geez, you're paying these expenses outside the SFBP

9   account.

10           But to return to Majestic, there's no written

11  agreement.  We know that Mr. Yan both — Mr. Yan bought a lot of

12  Majestic in 1998.  He sold it in 1999.  Somehow in 2001 for some

13  unexplained reason he's paying four $9,000 to Mr. Fu totaling

14  $36,000 for some obligation relating to a lot that sold three

15  years before.  That doesn't make any sense.  It's, on its face,

16  a ridiculous story.

17           There's another reason that I would question those —

18  those checks.  If that was their deal, why didn't he simply pay

19  him in one $36,000 check.  The money was certainly there in the

20  account.  But I'd asked Mr. Fu about that, because there's been

21  a lot of stories about those $9,000 checks.  It was his

22  deposition testimony that, well, $9,000 was paid for me.  And —

23  and he tried to evade that testimony in trying to explain that.

24           Then his second story was, well, we wrote "pay" on

25  that because Mr. Yan wanted it to appear as if I was getting

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 28 of
46

1    paid a salary, but that was really for Majestic.

2            And Mr. Yan's testimony on those was that because Mr.

3    Fu was the payee of the check, Mr. Fu asked Mr. Yan to sign the

4    checks, which sounds like a logical thing to do under the

5    circumstances of a partnership.  If I'm getting paid some money

6    out of the account, you better sign the checks.  It's a more

7    logical and cleaner explanation.

8            And there's a final problem — two final problems is

9    that there aren't four $9,000 checks; there's six $9,000 checks.

10   And it simply doesn't explain:  What are the other two checks

11   for?

12           Well, I was able to establish that through Mr. Fu's

13   own testimony.  And that was that — I asked him, in running this

14   project, is this — it was his policy to pay for labor as it was

15   incurred?  And he said, "Yes."  And the dates of those checks

16   correspond to activity on that project.  They start in June

17   2001.  They go for four months, roughly spaced months.  There's

18   a slight hiatus.  And then in January and February they pick up

19   again.

20           Well, that happens to — to coincide with the flow of

21   work.  And I think that what those checks really are, those six

22   checks, are exactly what Mr. Yan said that they were requested

23   for, which was pay for the workers.

24           Now actually we don't have any back-up receipts for

25   payment to the workers for all of those.  And it's even more

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 29 of
46

1   questionable, because if you look through Exhibit MM, you can

2   see that many of the laborers and workers on this project were

3   paid by checks, which is why Mr. Yan, in totaling it up in that

4   box on Exhibit NN, puts 54,000 as a questioned expense.  There's

5   never been any kind of back-up as to whether those were really

6   for pay.  They certainly weren't for Majestic.  Majestic is a

7   fantasy that we brought in late in this litigation.

8           THE COURT:  You have about eight minutes.  I want you

9   to get to the question of the — what "proceeds" means.

10          MR. ROMEO:  Well, —

11          THE COURT:  You talked about it briefly.  If you have

12  anything more to say, I want to make sure you get to that.

13          MR. ROMEO:  Well, "proceeds" means — in an ordinary,

14  reasonable understanding, it means the proceeds from the sale of

15  the property.

16          And let's take — let's take the matter of the loans,

17  the mortgages that were paid off.  Mr. Yan wasn't obligated

18  under the agreement, and there was no testimony that he had to

19  pay off those mortgages.  He did, in fact, pay off those

20  mortgages in order to make the project move forward.  He paid

21  them off in December 2003 during the Santiesteban escrow in

22  order — due basically to  his frustration that he couldn't get

23  the lenders to sign consent to the — to the subdivision map.

24          And so he paid them off so as to bypass those lenders.

25  Under those circumstances, had the property sold, they would

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 30 of 46

1    have — had the lenders, in fact, consented, the property simply

2    would have sold and the proceeds would have been put into escrow

3    net of those mortgages.

4            For Mr. Fu to now contend that he should have the

5    benefit of having those mortgages paid off is to simply create a

6    windfall for Mr. Fu.  Mr. Fu is — took this — took this property

7    and made his deal with Mr. Yan subject to whatever Mr. Yan's

8    interest was in this property.

9            THE COURT:  Now I haven't gone over all the evidence

10   again from phase one, but I remember — or maybe — maybe

11   incorrectly — that Mr. Yan said in phase one that the note that

12   was involved in phase one was really a — an embodiment of the —

13   of Mr. Fu's partnership interest in this property.

14           MR. ROMEO:  I understand.  And —

15           THE COURT:  Am I recalling it correctly?

16           MR. ROMEO:  Well, you know, he — he said that in

17   actuality what happened was — Mr. Chu wasn't very clear about he

18   — that he wanted to show some sort of ownership interest in the

19   property and, therefore, he asked for his note to be given and —

20   in September of 2002.  I was coming to that, because it's

21   interesting that the last accounting between the two parties is

22   September 1st, 2002.  And 17 days later this note is recorded —

23   is executed and recorded — or 19 days later.

24           THE COURT:  What I'm getting at — all I'm getting at

25   about it is does the amount of the note cast any light on how

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 31 of
46

1   the proceeds were expected to be divided?

2          MR. ROMEO:  Yes, it does, because it would be

3   one-quarter of the — of the proceeds of the property, according

4   to whatever — the range of values that they had discussed.

5          And I believe Mr. Fu said that 2.2 million in this

6   phase.  I believe it was 2.2 or 2.3 million in the first phase

7   of the trial.

8          THE COURT:  And how was it — I recall — and that's

9   roughly what these all sold for, right?

10         MR. ROMEO:  Eventually it sold for 2.3 million.

11         THE COURT:  Yeah, okay.  And how much was the note?

12         MR. ROMEO:  Four hundred and fifty thousand.

13         THE COURT:  Which is a little less than a quarter of

14  the gross, not the net, or is it a quarter of the net?

15         MR. ROMEO:  Well, it's a quarter of 1.8 million, which

16  I think was one of the first figures that they discussed.

17         THE COURT:  But that would have been a quarter of the

18  gross, not the net.

19         MR. ROMEO:  Yes, I understand.  But that was also in

20  relating — the 1.8 million was in relating to the Winky Wong

21  deal.

22         I know I've just got a few more minutes, but I want to

23  talk about it.  We've beat it a little bit to death on — but I

24  believe that because they are fiduciaries, what Mr. Fu did with

25  this account is unconscionable and has to be redressed and is a

1   breach of the contract on which it's being sued upon.

2          The contract says explicitly that the money that's to

3   be contributed by Mr. Yan is to be used for construction costs.

4   And Mr. Yan also testified — and it's not disputed — that he

5   asked Mr. Fu to build units of — of a, quote, average quality of

6   construction, not cheap construction, not high-end construction,

7   but average construction.  Never disputed by Mr. Fu.

8          Now when Mr. Fu goes and raids this account for

9   payment of things like an obligation to Ming Fong I don't know

10  what — we will never find out, probably, whatever the money was

11  paid for for Ming Fong.  But Ming Fong, a restauranteur in China

12  is paid $80,000 in a space of five weeks supposedly to work full

13  time for a year, six days a week, on a project.  And Mr. Yan has

14  met him twice on social occasions.

15         Mr. Yan is visiting the project on a more or less

16  daily basis, and he's never encountered this person, Ming Fong.

17  Ming Fong's payments don't correspond to any cycle of labor

18  provided to the project.  There's simply three huge checks sent

19  to him — given to him and cashed by him in a space of about five

20  weeks.  That's one problem.

21         The second problem is the credit cards.  And — and

22  other payments.  We had a payment to a jewelry store in 2001.

23  We had —

24         THE COURT:  Yeah, I'm aware of all that.

25         The question here really is whether this is a

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 33 of
46

1   situation in which he's to account for the fund, or whether he's

2   just responsible for creating the building without demanding any

3   more of Mr. Yan.

4           MR. ROMEO:  Well, their position's always been,

5   lookit, he — he entered into a contract.  He's supposed to pay

6   300,000.  If he pays 300,000 it's none of his business what

7   happens.  In other words, it's like even if I — even if I admit

8   I stole the money, there's no hard so, therefore, there's no

9   foul.

10          THE COURT:  Well, as long as the building is made.

11          MR. ROMEO:  But I don't agree with that, and I'll tell

12  you why.  Number one is —

13          THE COURT:  Okay.

14          MR. ROMEO:  — number one is Mr. Yan ended up spending

15  more than 300,000.  He spent 367,000.

16          THE COURT:  Okay.

17          MR. ROMEO:  So, you know, it isn't a no harm, no foul.

18          Number two is Mr. Fu and Mr. Yan both testified that

19  there was a great deal of dispute about change orders.  When Mr.

20  Yan wanted something of a better quality, Mr. Fu insisted that

21  Mr. Yan pay some extra, which wouldn't have been necessary had

22  he not been raiding this $300,000 account.

23          Number three is undisputed, that Mr. Yan asked Mr. Fu

24  to building a project of average construction.  Had 150,- or

25  $170,000 not leaked out of this account, then we would not have

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 34 of
46

1   had average construction.  We probably could have had high-end

2   construction, better finishes, hardwood floors, all of that

3   stuff.  So you can't blithely say:  It's okay.  I took the money

4   because there's no damage.

5           It's unconscionable to take this money to make a deal

6   with somebody to create a fund for $300,000 for construction

7   costs and then turn around and say:  No harm, no foul.  There is

8   harm.  They could have had a higher-end construction.  They

9   could have a higher net proceeds.

10          And the fact that they were under budget constraints

11  is apparent from the fact that they argued over side deals and

12  change orders.

13          THE COURT:  Okay.  I know what they're seeking here.

14  What are you seeking in relief?

15          MR. ROMEO:  It's pretty much laid out in our brief,

16  Your Honor.

17          Number one, number one, we believe that the licensing

18  defense is a good defense to Mr. Fu's claims, period — or Mr.

19  Suen's —

20          THE COURT:  Do you want to pay nothing on the Suen

21  claim?

22          MR. ROMEO:  We believe that it's illegal consideration

23  for the contract, Exhibit D.  If the Court is —

24          THE COURT:  Is there anything — is there any other

25  relief you're seeking?  Are you seeking relief against Mr. Fu?

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 35 of
46

1        MR. ROMEO:  No.  No.  But we are saying that if he

2   wants — if he wants to sue on this contract he has to account

3   for basically —

4        THE COURT:  But he assigned his rights —

5        MR. ROMEO:  Okay.

6        THE COURT:  — to Mr. Suen.  So the whole contract is

7   with Mr. Suen.  And you're not seeking any relief against Mr.

8   Fu?

9        MR. ROMEO:  No.

10       THE COURT:  Okay.

11       MR. ROMEO:  We're — this is purely defensive.

12       THE COURT:  Okay, I understand.

13       MR. ROMEO:  Okay.

14       THE COURT:  That's all I'm asking.

15       MR. ROMEO:  But they both take subject to these

16  defenses.  We — he should — he should, number one, — number —

17  well, we've discussed what 25 percent of the project is in the

18  brief.

19       THE COURT:  Oh, I understand all your defenses.  I'm

20  just —

21       MR. ROMEO:  But I — but I believe that if he embezzled

22  this money out of the construction account, he basically took

23  his profits upfront.  He went and carried his own personal

24  expenses, and I think that he — he — he should have to put that

25  money back.  This should have to be put back as a credit against

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 36 of
46

1    the contract.

2           If you don't sustain the licensing defense, then we

3    start counting money.  Then we have to put —

4           THE COURT:  Okay.  Let me — what you're seeking here —

5    I'm just trying to get the whole thing.

6           In phase one you said basically this note relates to

7    this property; it doesn't relate to a cash loan.

8           MR. ROMEO:  Correct.

9           THE COURT:  And with respect to this — the loan, as it

10   relates to this property, you're saying there's no lawful — to

11   me you're saying that loan was meant to represent what was

12   expected to be due on this partnership or joint venture

13   agreement, and there was no lawful consideration for it?

14          MR. ROMEO:  Correct.  And that's why —

15          THE COURT:  And you're not seeking affirmative relief;

16   you're seeking just to pay nothing.  That's all I'm asking.

17          MR. ROMEO:  Well, no.  To the extent that if the Court

18   finds — if the Court finds that the — that the $450,000 loan —

19   or note at issue in phase one is, in fact, Mr. Fu's liquidated

20   interest in the project which comes two weeks after the

21   accounting, then — we've said in our before — if it's a lien

22   based on illegal services, it's unenforceable under Business —

23          THE COURT:  Yeah, I understand that.

24          MR. ROMEO:  — Business — so I guess to the extent that

25   we want affirmative relief, we would have the lien removed from

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 37 of
46

1    the proceeds, just as, you know, the quiet title —

2           THE COURT:  All I'm asking:  You're not seeking to

3    recover dollars from Mr. Fu.  You're just seeking to defend all

4    these claims, the claim on the note and the claim against the

5    property?

6           MR. ROMEO:  We're seeking to get rid of those claims.

7           THE COURT:  Okay.

8           MR. ROMEO:  But to the extent that — that we need — we

9    should recover the money he embezzled.  If the — if you get past

10   the licensing defense, then we're starting to build all kinds of

11   credits against any recovery that he's claiming.

12          THE COURT:  I understand that, too.

13          MR. ROMEO:  Okay.

14          THE COURT:  And those — and you're arguing that when

15   he assigned the claim to Mr. Suen, he assigned it with the warps

16   and with the defenses and offsets?

17          MR. ROMEO:  Mr. Suen testified he knew about the

18   lawsuit.

19          THE COURT:  Yeah, okay.

20          MR. ROMEO:  Oh.  Can I make one final comment about

21   this Majestic deal, Your Honor?  I know I'm taking a little more

22   time, but you robbed me with some questions.

23          THE COURT:  I did.  Just speak quickly.  That's all.

24          MR. ROMEO:  The — the final piece of evidence on those

25   Majestic loans or that Majestic deal is that I asked Mr. Fu

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 38 of
46

1    about his cross-complaint and his proof of claim.  And it kept

2    on coming back as $60,000, the amount he believed the account

3    was underfunded.  It should have been — had he had any real

4    good-faith belief in this Majestic deal, it should have been a

5    $96,000 cross-complaint in state court.  It should have been a

6    $96,000 proof of claim in this Court.

7              THE COURT:  Okay.  Mr. Chu.

8        CLOSING ARGUMENT IN REBUTTAL ON BEHALF OF PLAINTIFF SUEN

9              MR. CHU:  Your Honor, I would —

10             THE COURT:  Is your client seeking relief against Mr.

11   Fu?

12             MR. CHU:  No.  No, Your Honor.  No.

13             First of all, I would —

14             THE COURT:  He's only the assignee of this claim?

15             MR. CHU:  He's the assignee.  That's correct.

16             THE COURT:  The witness and the assignee.

17             MR. CHU:  And — and he's never purported to be a *bona*

18   *fide* purchaser — purchaser type of assignee, taking free of

19   claims.  I mean —

20             THE COURT:  Mr. Suen?

21             MR. CHU:  That's correct.  I don't — he —

22             THE COURT:  But you have no claims against Mr. Fu?

23             MR. CHU:  No.  No, Your Honor.

24             THE COURT:  He's assigned all his claims to Mr. Suen?

25             MR. CHU:  That's correct.

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 39 of
46

1　　　　THE COURT:  Okay.

2　　　　MR. CHU:  I object to any — any argument to the effect

3　that there was some sort of problem with the quality of

4　construction with this project, that there was no evidence at

5　trial as far as any quality issues.  There was no evidence at

6　trial as to any dissatisfaction with the end result.  The end

7　result yielded a gross price of two point something million.  It

8　couldn't have been that — that bad.

9　　　　To the extent that Mr. Fu was sloppy in how he handled

10　the partnership money, that doesn't mean he embezzled it.  If he

11　advanced for construction and paid himself back by writing

12　checks to his personal cards — I wouldn't have done it that way,

13　but that doesn't necessarily mean he embezzled any money or he

14　did anything wrong.  There is no evidence to that effect.

15　　　　The end result was that Mr. Yan get exactly what he

16　bargained for.  He put in less than what he was supposed to put

17　in.  He got back a completed condominium project according to

18　the plans and specifications that — that they agreed upon.

19　　　　We didn't bother — there was no dispute as to the

20　quality so we did not put in our evidence as far as how — how

21　nicely this project was finished.  So I would object to any

22　reference that the — the end result was — was compromised

23　because of the financing mismanagement.

24　　　　Now the — as far as credibility, I think a lot of this

25　case turns on credibility, Your Honor.  The — Mr. Yan has

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 40 of 46

1  impugned Mr. Fu's credibility.  I think the major item was Mr.

2  Fu testifying about not knowing Ming Fong.  Well, that's such an

3  outrageous lie that, you know, Mr. Fu knew he wasn't going to

4  deceive anyone.  No one forgets who he — a person you write a

5  $35,000 check to.  I don't care who it is.  And they knew that.

6          Mr. Fu has always been straightforward.  He's

7  testified honestly.

8          Mr. Yan, however, he comes in and testifies that he

9  never made a full demand for payment upon Augustine Fallay in

10 phase one.  Well, two seconds later he's shown a letter that he

11 wrote to Augustine, Augustine Falley, making full payment of the

12 note.  I mean, come on.

13         You have Aluna like — Aline Laguna coming in and

14 telling — telling the Court that Mr. Yan told him the owner was

15 out of town.  Right.  He was the owner.

16         You have Mr. Brodie, the notary, coming in and

17 testifying that he would never notarize a document signed in

18 blank.  Mr. Yan testified that that deed of trust was blank when

19 he signed it.  Mr. Yan's testimony is totally incredible.  He —

20 he testifies, he says what he thinks he needs to say to suit his

21 own purposes.

22         His exhibits, as far as claiming all these expenses on

23 Chenery, for all we know and for all we suspect he pays expenses

24 on his own project, 543 - 23rd.  He writes Chenery on it.  He

25 tried to do that with one $8,000 payment.  I think he did it

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 41 of
46

1    with all the rest.  Anyway, —

2          THE COURT:  Okay.  I have a question for you, too,

3    about remedies and what you're seeking.  Your client is seeking

4    what, exactly?

5          MR. CHU:  Mr. Suen is seeking to enforce his — the

6    assigned agreement with Mr. Yan.  Mr. Suen seeks 25 percent of

7    all the remaining proceeds of the sales of the condominium

8    units.  Mr. Suen [sic] is also seeking the additional $101,000

9    that Mr. Yan is short on the October 18th, 2000 agreement.

10   That's it.

11          That was Mr. Yan's —

12          THE COURT:  That he — that he contributed less.

13   You're saying Mr. Yan contributed less than 300,000?

14          MR. CHU:  That's correct.  He contributed a total of

15   199,-.

16          THE COURT:  What if I were to find — and I haven't

17   decided this yet — but what if I were to find that this note was

18   really a — a manifestation of this interest and not a separate

19   loan.

20          I have all these parties now, this interest that's

21   been divided up in such strange ways.  What happens?

22          MR. CHU:  Well, if the note were a manifestation of

23   the partnership interest, which we dispute vehemently, —

24          THE COURT:  I know.

25          MR. CHU:  — Mr. Suen would be entitled to payment on

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 42 of 46

1   the note as opposed to Ms. Chen.  And along with the hundred and

2   — along with the 101,000 contribution that Mr. Yan was short on

3   — but I — I think we argued it at phase one.  The 450,- was not

4   representative of what the value of the property was at the

5   time.

6           Even before the note was executed, there was evidence

7   to the effect that Mr. Fu was offered a $500,000 buyout for the

8   property as is in the condition it was in, incomplete.

9           THE COURT:  Okay.  I don't need —

10          MR. CHU:  Yeah.

11          THE COURT:  I don't need any more about that.

12          Okay.  Thank you very much.

13          MR. FU:  Your Honor, Your Honor?

14          MR. ROMEO:  Thank you, Your Honor.

15          MR. FU:  Can I have one minute?

16          THE COURT:  Nobody is seeking relief against you, and

17  you have no claim of your own.

18          MR. FU:  I want to put in the record one minute that

19  Mr. Romeo was unethical, intentionally misleading —

20          THE COURT:  Wait a minute.  You don't have a — you

21  aren't involved in this action.  You are not a defendant or a

22  plaintiff.

23          MR. CHU:  He — he is a defendant, Your Honor.

24          THE COURT:  Again- — by — in what claim?

25          MR. ROMEO:  A cancellation, quiet title claim in the

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 43 of
46

1   removal action, is —

2           THE COURT:  A cancellation, quiet title claim.

3           MR. CHU:  The first thing that happened I think was

4   Mr. — Mr. Yan sued —

5           MR. ROMEO:  Mr. Yan sued Mr. Fu —

6           MR. CHU:  — Mr. Fu.

7           MR. ROMEO:  — and Mrs. Chen based on a cancellation

8   quiet title —

9           THE COURT:  But his interest has been assigned to Mr.

10  Yuen.

11          MR. ROMEO:  That's what I understand.

12          THE COURT:  Suen.  Well, I'm sorry.

13          MR. ROMEO:  Suen.

14          MR. CHU:  Well, I'm sorry.  Suen.  Yeah.

15          MR. FU:  So I can't say anything?

16          THE COURT:  Well, I don't — I mean what claim do you

17  hold?  Did you assign your in- —

18          MR. FU:  No.  I just want to testify something that

19  was wrong —

20          THE COURT:  Well, you can't — you testify as a

21  witness.

22          MR. FU:  Thank you.

23          THE COURT:  You argue as a party.  And I don't know

24  that you have an interest in this anymore.

25          MR. FU:  Thank you.  Thank you, Your Honor.  I — I —

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 44 of 46

1          THE COURT:  And nobody is seeking relief against you.

2     And, as I understand, you gave your entire interest in this

3     partnership to —

4          MR. CHU:  Mr. Suen.

5          THE COURT:  — Mr. Suen.  Is that right?

6          MR. FU:  Yeah, that's right.  I —

7          THE COURT:  Okay.  Then you're not a party.

8          MR. FU:  Thank you.

9          THE COURT:  Okay.

10          MR. FU:  I wanted to testify.

11          THE COURT:  I wanted to make sure nobody was — the

12     reason I asked of Mr. Romeo, when you asked to — to argue, is I

13     was trying to find out whether they were trying to get money

14     back from you personally or just defend this action.  And his

15     answer made that quite clear, and that's no relief sought

16     against you.

17          MR. FU:  But he misstate — misstate the material fact

18     for —

19          THE COURT:  Well, that's for the other parties to

20     argue.  You're — as a witness, you just do your best and let

21     them do their best.  Okay.

22          MR. FU:  Thank you, Your Honor.

23          THE COURT:  All right.  Thank you.

24       (Trial was adjourned at 12:09 o'clock p.m.)

25                            —o0o—

Case: 05-03257   Doc# 52   Filed: 06/16/06   Entered: 06/16/06 00:49:50   Page 45 of
46

```
State of California              )
                                 )    SS.
County of San Joaquin            )
```

       I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

       I further certify that I am not a party to nor in any way interested in the outcome of this matter.

       I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

                           Susan Palmer
                           Palmer Reporting Services

                           Dated June 13, 2006