1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              (SAN FRANCISCO DIVISION)

4    In re:

5    DEMAS WAI YAN aka DENNIS YAN,        Case No. 04-33526

6                                         Chapter 11

7                                         San Francisco,California
                                          November 30, 2005
8          Debtor.                        9:39 a.m.
     _____/

9    DEMAS WAI YAN aka DENNIS YAN,

10         Plaintiff,

11       v.                               A.P. No. 05-3257

12   DONG FU, aka TONY FU, et al.,

13         Defendants.

14   _____/

15   WEI SUEN,

16         Plaintiff,

17       v.                               A.P. No. 05-3257

18   DEMAS YAN, et al.,

19         Defendants.
     _____/

20   STELLA CHEN,

21         Plaintiff,

22       v.                               A.P. No. 05-03236

23   DEMAS WAI YAN aka DENNIS YAN,

24         Defendant.

25   _____/

1                              **VOLUME I**

2                              **PHASE 2**

                 TRANSCRIPT OF TRIAL PROCEEDINGS

3

4            BEFORE THE HONORABLE THOMAS CARLSON

             UNITED STATES BANKRUPTCY JUDGE

5

6 APPEARANCES:

7 For the Debtor:           LAW OFFICES OF MARK J. ROMEO

                        BY: MARK J. ROMEO, ESQ.

8                        130 Sutter Street, 7th Floor

                       San Francisco, California 94104

9

10

   For Wei Suen:             CORPORATE COUNSEL LAW GROUP

11                       BY: JOHN CHU, ESQ.

                      505 Sansome Street, Suite 475

12                       San Francisco, California 94111

13

14 For Tony Fu:               TONY FU, pro se

15

16 For Stella Chen:         STELLA CHEN, pro se

17

18 Court Recorder:          JANE GALVANI

                      GORDON HOM

19                       UNITED STATES BANKRUPTCY COURT

                      235 Pine Street

20                       San Francisco, California 94104

21

22

   Transcription Service:    Jo McCall

23                       Electronic Court

                      Recording/Transcribing

24                       3946 Pyle Avenue

                      Santa Rosa, California 95407

25                       Telephone: (707) 545-1838

1                          I N D E X

2

3    Debtor's Adverse Witness:  Direct  Cross  Redirect  Recross

4    Wuen, Wei

5          By Mr. Romeo            11                  24
                                                        27
6
          By Mr. Chu                      22                    26
7                                                               30
     Debtor's Witnesses:
8
     Tjoe, Maoe K.
9
          By Mr. Romeo            32
10
          By Mr. Chu                      38
11

12   Plaintiff's Witnesses:

13   Fu, Tony

14          By Mr. Romeo                  40

15

16

17

18

19

20

21

22

23

24

25

4

E X H I B I T S

Debtor's Exhibits:                                                    Evid.

ZZ    Application for Building Permit                    39G

CCC   Alarm system permit                                39

EEE                                                      46

AAA   Original Electrical Permit                         51

BBB Plumbing and mechanical permit                       52

MM    Copies of checks for expenses of Chenery
      Street project                                     95

PP    Bank Statements                                    96

VV    Defendant's responses to interrogatories           98

III   Assignment of Proof of Claim                       98

EEE   State Contractor's License Board Certificate       99

HH and II  - Two accountings by Mr. Yan                 137


Plaintiff's Exhibits:

119   Tapp Architectural Report                         134

1          P R O C E E D I N G S

2   November 30, 2005                          9:39 a.m.

3                        —oOo—

4          THE CLERK: All rise.

5          THE COURT: Please be seated.  Good morning.

6          ALL COUNSEL: Good morning, Your Honor.

7          THE COURT: Okay.  You probably ought to state

8   your appearances.

9          MR. ROMEO: Good morning, Your Honor, Mark Romeo

10  appearing for the Debtor, Demas Yan.  Demas Yan is also

11  present.

12         MR. CHU: Good morning, Your Honor, John Chu for

13  plaintiff, Wei Suen.  Mr. Suen is present in court.

14         THE COURT: Okay.

15         MR. CHU: I think Mr. Tony Fu is in here pro per

16  as well.

17         THE COURT: Okay.

18         MR. CHU: And for the record, Stella Chen is also

19  present in court.

20         THE COURT: Okay.  Do you have any preliminary

21  matters?

22         MR. ROMEO: Well, Your Honor, I think we need to

23  discuss a little bit about the order of proof this morning.

24  The remaining issues in Phase 2 have to do with the

25  contract for the 25 percent ownership of the proceeds.  I'm

1  under the assumption that because it's their breach of

2  contract action that they need to put on their prima facie

3  case for breach of contract first and then we would proceed

4  with any defensive matters that we have with that. That's

5  one thing.

6        Number two is, I have a translator here because

7  Mr. Suen is not proficient in English. He speaks Cantonese

8  and I would, in terms of his testimony, like to proceed as

9  early as possible because I have a translator on the meter

10 out here in the hall.

11       And finally, we do have another third-party

12 witness which I might, if Mr. Chu doesn't object, I'd like

13 to put on and let him go on his way too as early as

14 possible in the proceedings. So that's my comments.

15       MR. CHU: That sounds reasonable to me, Your

16 Honor. I have no objections to having the third-party

17 witnesses being taken out of order. As far as the order of

18 proof, we're prepared to proceed with the proof as to the

19 contract and the performance on the contract, so we can do

20 that also.

21       THE COURT: Yeah, I don't think you need to negate

22 the alleged defense at this point, unless you want to.

23       MR. ROMEO: No, Your Honor.

24       THE COURT: Then you can rebut later.

25       MR. ROMEO: There is one other housekeeping issue.

1    I asked Mr. Hom this morning about what happened with the
2    exhibit books from the prior phase of the trial, and I
3    guess they're not here.
4             THE COURT: Well, we still have them.
5             MR. ROMEO: Well, they're not on the stand, so I
6    don't know --
7             THE COURT: Oh, the extra copies?  I don't know.
8             MR. ROMEO: And the Court's copy of those
9    exhibits.  That would have been plaintiff's and
10   defendant's.  I have the books --
11            THE COURT: Do you have the -- somewhere out there
12   are the exhibits from Phase 1.
13            THE CLERK: We only have the originals, your
14   copies.
15            THE COURT: You don't have the extra copies.
16            THE CLERK: We don't have the extra copies.
17            THE COURT: Okay.
18            MR. ROMEO: I mean it's only going to be a problem
19   for -- in terms of my case -- there's a couple of exhibits
20   that are already in evidence and I have my set that was
21   given to me.  If that's not a problem, Mr. Chu, if we need
22   to use it.  It's just going to be in the case of a couple
23   of exhibits.
24            MR. CHU: I have no problem.
25            MR. ROMEO: And he may -- and Exhibit D was the

1  one I had particularly in mind which is --

2          THE COURT: Okay.  Let's just deal with this when

3  it comes up as best we can.  I think that would probably be

4  best.  I appreciate your attention to these matters and Mr.

5  Chu's cooperation.  I think it's best to get the translator

6  finished right away and then the third-party witness, and

7  then we can deal with all the other -- all the party

8  witnesses in the order we described previously.  Okay?

9          MR. ROMEO: So then I would assume then Mr. Suen

10  would be the first witness then.

11          THE COURT: I would think so if he's the one for

12  whom you need translator.

13          MR. ROMEO: Okay.

14          THE COURT: So we need to get the translator.  And

15  the translator is just outside; is that right?

16          MR. ROMEO: Yes.

17          THE COURT: Okay.

18      (Pause.)

19          MR. FU: Your Honor, may I say something?

20          THE COURT: Yes.

21          MR. FU: If Mr. Romeo does not object, I would

22  like to have the interpreter stand by for me because even

23  at the deposition, I requested a couple of times that it

24  would be best to have an interpreter for me too.  Would

25  that be possible?

1          THE COURT: Who is calling -- you're Mr. Fu,

2   right?

3          MR. FU: Yes.

4          THE COURT: Okay.  Who's calling you.

5          MR. CHU: I believe we're both going to be calling

6   Mr. Fu.  I think -- I will be calling Mr. Fu on direct and

7   Mr. Romeo has indicated that he's going to be calling Mr.

8   Fu as an adverse witness.

9          MR. FU: If you don't mind, my English is like

10  broken English.  It's not that good.

11         THE COURT: I'd rather have you testify in English

12  even if we have to slow down a little bit.

13         MR. FU: Okay.

14         THE COURT: Because I can assess what you're

15  saying better if we do it that way.

16         MR. FU: Okay.  But I make more mistakes that way.

17         THE COURT: Well, you just simply --

18         MR. FU: Okay.  Thank you.

19         THE COURT:  -- take the time to correct them,

20  that's all.

21         MR. FU:  Okay.

22         THE COURT: Okay, let's proceed.  We need to swear

23  the witness in and the interpreter.  We'll do the

24  interpreter first.

25         INTERPRETER, MIMI S.J. LAIN, SWORN BY THE CLERK

1          THE CLERK: Do you solemnly swear to correctly

2     translate English into Cantonese and Cantonese into

3     English?

4          THE INTERPRETER: Yes, I do.

5          THE CLERK: Please state your full name and

6     address for the record, please.

7          THE INTERPRETER: Yes.  Mimi S. J. Lain, L-a-i-n.

8          THE COURT: Okay.  Now let's get the witness.

9     You're calling him, Mr. Romeo; is that right?

10         MR. ROMEO: Well, I was going to call him as an

11    adverse witness.  I didn't know whether Mr. Chu was

12    planning on calling him in his case in chief.

13         MR. CHU: No, Your Honor.

14         THE COURT: Okay.  Then you can call him.  And we

15    need -- you have a chair there, good, okay.

16         MR. CHU: Oh, Mr. Suen, take the witness stand.

17         THE COURT: Okay.  In the witness box.

18         WEI SUEN, DEBTOR'S ADVERSE WITNESS, SWORN

19         THE CLERK: Raise your right hand, please.  Do you

20    solemnly swear the testimony which you're about to give in

21    this court is the truth, the whole truth, and nothing but

22    the truth?

23         THE WITNESS: (Through the Interpreter.)  Yes.

24         THE CLERK: Please be seated.

25         THE COURT: Jane, are you getting this?

1        THE RECORDER: Yes.

2        THE COURT: Okay.

3        THE CLERK: Please state your full name and

4   address for the record.

5        THE WITNESS: (Through the Interpreter) My name is

6   Wei Suen.  My address is 1542 - 39th Avenue, San Francisco,

7   California.

8        THE INTERPRETER: Do you want the zip code?

9        THE COURT: Not necessary.  Okay.  Go ahead, Mr.

10  Romeo.

11       MR. ROMEO: Thank you.

12                      DIRECT EXAMINATION

13  BY MR. ROMEO:

14  Q    Good morning, Mr. Suen.  Your occupation is as an

15  electrical contractor, correct?

16  A    (Through the Interpreter) Yes.

17  Q    And you were an electrical contractor who worked on a

18  project at 663 Chenery Street in approximately 2002.

19  A    Yes.

20  Q    And you are the -- your duties or your assignment in

21  that project was to install an alarm system.

22  A    Yes.

23       MR. ROMEO: Your Honor, I'd like to approach the

24  witness just to open the exhibit book to a particular page.

25       THE COURT: Yes.

1      MR. ROMEO: Your Honor, I have opened the exhibit

2  book to Exhibit MM, which is a series of checks and they're

3  in numerical order.  I have it open to check 252.

4      THE COURT: Gordon, do you have the exhibit book?

5  MM?

6      MR. ROMEO: MM.

7      THE COURT: Okay.  Yes.

8      MR. ROMEO: And to check number 252.

9      THE COURT: So that's probably back.

10     MR. ROMEO: They're in numerical order, so --

11     THE COURT: Okay.  So it's quite a ways in.

12     MR. ROMEO: Yes, sir.

13     THE COURT: All right.  Did you find it for him?

14     MR. ROMEO: Yes, I did, Your Honor.

15     THE COURT: Okay.  I have it.  Thank you.

16  BY MR. ROMEO:

17  Q    Mr. Suen, do you see check number 252?

18  A    Yes, I see it.

19  Q    And that was the payment that you received for putting

20  in the alarm system at Chenery Street?

21  A    I don't recall.

22  Q    You don't recall being paid on that job at all?

23  A    Correct.  No.  Incorrect.  Well, for that job, I would

24  think that they paid me.  Well, I don't remember whether

25  this check was the payment for the fire alarm.

1  Q    Did you do any other work at the project besides the
2  installation of the fire alarm?
3  A    Yes.
4  Q    What other work did you do?
5  A    Installed the electricity.
6  Q    And you worked with Tony Fu on other projects before
7  this one, correct?
8  A    Yes.
9  Q    And on those other projects, you worked as a
10 subcontractor for Tony Fu who was a general contractor,
11 correct?
12 A    Yes.
13 Q    And on this project, Tony Fu was also the general
14 contractor.
15 A    I don't understand.  Which project are you talking
16 about?
17 Q    Chenery project.
18 A    I don't know if he was the contractor, but I assisted
19 him in doing the electrical work.
20 Q    All right.  Do you remember having your deposition
21 taken?
22 A    Yes.
23        MR. ROMEO: Your Honor, I want to lodge Mr. Suen's
24 deposition with the Court at this time.
25        THE COURT: That's fine.

1  BY MR. ROMEO:

2  Q    Mr. Suen, in your deposition do you remember me asking

3  the following question and you giving the following

4  answers?  And, Your Honor, I'm at page 12 of the

5  deposition, and I'm going to start on page 12, line 5.

6  BY MR. ROMEO:

7  Q    And in this part of the deposition, Mr. Suen, I was

8  asking you about the electrical permit which was pulled for

9  this project.  And I asked the following questions, and you

10  gave the following answers:

11          "Question: Have you had a chance to look over

12          Exhibit 2?

13          "Answer: Yes.

14          "Question: Have you ever seen that document

15          before?

16          "Answer: Yes.

17          "Question: Is any of the handwriting on the

18          document your handwriting?

19          "Answer: No.

20          "Question: Do you know whose handwriting is on

21          that document?

22          "Answer: Yes.

23          "Question: Whose handwriting is it?

24          "Answer: It's my general contractor.

25          "Question: And who's the general contractor?

1  "Answer: Tony Fu.

2  "Question: And how do you know that's Tony Fu's

3  handwriting?

4  "Answer: He told me so."

5  MR. Romeo: Your Honor, that was page 12, lines 5

6  to 22.

7  BY MR. ROMEO:

8  Q  Is that your testimony, Mr. Suen?

9  A  Yes.

10  Q  Now in this case, you're suing Mr. Yan based on the

11  contract between you and Mr. Fu, correct?

12  A  Would you please repeat the question?

13  Q  Well, let me ask a different question.  You have a

14  contract with Mr. Fu in this case where Mr. Fu assigned to

15  you a 25 percent interest in Chenery, correct?

16  A  Assigned 25 percent interest?

17  Q  Yes, that's what I'm asking.

18  A  May I request a repetition of the question?

19  Q  Yes, you can.  Do you have the -- let me ask a

20  different question.  Do you have the exhibit book in front

21  of you?

22  THE COURT: Show him what you want him to look at.

23  MR. ROMEO: I'm going to open it to the page I

24  want.  I'm going to Exhibit III.

25  ///

1  BY MR. Romeo:

2  Q    First of all, Mr. Suen, do you recognize this

3  document?

4  A    Yes, I recognize it.

5  Q    And this is a claim that was assigned to you by Mr. Fu

6  in this case?

7  A    Yes.

8  Q    And if you would open that exhibit to the second to

9  the last page.  Have you had a chance to look at the

10  document?

11  A    Yes.

12  Q    And this is an exhibit to your Proof of Claim in this

13  case, correct?

14  A    Yes.

15  Q    And this is the contract that I was asking you about

16  between you and Tony Fu, correct?

17  A    Yes.

18  Q    And this contract was signed by you and Mr. Fu on

19  February 23rd, 2004, correct?

20  A    Yes.

21  Q    And Mr. Fu prepared this contract?

22  A    I don't know if it was prepared by Mr. Fu.

23  Q    Now at the time that Mr. Fu and you signed this

24  contract, you were in a coffee shop here in San Francisco,

25  correct?

1  A    I should say that we were discussing this matter in

2  the coffee shop.

3  Q    My question to you, Mr. Suen, is that you signed the

4  contract at the coffee shop, correct?

5  A    No.  We should have signed the contract I believe, it

6  was in an office.

7  Q    Was it in front of a notary?

8  A    Yes.

9  Q    Okay.  And before you signed the contract, there were

10  no negotiations between you and Mr. Fu about the purchase

11  price.

12  A    Yes.

13  Q    There were negotiations?

14  A    Yes.

15  Q    So now you recall that there were negotiations?

16  A    Yes.

17  Q    And what price negotiations went on between you and

18  Mr. Fu?

19  A    Four hundred thousand.

20  Q    So 400,000 was the price negotiated between you and

21  Mr. Fu?

22  A    Yes.

23  Q    Did you pay Mr. Fu 400,000 for the assignment

24  contract?

25  A    Yes.

1  Q    And how did you pay him?

2  A    Partially I gave him some checks.

3  Q    Has all the 400,000 been paid, Mr. Suen?

4  A    Yes.

5  Q    And you paid it by giving Mr. Fu a series of checks?

6  A    I gave him three checks.

7  Q    Were those checks negotiated or cashed by Mr. Fu?

8  A    Yes.

9  Q    Now Mr. Fu was the one that approached you about

10  purchasing an interest in the Chenery contract, correct?

11  A    Yes.

12  Q    In your deposition, you told me that you didn't recall

13  or didn't know whether you and Mr. Fu had negotiated on the

14  price; do you recall that?

15  A    I remember.

16  Q    So you're telling me a different story today about the

17  negotiations on the price.

18  A    Well, during the deposition last time, I could not

19  recall, but now I think back, I was able to remember.

20  Q    Now at the time that you signed the contract with Mr.

21  Fu, Mr. Fu didn't tell you that he had a dispute with the

22  other owner of the project; did he?

23  A    I don't recall.

24  Q    Maybe I can refresh your recollection with your

25  deposition testimony.  At page 28, lines 10 through 12.

1   Actually I'm going to go to line 18.

2                   "Question: Did Mr. Fu tell you he had a dispute

3                   with the other owner?

4                   "Answer: No.

5                   "Question: Did you ever learn that Mr. Fu had a

6                   dispute with the other owner?

7                   "Answer: No.

8                   "Question: To this day you don't know whether

9                   there's a dispute with the other owner.

10                   "Answer: No."

11  Does that refresh your recollection, Mr. Suen, about what

12  you testified in your deposition?

13                   THE COURT: What page is that again?

14                   MR. ROMEO: Page 28, lines 10 through 18.

15                   THE WITNESS: (Through the Interpreter) Is there a

16  question for me to respond to?

17  BY MR. ROMEO:

18  Q    Does that refresh your recollection that Mr. Fu never

19  told you that he had a dispute with the co-owner of the

20  property?

21  A    Well, Mr. Fu did talk about that he had some troubles

22  with the two other owners, but he didn't mention what kind

23  of troubles.

24  Q    So you're telling me different testimony today; is

25  that correct, Mr. Suen?

1  A    Perhaps at that time I did not remember.  Now I just

2  remember.

3  Q    All right.  So in your deposition, when you answered

4  my question, no, you are telling me that you remembered

5  less well at that time than you do today?

6  A    At that time I did not remember clearly.

7  Q    At that time, meaning the time that you signed the

8  contract with Mr. Fu on February 23rd, 2004, did you know

9  who the other owner was?

10  A    Yes.

11  Q    And who was the other owner that Mr. Fu told you had

12  75 percent of the property?

13  A    Mr. Yan.

14  Q    Do you remember in your deposition telling me you

15  didn't recall who the other co-owner was?

16  A    Yes.

17  Q    And so you're telling me that your memory in December

18  or November 30th, 2005 is better than it was six months ago

19  in June when you had your deposition taken?

20  A    Well, at that time, I did not recall.  Now I remember.

21  That's why I answered you.

22  Q    So what you're telling me today now is that Mr. Fu

23  told you there was a dispute between him and Mr. Yan

24  regarding this property at the time you signed the

25  contract?

1  A    I don't know if it was at the time when we signed the

2  contract but I remember that Mr. Fu did mention something

3  like that.

4  Q    What did Mr. Fu mention about that?

5  A    He said that at that time he wasn't working very

6  happily with his partner.

7  Q    But Mr. Fu didn't tell you about a lawsuit at the time

8  that you signed the assignment contract with Mr. Fu; did

9  he?

10  A    No.

11  Q    And at some point though, you decided to file a

12  lawsuit against Mr. Yan, correct?

13  A    Yes.

14  Q    And you did so at the suggestion of Mr. Fu, correct?

15  A    Yes.

16  Q    And in fact Mr. Fu found you your first lawyer,

17  Charlene Drummer, (Phonetic) correct?

18  A    Yes.

19  Q    And when was the $400,000 completely paid to Mr. Fu?

20  A    During that period of the signing of the contract.

21  Q    Well, the contract was signed in February 2004,

22  correct?

23  A    Yes.

24  Q    And so were all three checks that you mentioned given

25  to him in February 2004?

1   A    Yes.

2   Q    Do you have copies of those checks?

3   A    I don't have them with me today.

4   Q    Do you have them at your house?

5   A    Should be at my house.

6   Q    So if I asked you, you could bring them tomorrow?

7   A    If I can find them, I can bring them.

8        MR. ROMEO: I have no further questions, Your

9   Honor.  Thank you.

10       THE COURT: Okay.  Any cross-exam?

11       MR. CHU: Yes, Your Honor.

12                    CROSS-EXAMINATION

13  BY MR. CHU:

14  Q    Mr. Suen, I'm going to refer you back to your earlier

15  testimony about your deposition.  At your deposition, you

16  refer to Tony Fu as your general contractor.  Do you recall

17  that?

18  A    Yes.

19  Q    Now did anyone tell you that Mr. Fu was the general

20  contractor on 663 Chenery?

21  A    No.

22  Q    So why did you think he was the general contractor for

23  that project?

24  A    Well, I did not think that he was the general

25  contractor for that project, but ever since I worked with

1   him, he has been a general contractor.  That's what I

2   address him.

3   Q    I see.  Do you know the other owner here, Mr. Yan.

4   He's sitting next to Mr. Romeo over here?

5   A    Yes, I know him.

6   Q    How did you meet him?

7   A    I see him at the place of my work.

8   Q    The place of your work, are you referring to the

9   Chenery project?

10  A    Yes.

11  Q    So when you were working at Chenery, you saw Mr. Yan

12  out there?

13  A    Yes.

14  Q    Did you introduce yourselves?

15  A    Yes, we greeted one another and also we chatted.

16  Q    What was Mr. Yan doing out there?

17  A    I don't remember.

18  Q    When you met him out there, did you know he was the

19  owner of the project?

20  A    I knew.

21  Q    Did he tell you that?

22  A    No.

23          MR. CHU: I don't have anything else, Your Honor.

24          THE COURT: Okay.  Any redirect?

25          MR. ROMEO: Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ROMEO:

Q    You were just talking about being at the project and
meeting Mr. Yan, correct?

A    Yes.

Q    And when you did the work at the project, did you have
an electrical permit pulled from the City and County before
you started the work?

A    Yes.

Q    And in fact, that would be your custom and practice as
a licensed electrical contractor to have the permit pulled
before you commenced work, correct?

A    Yes.

Q    And when you went to commence the work, that was in
February 2002, correct?

A    I don't recall the specific timing.

Q    Okay.  Let me ask you a different question, Mr. Suen.
It's true that after you got the permit, you started the
work.

A    Yes.

Q    And in fact you started the work quite soon after the
permit was issued, correct?

A    Yes.

Q    And the work consisted of installing electrical lines
throughout the four units of the project, plus the fire

1  alarm system, correct?

2  A    Yes.

3  Q    And you did that work yourself personally.

4  A    Yes.

5  Q    And how long did it take you to do that work?

6  A    Pretty long period of time.

7  Q    How long of a period of time, Mr. Suen?

8  A    I don't recall clearly.

9  Q    Was it less than a month or more than a month?

10 A    More than a month.

11 Q    More than two months?

12 A    More than two months.

13 Q    More than three months?

14 A    Around three months or so.

15 Q    Okay.  So between February and perhaps the end of

16 April?

17 A    Usually when we work, we don't work continuously.  We

18 work in segments.

19 Q    So the last time you would have been at the job site

20 would have been in April 2002?

21 A    I don't recall the specific time.

22 Q    Okay.  When you first met Mr. Yan, was it early on in

23 your work?

24 A    I don't recall.

25 Q    All right.  Was it -- do you remember what you were

1  doing when you first met Mr. Yan?

2  A    I don't recall.

3  Q    If I asked you if you met Mr. Yan within a month of

4  commencing work, would that -- could you recall if it was

5  that early in the process?

6  A    I don't recall.

7           MR. ROMEO: Your Honor, I don't think I have any

8  further questions.

9           MR. CHU: Just a couple follow-up, Your Honor.

10                      RECROSS-EXAMINATION

11 BY MR. CHU:

12 Q    Mr. Suen, you installed the electrical system at

13 Chenery and you also installed the fire alarm system,

14 correct?

15 A    Yes.

16 Q    Was that altogether in the same job or were those two

17 different jobs?

18 A    Different jobs.

19 Q    Okay.  Which one did you do first?  Did you install

20 the electrical system first or did you do the fire alarm

21 first?

22 A    Well, I did the installation of the electrical work

23 first, and then I did the fire alarm.

24 Q    And the fire alarm was a separate permit; was it not?

25 A    Correct.

1  Q    If I told you that the fire alarm permit was issued in
2  February of 2002, would that help you recall when you
3  installed the electrical system?
4  A    Yes.
5  Q    So do you recall working on the electrical system in
6  2001?
7  A    Yes.
8  Q    And would it be fair to say that the three months you
9  were talking about working on the project before, that a
10 lot of that -- would it be fair to say a lot of that took
11 place in 2001?
12 A    Yes.
13            MR. CHU: That's all, Your Honor.
14            THE COURT: Any more questions?
15            MR. ROMEO: Just a couple.
16                    RE-REDIRECT EXAMINATION
17 BY MR. ROMEO:
18 Q    If you'd look at --
19            MR. ROMEO: Can I approach the witness, Your
20 Honor?
21 BY MR. ROMEO:
22 Q    Mr. Suen, I'm asking you to look at Exhibit CCC.  Is
23 that the permit for the alarm system?
24            THE COURT: Okay.  I'm sorry.  CCC?
25            MR. ROMEO: Yes, sir.

1          THE WITNESS: Yes.

2   BY MR. ROMEO:

3   Q    And so the alarm system would have been the last work

4   that you would have done at the project?

5   A    Yes.

6   Q    And the date of that permit is February 20th, 2002?

7   A    Yes.

8   Q    And in terms of sequencing the work, you took your

9   directions from Tony Fu?

10  A    Yes.

11  Q    And in fact Tony Fu directed you in all of your work

12  at the project, correct?

13          MR. CHU: Objection.  I'm not quite sure what

14  "directed" means and after a translation from English to

15  Cantonese, it may even be further muddied.

16          THE COURT: I'm sorry.  I don't fully understand.

17          MR. CHU: I think the question was, whether Mr. Fu

18  directed all of his work and directed is too ambiguous a

19  term, I think, in this instance, especially where there's

20  going to be a translation from Cantonese -- from English to

21  Cantonese, and coming back, so --

22          THE COURT: What's the purpose of the question?

23  I mean you're trying to get at whether he was a general

24  contractor or not, that's all, really?

25          MR. ROMEO: That's correct.

1    THE COURT: Why don't you get it -- well --

2    MR. ROMEO: Let me -- if I could ask a question

3  from his deposition, I think I can clarify it, because he

4  understood the term during his deposition.

5    THE COURT: It's overruled.  You can have it.  You

6  know, ask it again so that she can translate it.

7  BY MR. ROMEO:

8  Q    Mr. Fu was the one who gave you directions regarding

9  your work at the Chenery project, correct?

10 A    I don't understand the term "directions."  What do you

11 mean by that?

12 Q    Okay.  Let me go back to your deposition then, Mr.

13 Suen.

14    THE COURT: Use another word.  He doesn't

15 understand it now.

16    MR. ROMEO: Well, I think he understood it in his

17 deposition, and that's -- reading from page 23, line 24:

18         "Question: Did you take direction from somebody

19         as far as doing the work at Chenery Street?

20         "Answer: Yes.

21         "Question: Who gave you directions?

22         "Answer: Tony Fu.

23         "Question: Did anyone else besides Tony Fu give

24         you directions regarding your work at Chenery

25         Street?

1   "Answer: No."

2   And that last answer ends at page 24, line 6.

3   BY MR. ROMEO:

4   Q   Do you recall giving those answers to those questions

5   in your deposition, Mr. Suen?

6   A   Yes.

7         MR. ROMEO: All right.  I have no further

8   questions, Your Honor.

9         THE COURT: Okay.

10        MR. CHU: One last one, Your Honor.

11        THE COURT: Okay.

12               CROSS-EXAMINATION (CONTINUED)

13  BY MR. CHU:

14  Q   At your deposition when you said that Tony Fu gave you

15  directions, what did you mean by that?

16        MR. ROMEO: Your Honor, I have to object to the

17  question.  I think the questions and answers stand for

18  themselves.

19        THE COURT: Overruled.

20    (Pause.)

21        THE WITNESS: Well, he directed me because he's

22  the one who hired me to come back and do things.  So he

23  would ask me what have I done.

24  BY MR. CHU:

25  Q   So you weren't -- he wasn't telling you what to do

1  then.

2  A    No.

3         MR. CHU: That's all I have.

4         MR. ROMEO: Nothing further.

5         THE COURT: Okay.  Thank you.  The witness may

6  step down.

7         All right.  Now you have a third-party witness?

8         MR. ROMEO: Correct, Your Honor.

9         THE COURT: Okay.  Why don't you get that person.

10  We don't need the interpreter for that witness?

11         MR. ROMEO: No.

12         THE COURT: Are we through with the interpreter?

13         MR. ROMEO: Yes.

14         MR. CHU: Yes.

15         THE COURT: I mean you can -- I'm not going to

16  require him to pay for the interpreter for Mr. Fu because I

17  think -- I would rather hear from Mr. Fu in English,

18  because I'll understand it better.

19         MR. CHU: I would prefer it that way.

20         THE COURT:  It would help me more to just hear

21  him speak for himself.

22         Okay.  Thank you.

23          MAOE K. TJOE, DEBTOR'S WITNESS, SWORN

24         THE CLERK: Raise your right hand, please.  Do you

25  solemnly swear the testimony which you are about to give in

1  this court will be the truth, the whole truth, and nothing

2  but the truth?

3          THE WITNESS: Yes.

4          THE CLERK: Please be seated.  Please state your

5  full name and address for the record.

6          THE WITNESS: My name is Maoe K. Tjoe.  I'm living

7  in 22280 Athens Street in San Francisco.

8          THE COURT: Could you spell your name for us,

9  please?

10          THE WITNESS: M-a-o-e.

11          THE COURT: M-a-o-e.

12          THE WITNESS: T-j-o-e.

13          THE COURT: T-j-o-e?

14          THE WITNESS: M-hm.

15          THE COURT: M-a-o-e, T-j-o-e.

16          THE WITNESS: Yes.

17          THE COURT: Okay.  Thank you.  Go ahead, Mr.

18  Romeo.

19                    DIRECT EXAMINATION

20  BY MR. ROMEO:

21  Q    Mr. Tjoe, can you tell me what your occupation is?

22  A    Right now, I'm a senior plan checker, and I'm working

23  as a permit coordinator.

24  Q    And who is your employer?

25  A    City and County of San Francisco.

Q    And how long have you been a plan checker for the City
and County of San Francisco?

A    My work is changing.  Originally I was a plan checker
starting in '85 for five years, and then I became a
building inspector for seven years, and then I'm back to
become the senior plan checker, but working as a permit
coordinator until now.

Q    Were you working as a senior plan checker in 2002?

A    Yes.

Q    What about in 2000?

A    Yeah.

Q    And do you see -- I've opened the exhibit book in
front of you to an exhibit that's marked ZZ.  Do you see
that in front of you?

A    M-hm.

Q    Yes?  You have to answer out loud.

A    Yes.

Q    Did you have any involvement in the issuance of
permits for the property at 663 Chenery Street in San
Francisco in 2000?

A    I was a plan checker for -- architectural and
structural plan checker for this property.

Q    And can you tell me what Exhibit ZZ is.

A    This is an application for a building permit for 663
Chenery Street for residential, condo and commercial

1  building, a number of line industry and four-story

2  building.

3  Q    Was this the initial building permit for this project?

4  A    Would you repeat the question?

5  Q    Was this the initial building permit for this project?

6  A    For this -- I believe so.

7  Q    And in the issuance of a building permit what does the

8  applicant have to submit to the City and County at this

9  time in 2000?

10 A    They need to fill out a building permit like this,

11 application, and then they are required to submit a plan

12 and other supporting documents like calculation for

13 different things like structural, energy compliance, and --

14 yeah.

15 Q    Okay.  And with respect to this particular building

16 permit, does the application designate a general

17 contractor?

18 A    In here it's stated that the San Francisco

19 Contractor's Associates, Incorporated, address 3213 Geary

20 Boulevard.

21 Q    And do you understand -- do you know Tony Fu?

22 A    Yes.

23 Q    And do you understand that to be his company?

24 A    His company, what do you mean by that?

25 Q    Do you know if this company is Tony Fu's company?

1  A    That I don't know.

2  Q    Did Mr. Fu -- was Mr. Fu the person who submitted this

3  application?

4  A    Yes.

5  Q    And you worked with Mr. Fu on other projects, correct?

6  A    When I was a building inspector, I did inspect his --

7  several of his constructions.

8  Q    And during what period of time would you have

9  inspected other projects of Mr. Fu's?

10  A    That is between the year -- between probably '92 to

11  '97.

12  Q    And have you had other contacts with Mr. Fu on other

13  projects since 1997 besides Chenery Street, apart from

14  Chenery Street?

15  A    No.

16  Q    Now with regard to this application, Exhibit ZZ, in

17  the boxes at the top there, it says "Estimated Cost

18  100,000," and that's crossed out.  Do you know who crossed

19  that out?

20  A    I believe I did it.

21  Q    Okay.  Do you know who filled it in as a hundred

22  thousand?

23  A    I only can guess because I didn't really check -- I

24  mean whoever fill out this application would be the one,

25  and I don't know whether that is Tony's handwriting or not.

1    Q    All right.  Then next to that there's another box that

2    says "Revised Cost."  Do you see that?

3    A    Yes.

4    Q    And what is -- the revised cost is 400,000?

5    A    Yes.

6    Q    Who put that $400,000 figure in?

7    A    I did it.

8    Q    And first of all, why did you do that?

9    A    Why?  Because -- for the purpose of building permit

10   application and for building permit, we need to have a

11   closer estimate for the construction, and for a four-story

12   building, such a building like this, I would consider

13   approximately about 400,000 at least to build.  And so

14   therefore I change it for the purpose so that they pay

15   proper permit fees.

16   Q    Now, did you perform calculations in order to reach

17   that $400,000 figure?

18   A    Rough calculations, yes.

19   Q    And are those calculations done in conformance with

20   the policy or procedure used by your department at this

21   time?

22   A    Pretty much.

23   Q    And did you use that policy or procedure in

24   formulating then this $400,000 figure?

25   A    Yes.

Q    Did you ever personally visit the project at 663 Chenery Street?

A    Yes, sir.

Q    When did you do that?

A    One time I recall because there is a need to correct their problems because of the building inspector -- I mean find out that the construction of the stairs doesn't meet the requirements.  So I was -- because in the process of correcting their situation and Tony -- I don't know whether Tony by himself or with Demas, have come and apply -- reapply for building permit to correct the problems, and then I make an appointment to go to see that.

Q    And did you make an appointment with Tony Fu?

A    I believe so.

Q    And did you inspect the project?

A    Yes.

Q    And in regard to your other dealings, as far as this project went, was your contact person Tony Fu?

A    Yes.

        MR. ROMEO: I have no further questions.  Thank you, Your Honor.  Thank you, Mr. Tjoe.

        THE COURT: Any cross-exam.

        MR. CHU: Yes, Your Honor.

///

///

CROSS-EXAMINATION

1

2 BY MR. CHU:

3 Q    Do you recall testifying just a minute ago that Tony

4 Fu submitted this application to you, Exhibit ZZ?

5 A    Yes.

6 Q    How do you know that?  Do you recall?  Did he hand it

7 to you personally?

8 A    As I recall, we sit together, because during that time

9 when people apply for a building permit, they come to our

10 office, and then we will fill out -- I mean we'll make sure

11 that all they put in here is all being filled out properly.

12 Q    So you recall sitting together with Tony this day?

13 A    Yes.

14 Q    Was there anyone else there?

15 A    For that, I'm not quite sure.

16          MR. CHU: Nothing further, Your Honor.

17          THE COURT: Any other questions?

18          MR. ROMEO: Nothing further, Your Honor.

19          THE COURT: Okay.  Thank you, Mr. Tjoe.  You're

20 excused.  Thank you for coming.

21          MR. ROMEO: Your Honor, I'd like to move ZZ into

22 evidence.

23          THE COURT: Any objection?

24          MR. CHU: No objection.

25          THE COURT: Okay.  ZZ is admitted.

1            (Whereupon, Debtor's Exhibit ZZ,

2            application for building permit at

3            663 Chenery Street, is admitted

4            into evidence.)

5      MR. ROMEO: Your Honor, I'd also like to move

6 Exhibit CCC into evidence.

7      THE COURT: Any objection to that?  I know you've

8 got to go back and find it.

9      MR. ROMEO: It's the alarm system permit that I

10 was asking Mr. Suen about.

11      MR. CHU: No objection.

12      THE COURT: Okay.  That's admitted also.

13            (Whereupon Debtor's Exhibit CCC,

14            alarm system permit, is admitted

15            into evidence.)

16      THE COURT: Now was MM admitted previously?

17 That's another one you dealt with.

18      MR. ROMEO: I dealt with it.  I will ask for its

19 admission through another witness, Your Honor.

20      THE COURT: Okay.  Shall we take a quick break?

21      MR. ROMEO: Yes, Your Honor.

22      THE COURT: Okay.  You're going to start with your

23 witnesses now, right?

24      MR. CHU: Yes.

25      THE COURT: Okay.  Good.  Let's take till about

1   ten after on that clock, and we'll go till about 12:00.)

2          THE CLERK: All rise.

3      (Whereupon, a recess is taken at 11:02 a.m., and the

4   court is reconvened at 11:10 a.m.)

5      (The direction examination of Tony Fu, previously

6   transcribed, is not included in the transcript by this

7   transcriber, and is resumed at 1:26 p.m. with the cross-

8   examination of Mr. Fu.)

9

10          THE COURT: Okay.  Any cross-exam?

11          MR. ROMEO: Yes, Your Honor.  And also it was my

12  intent to call Mr. Fu as an adverse witness.  I wonder, to

13  avoid any kind of a scope objection, if I could just go

14  forward with all of my examination of him.

15          THE COURT: Do you have any other witnesses?  Mr.

16  Chu?

17          MR. CHU: I have no other witnesses, Your Honor.

18          THE COURT: Okay.  It doesn't matter then.  You

19  could just roll over into your case.

20          MR. ROMEO: Okay, thanks.

21          THE COURT: I understand your comment.

22          MR. ROMEO: If Your Honor would just give me a

23  minute.  I just want to locate something.

24  ///

25  ///

CROSS-EXAMINATION

BY MR. ROMEO:

Q    Good afternoon, Mr. Fu.  Mr. Fu, you don't have a contractor's license; do you?

A    I do.

Q    You did have a contractor's license; is that correct?

A    That is correct, yes.

Q    And it was originally issued in 1993, correct?

A    Yes.

Q    And you worked full time as a contractor after obtaining your license?

A    I was mainly a consultant in real estate.

Q    And as I understand it, you told me at your deposition that you deliberately inactivated your license in 1999; is that correct?

A    What does deliberately mean?

Q    You filed an application or some kind of paper with the Contractor's State License Board to inactivate your license.

A    I think I did, yes.

Q    You did that at your own request, correct?

A    Correct.

Q    And as I understand your testimony, then you never used -- never activated it after 1999; is that correct?

A    I think I -- I would say I did not intend to do

1  anything after Florence Fung's project.

2  Q    So if I'm understanding you correctly, the last time

3  you ever used your license was in a project you did for

4  Florence Fung, correct?

5  A    That's correct.

6  Q    That's the woman that has a judgment against you?

7  A    Correct.

8  Q    The same woman you believe has conspired with Demas

9  Yan to affect your interests?

10         MR. CHU: Objection.  Cumulative.

11         MR. ROMEO: All right.

12         THE COURT: Sustained.

13 BY MR. ROMEO:

14 Q    But if I understand your testimony from your

15 deposition correctly, you said that you had not used your

16 license since 1999 when you inactivated it on your own

17 request, correct?

18 A    I think it would be correct to say, like I just

19 testified, after Florence Fung's project, I really don't

20 want to go out and take any jobs.

21 Q    Do you have the exhibit book there in front of you?

22 A    Yes.

23 Q    Could you go to Exhibit EEE, please.

24         MR. CHU: Your Honor, I'd like to object to the

25 use of Exhibit EEE.  This is a document that I believe

1  would have fallen under the scope of the discovery requests

2  just prior to trial, and this document was never produced

3  to the plaintiffs in the case previously, so I don't think

4  it should be used now.

5       MR. ROMEO: I don't remember Mr. Chu giving me any

6  discovery requests in this case.

7       MR. CHU: The discovery requests that I'm

8  referring to are discovery requests propounded by Ms.

9  Chen's counsel, Mr. Farrer. As late as June 5th, 2005, at

10  Mr. Yan's deposition, there was a document request

11  requesting production of all documents pertaining --

12       THE COURT: Okay. Let me ask this. Is there a

13  dispute about when Mr. Fu had an active license and when he

14  didn't?

15       MR. CHU: I don't think so, Your Honor.

16       THE COURT: See, I don't know what these requests

17  are. This is the sort of thing you do in a motion in

18  limine and I don't have any papers in front of me. I can't

19  tell. And what I'm really trying to get at is the question

20  of, is there really a dispute as to whether his license

21  expired at the end of October of '01.

22       MR. CHU: I don't think there's a dispute to --

23       THE COURT: What's the importance of this -- what

24  is the remainder -- in other words, that is the fact. Is

25  that what you're suggesting, that that is the case?

1    MR. CHU: There's no dispute that Mr. Fu's license
2    expired on October 31, '01.
3        THE COURT: Okay.  What is the problem with
4    this -- what additional information, if any, in this
5    exhibit is troublesome to you?
6        MR. CHU: Apparently, there was a renewal as of
7    November 1, 1999 that Mr. Fu did not testify as to
8    previously, and his recollection was that once he had
9    inactivated it, it expired under -- while it was inactive.
10   But this seems to indicate there was a renewal.
11       THE COURT: Okay.  I guess what I'm trying to get
12   at here is -- I've read the plaintiff's -- I'm sorry, Mr.
13   Yan's brief takes the position that the only relevant date
14   is whether it expired before the completion of the project,
15   right?
16       MR. ROMEO: That's true.
17       THE COURT: And that's all you're really trying to
18   show.
19       MR. ROMEO: I need to actually offer this into
20   evidence just to show what his licensing status was, and
21   this is the best evidence of it.  It's a certified record
22   from the Contractor's State License Board.  I actually have
23   the original right here in my hand.
24       THE COURT: Okay.  Does anything matter under this
25   other than that it expired as of October 31st?

1    MR. ROMEO: Well, what's troubling the plaintiff
2  is that Mr. Fu has taken the position more than one time in
3  his deposition that he retired his license in 1999 and
4  never ever used it again, and this contradicts that
5  statement because it shows that he did in fact inactivate
6  the license on September 20th, 1999 and then just a few
7  weeks later, he activated it again on October 31st, 1999,
8  because he's denying that he's ever acted as a licensed
9  contractor.  But clearly, that's inconsistent with his
10 testimony that he said, I really wasn't an active
11 contractor.

12    THE COURT: All right.  I'm going to let it in
13 until you show me more about -- it's provisionally
14 admitted.  You can pursue this further, but I don't have
15 the request in front of me, so I just can't tell.  Okay?

16    MR. ROMEO: Thank you, Your Honor.

17    THE COURT: This seems to be going, not to his
18 status as to whether he was a contractor throughout the
19 whole period, but for some collateral purpose, some purpose
20 of impeaching other testimony, right?

21    MR. ROMEO: Right.  But I'm also admitting it for
22 the truth of the matter as to when he had a license, when
23 he had --

24    THE COURT: But apparently it's not disputed that
25 he didn't have one after October 31st of '01.

1          MR. ROMEO: Correct.

2          THE COURT: Okay.

3                    (Whereupon, Debtor's Exhibit EEE,

4                    is admitted into evidence.)

5    BY MR. ROMEO:

6    Q    When you had a contracting business, Mr. Fu, you used

7    a fictitious business name as San Francisco Contractor's

8    Association; is that correct?

9    A    That's correct.

10   Q    And a copy of your fictitious business name filing is

11   in our exhibits as Exhibit XX, if you could confirm that?

12   A    Which is XX?

13   Q    I can help you.

14        Is that the business name under which you did

15   your contracting business?

16   A    I think so.

17   Q    And that fictitious business name as filed in

18   July 1999, correct?

19   A    Yeah, that's what the document say.

20   Q    Now when it came time to -- when it came time to get

21   permits on Chenery Street, isn't it the case that on the

22   application for the demolition permit, the very first

23   application, you filled out that application and listed San

24   Francisco Contractor's Association as the general

25   contractor?

A    I don't think I filled out that application.  As I
testified earlier to you, that application is signed by
Winky Wong and --

Q    Well, take a look at the next exhibit.  Let's look at
Exhibit YY.  Now, on the box that says "General
Contractor," it says San Francisco Contractor's
Association, correct?

A    Yes.

Q    And it says a business address of 5813 Geary
Boulevard, PMB 188, San Francisco, correct?

A    That's correct.

Q    And that was the business address for your contracting
business, correct, at the time?

A    I guess so, yes.

Q    Well, isn't this even your current business address,
Mr. Fu?

A    Yeah, this is the mail box I've been maintaining all
along.

Q    And on the next line down, isn't that your
contractor's license number, the same one we saw on the
certification of records from the Contractor's Board a few
minutes ago?

A    Yes.

Q    And you provided that information for this demolition
permit; didn't you?

1   A    I don't recall that.

2   Q    Well, did somebody else know your contractor's license

3   number?

4   A    Oh, everybody knows it.

5   Q    Oh, I see.  So you don't recall whether your provided

6   this license number to the building department; is that

7   what you're saying?

8   A    Yes.

9   Q    And you don't recall whether you filled in this line

10  above San Francisco Contractor's Association?

11  A    Yes.

12  Q    You just don't recall.

13  A    Yes.

14  Q    It could be in your handwriting though.

15  A    It could be.

16  Q    And the phone number next to it, is that -- was that

17  your business phone number at the time in 2000?

18  A    Yeah.  Yes.

19  Q    And the expiration date of the license 10/31/01, was

20  that the expiration date of your license at this time?

21  A    I think so, yes.

22  Q    And that's Winky Wong's signature at the bottom of the

23  application?

24  A    That's correct, yes.

25  Q    And is that your signature on the second page of this

1 document?

2 A    That was not.

3 Q    You deny that?

4 A    I do.

5 Q    You believe that signature is forged?

6 A    It don't look like my signature.

7 Q    Aren't you the one that went down to get this permit

8 to 1660 Mission Street?

9 A    This permit we all -- the three of us was involved.

10 Q    Okay.  But you actually went down there to 1660

11 Mission Street to get this permit; didn't you?

12 A    I don't have a specific recollection on that one, but

13 at the same time, I mean I was actively participating.

14 That was true.  And also, you know, Mr. Yan was actively

15 participating, altogether.

16 Q    My question to you is, you were the one that -- you

17 were at least one of the people that went down to get this

18 permit from 1660 Mission Street from the Building

19 Department, correct?

20 A    I'm sorry.  Would you say it again?

21 Q    You went down to 1660 Mission to get this permit;

22 didn't you?  You personally.

23 A    I don't have a recollection I am the one that went

24 down to get the permit or I was accompanied with the other

25 two partners.

1 Q    Why don't you take a look at the next exhibit in

2 order, ZZ.  This is the building permit, the original

3 building permit, for the Chenery project, correct?

4 A    Correct.

5 Q    And the handwriting on this exhibit where it says "San

6 Francisco Contractor's Association" with the address under

7 the box for "General Contractor," that's your handwriting;

8 isn't it?

9 A    It looks like it.

10 Q    And the license number and the expiration date on the

11 next line are also in your handwriting, correct?

12 A    It looks like it.

13 Q    And you were here this morning when Mr. Tjoe said that

14 he had a sit-down with you at the Department when this

15 building permit was pulled to go over it to make sure that

16 it was correct, correct?  Do you remember that?

17 A    I heard that.  Yes.

18 Q    And do you dispute his testimony or do you agree with

19 it?

20 A    I think I agree with it.

21 Q    Okay.

22 A    Because we -- I was there I recall with the other two

23 partners.

24 Q    Can I ask you to take a look at the next exhibit, which

25 is Exhibit AAA.  This is a copy of the original electrical

1  permit pulled for the Chenery project, correct?

2         MR. CHU: Same objection on this exhibit, Your

3  Honor.  It was not produced during the course of discovery.

4         THE COURT: Okay.  Same ruling.

5                        (Whereupon, Debtor's Exhibit AAA,

6                         original electrical permit for the

7                         Chenery project, is admitted into

8                         evidence.)

9  BY MR. ROMEO:

10 Q    Mr. Fu, taking a look at Exhibit AAA, this information

11 shows San Francisco Contractor's Association, Incorporated

12 as the contractor for this permit; doesn't it?

13 A    Yes, the document say it that way.

14 Q    And it's in your handwriting; isn't it?

15 A    I think so.

16 Q    And the license number and the expiration date are in

17 your handwriting; isn't it?

18 A    It looks like it.

19 Q    And the signatures are your signatures; aren't they?

20 A    It looks like it.

21 Q    And Exhibit BBB, which is the next exhibit in order,

22 this is the plumbing and mechanical permit, the original

23 plumbing and mechanical permit for Chenery?  Is that true;

24 is that what this is?

25 A    That's what it says, 663 Chenery.

1    MR. CHU: Same objection, Your Honor, not produced

2    during the course of discovery.

3    THE COURT: All right.  Same ruling.

4    (Whereupon, Debtor's Exhibit BBB,

5    plumbing and mechanical permit, is

6    admitted into evidence.)

7    BY MR. ROMEO:

8    Q    And the company name for the contractor is San

9    Francisco Contractor's Association, correct, Mr. Fu?

10   A    Would you say it again, I'm sorry.

11   Q    Well, you see this box here in the middle, which has

12   the contractor's signature and the company name and address

13   and the license number and the expiration date.  Do you see

14   all that there?

15   A    I see that, yes.

16   Q    And that's all in your handwriting; isn't it?

17   A    It looks like it.

18   Q    And those are your signatures.

19   A    But I'm not positive, yes.

20   Q    Take a look at the next exhibit CCC.  Just go one more

21   tab over.  This is another electrical permit for the Chenery

22   project, correct?

23   A    This one is for the --

24   Q    The electrical.

25   A    -- the firm alarm system.  The fire alarm system was

1  hired by a professional called Losin Patrick (Phonetic) and

2  she's the one handled that.

3  Q    All right.  But you arranged for the issuance of this

4  permit, correct?

5  A    I think so.  I think so, yes.  I'm the agent for Suen.

6  Q    So when you put your contractor's name and your license

7  number on the application for these permits, you were in

8  fact using your contractor's license for this project;

9  weren't you?

10  A    No.

11  Q    Were you telling the Department of Building Inspection

12  that you weren't the general contractor by filling out the

13  form where it represented your company as general

14  contractor?

15  A    As a matter of fact, I don't have a specific

16  recollection on that one, stating that I'm the one filled it

17  in.  Second, it was the time that I really, really decided

18  not to be in a consulting business.  That's why Winky Wong

19  and Demas, we partners, all go together, and that --

20  Q    Now, when you -- when you became involved in this

21  project with Demas Yan on October 18th, 2000, your primary

22  role was to insure that the project was built, correct?

23  A    Correct.

24  Q    And in that capacity then, you were the one that was

25  going to act as the general contractor for the project,

1 correct?

2 A    We were partners and owners, but I have -- I'm taking

3 more risk.  That's all.  I -- I -- I'm sorry.

4 Q    Well, at the time that you entered into this contract

5 with Mr. Yan, he didn't have a contractor's license; did he?

6 A    He submitted the application, and I believe he

7 specifically stated in his application maybe because I was

8 helping him for his application, that because he had the

9 experience for 32nd Avenue and also other projects that he

10 would use that specifically for Chenery.

11 Q    Did Mr. Yan have a contractor's license in October

12 18th, 2000 when you signed the agreement with him?

13 A    I don't think so.

14 Q    And isn't it the case that you were going to be the one

15 that was going to have primary responsibility to build this

16 project?

17 A    You are talking about the October 18 agreement.

18 Q    Yes, I am.

19 A    The October 18 agreement is that because he is buying

20 out Winky Wong and that I maintain my 25 percent share of

21 ownership.  And all along --

22 Q    And in terms of your role between you and Mr. Yan, you

23 were the builder and he was the investor, correct?

24 A    We are the investors together, and we are the owners,

25 on the same boat, and we have this equal share, but he buy

1  out Winky Wong and then he stepped into the shoes of Winky

2  Wong.  That's all.

3  Q    Let me see if I can go about it a different way.  If

4  you could go to your exhibit book and open it to Exhibit

5  III; it's one of the last ones in the book there.  If you

6  could go to page 3.  This is a pleading you filed in this

7  court; isn't it?  Isn't that true.

8  A    True.

9  Q    Okay.  And on page 3, paragraph 9, it says, quote:

10              "As the joint owner with the general contracting

11              experience, I also had the primary responsibility

12              for hiring contractors and purchasing building

13              materials for the property."

14 Is that a true statement, Mr. Fu?

15 A    It is a true statement.

16 Q    Okay.  And in your deposition -- oh, I've got to lodge

17 these with you.

18              MR. ROMEO: Your Honor, I think I previously lodged

19 Volumes I and II of his deposition with the court, and I'm

20 going to lodge --

21              THE COURT: I have I and II yes.  I don't know if

22 there are more, but --

23              MR. ROMEO: There's III and IV.  I'm lodging those

24 with the Court right now.

25              THE COURT: Okay.

1    MR. ROMEO: But I want to read from Volume II, page
2  170.
3         THE COURT: Volume II, page what?
4         MR. ROMEO: Page 170.
5         THE COURT: Okay.
6         MR. ROMEO: In the deposition -- are you there yet,
7  Your Honor?
8         THE COURT: No.
9         MR. ROMEO: Okay.
10        THE COURT: Yeah.  Thanks.  Okay.  We have III and
11 IV here.
12        MR. ROMEO: Yes.  But I just lodged those because
13 I'm going to be using all four volumes.
14        THE COURT: Okay.  So you're talking about Volume
15 II now, which you gave to us previously?
16        MR. ROMEO: Yes, sir.
17        THE COURT: I don't think I have it here.
18        MR. ROMEO: I have an extra copy here if you want
19 to --
20        THE COURT: I probably have it here.  Yeah, there
21 it is.  I did.  Thank you.  170.  Be there in just a second.
22 BY MR. ROMEO:
23 Q    In your deposition, I was asking you a question about
24 the San Francisco Building Professionals' account, Mr. Fu,
25 and starting at line 20, I asked you the following question:

1  "Question: Was Mr. Yan under your agreement with

2  him, was he allowed to also get credit for the

3  300,000 by paying directly from his own account

4  other expenses of the project?

5  "Answer: No."

6  And then you added the following comment, quote:

7  "I would like to add that it was him just put him

8  the money and I am the one who will do the job."

9  End quote.  Is that your testimony, Mr. Fu?

10  A    Yes.

11  Q    And at page 189, line 25, you also added a comment to

12  one of your questions, you said:

13  "And it was also the agreement that I was building

14  the general project."

15  End quote.  And that ends on page 190, line 1.  Did you make

16  that statement during your deposition?

17  A    Would you say it again?

18  Q    "And it was also the agreement that I was building

19  the general project."

20  A    Yeah, I was the one, yes.

21  Q    And then a little further on in your deposition, I

22  asked you some further questions about this account, and

23  starting on page 191, line 14, I was you a question about

24  the SFBP account and how any -- what could be paid out of

25  it.  And the question was:

1   "Question: When you say anything, are you

2   referring to anything as in a plumbing contractor,

3   a Home Depot bill, drywall delivery, or using it

4   in even a broader sense?"

5   And then Mr. Farrer makes an objection and then I asked the

6   question again.

7   "Question: When you say anything related to the

8   construction of the project."

9   And you gave the following answer:

10  "Quite frankly, I don't know how to answer your

11  question because the primary purpose -- I go back

12  to the account -- he is going to put 300,000 into

13  it.  Make no mistake about it, otherwise it will

14  be very confusing.  And he's writing his own

15  checks to his 547 - 23 and also some other places.

16  And the agreement very clearly, specifically, oral

17  or written, 300,000, put it in, and I'm going to

18  build that building."

19  End quote.  And that ends on page 192, line 5.  Do you

20  recall that testimony?

21  A    I think so.  Yes.

22  Q    And so based on that, then your role was to be the

23  builder in the joint venture partnership or what have you

24  with Mr. Yan, correct?

25  A    Because it is true that I am involved in building the

1    project, it is, because I invest my money and time and

2    energy to get the new building.

3    Q    Well, I go back to the pleading you filed in the court.

4    You said it was your primary responsibility to be the

5    builder; isn't that true?

6    A    Primary responsibility for the --

7    Q    I'm only using your words, Mr. Fu.

8    A    Right or wrong, I don't know.  I made a lot of

9    mistakes, but the understanding for this project, for this

10   joint venture as a partner, I have the general contracting

11   experience, and I am the one hiring others as a contractor

12   and to fulfill the tasks and that's what I did, yes.

13   Q    Okay.  Let's take a look if you could to Exhibit NN.

14   You testified a little earlier today about the bank

15   statements that you had for the SFBP account, correct?

16   A    I think so.

17   Q    And you had signing authority over that account and so

18   did Mr. Yan, correct?

19   A    That's correct.

20   Q    And that account -- from that account people who worked

21   on the project were paid their wages or charges, correct?

22   A    Correct.

23   Q    And if you look, for example through this listing, this

24   is a numerical listing in order of the checks of that

25   account, right?

1    A    Yeah, I think so.

2    Q    And there's a number of the listed checks or payments

3    are to people who worked on the project; do you see those

4    names?

5    A    Yes.

6    Q    For example, there's a Mr. Li, L-i.  There's a Mr.

7    Wen, W-e-n.

8    A    Yes.

9    Q    There's a Charles Li, L-i, correct?

10   A    Yes.

11   Q    A Tony Ng, N-g.

12   A    Yes.

13   Q    Lee Ruikun, R-u-i-k-u-n.

14   A    Where is that?

15   Q    Second page, 177, check number 177.

16   A    Well, I think so.

17   Q    And I'm not sure how you say this name, but Kui, K-u-I,

18   and then a Mr. Yik, Y-i-k.

19   A    Yeah, I think so.

20   Q    Those were all people that worked on the project,

21   correct?

22   A    That is correct?

23   Q    They did carpentry or plastering or various tasks

24   around the project when it was being built.

25   A    Yeah.  There's more people too, yes.

1  Q    And there were other people too.

2  A    Yes.

3  Q    And you hired all of them; didn't you?

4  A    Actually us both, Mr. Yan and I hired them.

5  Q    All right.  Let me ask you this.  Did Mr. Yan know

6  these people, any of them?

7  A    Like, for example, Mr. Li, not only he hired him for

8  Chenery, he also hired him for his 547 - 23 Avenue.

9  Q    You're talking about Charles --

10          MR. CHU: Objection.  Non-responsive.

11          THE WITNESS: I'm sorry.

12          MR. CHU: The question was if he knew any of these

13  people.

14          THE WITNESS: Yes.

15  BY MR. ROMEO:

16  Q    You knew these people beforehand.

17  A    I'm sorry.

18  Q    You knew these people beforehand that you hired to work

19  on the project.

20  A    No, I may not.

21  Q    But you did the hiring.  You located the workers to

22  work on the project.

23  A    I located them, and also Mr. Yan located them.  I don't

24  know who to whom.

25  Q    Who did Mr. Yan locate, Mr. Fu?

1  A    It is a long time, so I don't know, I mean who and who,

2  kind of mixed up, I'm sorry.

3  Q    So you can't tell me which ones Mr. Yan hired; is that

4  what you're saying?  You don't remember?

5  A    All the peopled hired, and he participate.

6  Q    Okay.  But you were the one that located all of these

7  people and hired them.

8  A    I remember we put it on the ad to have people come, and

9  then we talk to them and see if they fit for the jobs.  So

10  we did just all that.

11  Q    Okay.  And with your general contracting experience,

12  you were the one that decided who was fit for the jobs.

13  A    He made comments too, and I -- I mean, we respect each

14  other at that time.

15  Q    Well, let me ask the question again so you can answer

16  it.  With your general contracting experience, you were the

17  one that determined a particular worker's fitness for a job

18  and whether to hire them, correct?

19  A    I don't know how to answer your question, yes or no,

20  because Mr. Yan gave me a lot of input.

21  Q    Now if you were building this project, you were keeping

22  track of some of the expenses that were being incurred to

23  build the project, true?

24  A    True.  True.

25  Q    In fact when you were testifying this morning about the

1  SFBP account, you were concerned about what you said was Mr.

2  Yan's refusal or inability to make deposits into that

3  account, correct?

4  A    Could you make a shorter sentence.

5  Q    A softer sentence?

6  A    No, a shorter.

7  Q    Shorter, okay.  You said at one point you were

8  concerned that Mr. Yan was not depositing funds into the

9  account.

10 A    I did.

11 Q    And the reason you were concerned is because there were

12 going to be expenses that were already incurred or needed to

13 be paid, true?

14 A    True.

15 Q    And you were the one watching what expenses were either

16 already incurred or were coming down the pike, as it were,

17 correct?

18 A    Yes, correct.  And also I'd like to add, it's like he

19 is supposed to -- in our agreement, he is supposed to input,

20 like put into the account the $300,000 in the early stage.

21 Q    Okay.  But to go back to my question, my question was,

22 you were very concerned about having enough money to meet

23 expenses, correct?

24 A    Very concerned, I don't know how to answer that

25 wording.  I mean we are friends and I would tell him, hey,

1  put some more money in, something like that.  It's informal.

2  It's all -- I mean all based on good faith.

3  Q    But you were the one that was keeping track of the

4  expenses, correct?

5  A    We were both keeping track of the whole thing.

6  Q    Well, you said that you were watching the account, and

7  you just told me that you were concerned that you'd have

8  enough money in that account to meet expenses, correct?

9  A    Yes and no, because Mr. Yan is also watching the

10  account and also he is the one who knows even better than I

11  am.  I mean we all are into one thing.  It's like he put in

12  money, and after he fulfill all his contractual obligations

13  and I -- how should I say -- I won't be bugging him, if he

14  did.

15  Q    Okay.  But you were bugging him.

16  A    I did.

17  Q    And you were bugging him because you were keeping track

18  of what expenses were going to be incurred.

19  A    I told you, we both keep track with it.  He did it too,

20  because he was short of money and then he would -- he

21  would -- I mean ask me of the money coming in, and I'm short

22  of money, short, I'm sorry, maybe my pronunciation wasn't

23  that good -- so short of money.  So it wasn't that bad, even

24  though some delay or something, so I did not really like

25  what you just said, very concerned, or something.

1 Q    Well, you were the one that had the primary

2 responsibility for doing the purchasing, if I understand the

3 pleading you filed in this case correctly.  You said in your

4 pleading in the assignment of Proof of Claim, that

5 purchasing materials and labor was part of your role,

6 correct?

7 A    Oh yes.

8 Q    And because you were doing the purchasing, you were the

9 one that knew what needed to be purchased and what expenses

10 needed to be paid, correct?

11 A    Correct.

12 Q    That was your primary responsibility -- or part of your

13 primary responsibilities, correct?

14 A    It is part of my -- yeah, one of the things, yeah one

15 of the --

16 Q    Part of running the project, correct?

17 A    That's correct, yeah, this joint venture, yes.

18 Q    And so because you were keeping track of that and that

19 was part of your primary responsibilities, it was you that

20 was telling Mr. Yan what expenses were going to be incurred

21 or needed to be paid, correct?

22 A    Correct.  And also he knew it and he --

23 Q    This morning you were testifying about the SFBP account

24 that was set up for clearing the construction costs in this

25 project, correct?

A    Is that one question or two questions.  Give me a short question.

Q    Let me ask a different -- let me ask a shorter and more direct question, Mr. Fu.  Why don't you take a look at PP, Exhibit PP.  We were looking at that this morning.  I think you identified those as the bank statements for the SFBP account.

A    Yes.

Q    And your testimony this morning was that the statements and the canceled checks both came back from the bank on a monthly basis for this account.

A    That's correct.

Q    And the statements and the canceled checks would go to your post office box at 5813 Geary, correct?

A    That's correct.

Q    And that's still your post office box, correct?

A    That's correct.

Q    And your testimony this morning, if I understood it, was that Mr. Yan had a key to that post office box?

A    That's correct.  I give him a key, yes.

Q    Did you ever take the key back?

A    No.

Q    And you're still using this post office box?

A    Yes.

Q    And if I understand your testimony, Mr. Yan got the

1  statements sometimes and you got the statements sometimes.

2  A    That's correct because when he went to the box to pick

3  up his mail too, so he regularly pick up the statement too.

4  Q    Okay.  And did you say this morning that the canceled

5  checks came back with the statements too?

6  A    Yes, it is.

7  Q    So this was the kind of account where the bank in

8  addition to sending you the statements actually sends you

9  physically the canceled checks back with the statement; is

10 that was you're saying?

11 A    I think so.

12 Q    Okay.  But you're not positive.

13 A    I think I'm positive.

14 Q    Let's go to Exhibit MM.

15        THE COURT: Before we leave -- you're not positive

16 whether you got the canceled checks?  Do you believe you got

17 the canceled checks?

18        THE WITNESS: No, we got the canceled checks.

19 BY MR. ROMEO:

20 Q    By the way, did Mr. Yan ever make a request to you for

21 copies of the bank statements and canceled checks after the

22 litigations between you began?

23 A    No.  I don't think so.  But he may -- but actually he

24 did have a complete set.

25 Q    But you have no personal knowledge of that, do you, Mr.

1  Fu?

2  A    Personal knowledge of what, I'm sorry.

3  Q    Well, do you recall Mr. Yan asking you for the bank

4  statements and the canceled checks, and you refusing to

5  provide those to him?

6  A    No, I don't recall he made that request.  I don't

7  recall that.

8  Q    Okay.  So you deny that that happened?

9  A    No, I don't recall that.  Yes.

10  Q    Okay.  So you're not denying it.  You just don't recall

11  it.

12  A    I really don't think he make a request like that.  No.

13  Q    But you're telling me it's because you don't recall it,

14  or are you telling me that because you're denying it?

15  A    How should I say it -- let's see -- I really don't

16  recall he make that request.

17  Q    Now with regard to this account, you said that you were

18  the only one that was supposed to sign checks on this

19  account, true?

20  A    True.

21  Q    If you look at Exhibit MM and I've got -- the exhibit

22  is organized according to check numbers, so you can kind of

23  treat this as page numbers, if you go through that.

24          THE COURT: MM?

25          MR. ROMEO: Yeah, Exhibit MM.

BY MR. ROMEO:

Q    If you turn to check number 106.  It's on the second page of the exhibit, Mr. Fu.

THE COURT: 106, okay.

BY MR. ROMEO:

Q    Whose signature is on that check?

A    It's Mr. Yan's signature.

Q    And if you go to check number 112, it should be a few pages in.  Whose signature is on check number 112?

A    It's Mr. Yan's.

Q    If you would go to check number 131.

THE COURT: 131?

MR. ROMEO: Yes.

BY MR. ROMEO:

Q    Whose signature is on that check?

A    It's Mr. Yan's.

Q    And if you go to check number 144.  Whose signature is on check 144?

A    Mr. Yan's.

THE COURT: 144, okay, hold on.

MR. ROMEO: And the answer was?

THE WITNESS: Mr. Yan.

BY MR. ROMEO:

Q    With regard to these four checks, Mr. Fu, weren't they all made out to you?

1    A    True.

2    Q    And you cashed them?

3    A    I think so.

4    Q    And at the time you cashed them, you could see that Mr.

5    Yan had signed those checks; couldn't you?

6    A    Oh, I'm sorry.  What question --

7    Q    Couldn't you see that those were signed by Mr. Yan at

8    the time you cashed them?

9    A    Correct.  Yes.

10   Q    Now with regard to your agreement, Mr. Yan was supposed

11   to pay the first $300,000 of the construction costs,

12   correct?

13   A    Correct.

14   Q    And in looking at the agreement, the term that's

15   actually used is construction costs, correct?

16   A    That's correct.

17   Q    And construction costs means, for example, materials,

18   labor, deliveries, utilities, things like that, correct?

19   A    You said utilities, I don't believe utilities is part

20   of the construction costs, usually when you go out, a

21   contractor do a job for you.

22   Q    Okay.  Well, let's set that one aside as arguable for

23   right now.  But you, before your license was suspended had

24   about ten years more or less of construction experience as a

25   licensed general contractor, true?

1  A    True.

2  Q    And as a licensed general contractor, you know that

3  construction costs would mean things like hiring the workers

4  and buying drywall and framing and various things that go

5  into -- the various physical components that go into the

6  construction, true?

7  A    Yes.

8  Q    And that's what was meant in the agreement, was

9  construction costs meant buying labor and materials to build

10  the Chenery project, correct?

11  A    That's correct.

12  Q    There's no special other meaning to that term; is

13  there?

14  A    Yes, you're correct.

15  Q    Are you still on Exhibit MM, Mr. Fu?

16  A    MM, yeah, I think so, yes.

17  Q    Okay.  What I'd like you to do is to go to check number

18  136.  Have you found that one?

19  A    Yes.

20  Q    And that's payable to a person named Ming Fong?

21  A    Correct.

22  Q    And that check is signed by you; isn't it?

23  A    Correct.

24  Q    And it's for $35,000?

25  A    Correct.

1 Q    And I'd like you to go further into the exhibit to go

2 to checks 152 and 153, if you could.  Taking check 152

3 first, that's another check to Ming Fong but this time in

4 the amount of $25,000, correct?

5 A    That's correct.

6 Q    And the next one over -- and that's -- excuse me.  That

7 check 152 is signed by you; isn't it?

8 A    True, yes.

9 Q    And the next check over, number 153, dated a few days

10 later, September 21st, 2001, for $20,000 to Ming Fong,

11 correct?

12 A    Correct.

13 Q    And that's also signed by you?

14 A    Correct.

15 Q    And I believe that in deposition, you told me that Ming

16 Fong was a person who you hired to work on this project,

17 correct?

18 A    Correct.

19 Q    And you told me Mr. Fong worked full time on the

20 project, correct?

21 A    I said he worked a lot of times.

22 Q    Well, do you remember specifically telling me that Ming

23 Fong was there six days per week most of the time?

24 A    I said to you he's there for a lot of time, yes.

25 Q    Okay.  But do you remember telling me that he was there

1  six days a week most of the time?

2  A    I don't think I specifically say that.  Well, anyway,

3  he is there a lot of time, yes.

4  Q    Well, do you remember saying that he was there six days

5  a week most of the time?

6  A    He was there most of the time.

7  Q    Six days a week.

8  A    In almost a year period.

9  Q    For almost a year period, correct?

10  A    Yes, correct.  That's correct.

11  Q    And it's your testimony that Ming Fong was there from

12  June 2001, shortly after construction started, until

13  approximately May 2002.  Wasn't that your testimony?

14  A    I think so, yes.  I -- yeah --

15  Q    And Ming Fong is a long time friend of yours, correct?

16  A    Correct.

17  Q    And he knows your family from -- I think from China;

18  doesn't he?

19  A    I know him in China, yes.

20  Q    Okay.  And he in fact lives in Hong Kong.

21  A    He lived in the United States for quite a long time.

22  Q    Okay.  Are you telling me that he lived in the United

23  States in 2001 and 2002?

24  A    And 2003 until 2004, I think.

25  Q    Okay.  And presently -- and you're still in contact

1  with Mr. Fong.

2  A    I did.  I do.

3  Q    And he resides now in Hong Kong, correct?

4  A    Right now, he's in Hong Kong, correct.

5  Q    And when you say he was working on this project, I

6  think you told me that he was your right hand man, correct?

7  A    Correct.  He give me a lot of help, yes.

8  Q    Okay.  He was a very trusted managerial person that was

9  helping you run this project.

10 A    Yeah, he helped me a lot.

11 Q    But I think you told me that you expressed great

12 confidence in him because you had known him for such a long

13 time, correct?

14 A    Yes, that's correct.

15 Q    And you think a lot of his abilities as a construction

16 or a supervisor -- a construction supervisor, correct?

17 A    Yes.

18 Q    And so if I'm reading or adding up these checks

19 correctly, you paid Mr. Fong $80,000 between August 16, 2001

20 and September 21st, 2001, correct?

21 A    That's correct.

22 Q    On these three checks.

23 A    Yes.

24 Q    And that was for his work as your right-hand man on

25 this project, correct?

1  A    That's correct.

2  Q    Now when I first asked you about these checks in your

3  deposition, isn't it the case that you told me you didn't

4  recall who Mr. Fong was?

5  A    I don't think it's relevant to go into the detail, I

6  mean the detail, and because -- just because I really think

7  it was irrelevant.

8  Q    Okay.

9  A    At that point.

10 Q    I'm still in Volume II of your deposition.

11          THE COURT: What page?

12          MR. ROMEO: I'm going to go start reading at page

13 198, line 8:

14          "Question: Okay.  And flipping over one more and

15          going to check 136, a $35,000 check to someone

16          named Ming Fong.

17          "Answer: Yes.

18          "Question: Whose signature is that on the check?

19          "Answer: That's my signature.

20          "Question: That's on August 16th, 2001?

21          "Answer: Correct.

22          "Question: What did Ming Fong do for the project

23          for $35,000?

24          "Answer: I don't recall that.

25          "Question: You have no idea why you wrote a check

1    for $35,000 to Ming Fong?

2    "Answer: I just said that I don't recall that.

3    "Question: You don't recall what Ming Fong did for

4    the project?

5    "Answer: Correct.

6    "Question: Do you know who Ming Fong is?

7    "Answer: I don't recall.

8    "Question: You have no clue looking at this check

9    as to who Ming Fong is.

10   "Answer: I told you I don't recall.

11   "Question: Do you have any clue looking at this

12   check what the purpose of the check was?

13   "Answer: I -- same answer, yes.

14   "Question: Same answer, I don't recall?

15   "Answer: I don't recall.

16   "Question: Do you think you knew at one time why

17   you were writing a check to Ming Fong for $35,000?

18   "Answer: Yeah, same answer again.

19   "Question: You don't recall or you don't recall if

20   you even knew why you were writing a check?

21   "Answer: Yeah, I don't recall.  Yeah, writing a

22   check -- wait a minute.  That was my signature

23   here.  I wrote the check and --

24   "Question: Is the check itself for 35,000 and the

25   name of the payee and the date, is that in your

1        handwriting?

2            "Answer: Yes, that's my handwriting.  Correct."

3    Do you remember giving that testimony, Mr. Fu?

4    A    Yes, I did.  I apologized for that later.

5    Q    Reading from your deposition, page 201, line 20, 23,

6    excuse me:

7            "Question: Let's go to check 152.  This is a check

8            dated September 19th, 2001 payable to a Ming Fong

9            in the amount of $25,000.  I guess this is the

10            front and back of the check with Ming Fong's

11            endorsement on it.  Did you write this check?

12            "Answer: I signed this check, yes.

13            "Question: The other entries on the check, is

14            that your handwriting?

15            "Answer: The other handwriting here on the check,

16            on the face of the check?

17            "Question: Right.

18            "Answer: Yes.

19            "Question: What did Ming Fong provide to the

20            project in September 2001 for what you needed --

21            or I don't know if it's even a she, but Ming Fong

22            needed to be paid for $25,000?

23            "Answer: I don't recall that."

24    Is that your testimony in your deposition, Mr. Fu?

25    A    Yes.

Q    And then reading at page 202, line 20:

"Question: Flip it over one more check to 153.
This looks like a check on the same account dated
September 21st, 2001 in the amount of $20,000
payable to a Ming Fong.  Can you tell me what
contribution or debt was owed to Ming Fong from
this project on September 21st, 2001 for which
Ming Fong was paid $20,000 from this account?

"Answer: I don't recall.

"Question: Is that your signature on the check?

"Answer: Correct.

"Question: Is the check in your handwriting?

"Answer: I'm sorry?

"Question: Is the check in your handwriting?

"Answer: Check in my handwriting, yes.  I issued
the check, yes.

"Question: So by this time, you had issued checks
to a Ming Fong for 35,000, 25,000 and $20,000.  If
my math is correct, that would be $80,000,
correct?

"Answer: I assume that's correct.  That's what you
told me.

"Question: And notwithstanding that we're talking
about $80,000, you have absolutely no recollection
as to what project expense is being retired by

these payments to Ming Fong.

"Answer: I don't recall at this time."

Was that your testimony, Mr. Fu?

A    Yes.

Q    And then later on in the deposition, you decided to give me different testimony that he worked on the project, that I just went through with you, correct?

A    What you're saying is not correct, but it is Mr. Chu advised me I should not be offensive -- offensive and should cooperate, so I did apologize for that.  I did.

Q    Okay.  Let's go to Exhibit VV in your book there.

THE COURT: VV?

MR. ROMEO: Yeah, VV as in Victor.

BY MR. ROMEO:

Q    Exhibit VV is some responses to some interrogatories that you provided in the State Court litigation; isn't it, Mr. Fu?

A    Yes.

Q    If you would go to page 5 and read, if you would, from line 3, specially prepared interrogatory number 3, to line 15, your response to interrogatory number 3.  Do you see that?

A    I see that.

Q    And the question in the interrogatory is:

"Identify by name, position, address and telephone

1          number of all persons you hired to work on the

2          project."

3 And your response was to list four people, Valley

4 Inspection, Incorporated, Wei Suen who was here this

5 morning, Charles Li, who we've discussed who's the engineer,

6 and Tony Ng Plumbing Company, correct?

7 A    That's correct.

8 Q    And in fact you didn't list your right-hand man, Ming

9 Fong; did you?

10 A    I did list this four -- yeah, I did not list the

11 others.

12 Q    All right.  And you paid Ming Fong $80,000 for his work

13 on this project, correct?

14 A    Yes.

15 Q    And if I understand the check register in your

16 construction costs account correctly, Wei Suen was paid

17 about $15,000 for all of his work, correct?

18 A    I'm sorry?

19 Q    Wei Suen was paid about $15,000 for his work, correct?

20 A    More.

21 Q    Okay.  Well, I only saw one check for $15,000.

22 A    That's one -- in that company account, and I --

23 Q    Okay.  But in any case -- and that's your signature on

24 the last page of these interrogatory responses, correct?

25 A    Yes.

1  Q    You verified these under oath, correct?

2  A    That's correct.  But --

3  Q    On September 29th, 2004, correct?

4  A    Correct.

5  Q    After you'd had -- you had the interrogatories for a

6  long time before you had to answer them; didn't you?  You

7  had them at least 30 days.

8  A    Yes.

9  Q    You had adequate time to think about the answers and

10 make them as complete and truthful as possible; didn't you?

11 A    It is -- yeah, I try to be -- and also subject to the

12 primary statement in the general objections.

13 Q    If you can refer back to Exhibit MM again, the checks,

14 Mr. Fu?  If you could go to check number 165.

15          THE COURT: This is back in MM?

16          MR. ROMEO: Yes, sir.

17 BY MR. ROMEO:

18 Q    Do you see that check?

19 A    Yes.

20 Q    Is that signed by you?

21 A    Yes.

22 Q    Was it made out by you?

23 A    Yes.

24 Q    Was it given by you to San Francisco Toyota?

25 A    Yes.

1  Q    And that's for $13,000?

2  A    Yes.

3  Q    And if you go to the next check, check number 166, this

4  is also made out to San Francisco Toyota?

5  A    Correct.

6  Q    The check is in your handwriting.

7  A    Correct.

8  Q    Dated the same day, correct?

9  A    Yes, correct.

10 Q    And it's signed by you, correct?

11 A    Correct.

12 Q    And it's presented by you to San Francisco Toyota,

13 correct?

14 A    Correct.

15 Q    And in exchange for presentation of these checks to San

16 Francisco Toyota, you purchased a truck; didn't you?

17 A    Correct.

18 Q    And you still have that truck; don't you?

19 A    Yes.

20 Q    Let's look at exhibit -- or check number 236, same

21 exhibit, Mr. Fu.

22         THE WITNESS: Your Honor, may I ask that I -- I

23 want to go to the bathroom.

24         THE COURT: Yes.  We can take a break, that's fine.

25         MR. ROMEO: Okay.

1       THE COURT: That's fine.  Let's take till quarter

2  to, seven or eight minutes, okay?

3       MR. ROMEO: What time?

4       THE COURT: About a quarter to on that.

5       MR. ROMEO: Okay.  I'm sorry.

6       THE COURT: I think that will probably be enough.

7  Okay?

8       MR. ROMEO: That's fine, Your Honor.

9       THE CLERK: All rise.

10     (Whereupon, a recess is taken at 2:36 p.m., and the

11  court is reconvened at 2:47 p.m.)

12       MR. ROMEO: I have just another question about the

13  truck.

14  BY MR. ROMEO:

15  Q    You said that you have the truck, you still have the

16  truck currently, correct?

17  A    Correct.

18  Q    What kind of truck is it?

19  A    It's a Toyota Tundra.

20  Q    Okay.  And you were the one that picked out the truck

21  correct?

22  A    I was there with Demas, yes.

23  Q    Are you saying that Demas Yan was there and helped you

24  pick out this truck?

25  A    Originally, yes.

Q    Do you remember in your deposition giving the following testimony, and I'm on Volume II, page 208, starting on line 17:

  "Question: So you bought a truck at San Francisco Toyota?

  "Answer: That's correct.

  "Question: What kind of truck did you buy?

  "Answer: I don't recall.

  "Question: Do you know where the truck is today?

  "Answer: I don't recall because it's totally irrelevant here to the $300,000.

  "Question: Were you the person who selected the truck?

  "Answer: I don't recall.

  "Question: Do you remember if someone else selected the truck?

  "Answer: Same answer.  And also I would like to say this is distracting, I mean the main issue."

Do you remember giving that testimony?

A    Yes.

Q    So now you remember the make of the truck and that it's in your possession; is that what you're telling me?

A    Sorry, your question -- what was the question?

Q    My question is, now you remember who selected the truck and where it is and what kind it is, correct?  At your

1 deposition you told me you couldn't recall.

2 A    Because at the time I was sick of the questions, that's

3 all.  I'm sorry.

4 Q    Well, you understood you were under oath at your

5 deposition, correct?

6 A    I do.

7 Q    Okay.  And you understood you were supposed to be

8 telling the truth and the whole truth, correct, Mr. Fu?

9 A    That's correct, and I also --

10 Q    On that occasion, you didn't tell the whole truth; did

11 you?

12 A    I did tell you the truth that I object to it, and it's

13 irrelevant.  That's my response.

14 Q    Okay.  Let's take a look then -- I had you open the

15 exhibit to check number 236.

16 A    236.

17 Q    Is that check in your handwriting?

18 A    Yes.

19 Q    And it's signed by you; isn't it?

20 A    Yes.

21 Q    Dated 12/20 -- is that 25 or 28/01?  You'll have to

22 interpret your handwriting for me.

23          THE COURT: Which check now?

24          MR. ROMEO: 236, Your Honor.

25          THE WITNESS: That's December 25.

BY MR. ROMEO:

Q    12/25/01?

A    Uh-huh.

Q    Christmas Day?

A    Yes.

Q    To Bailey, Banks and Biddle? (Phonetic)

A    12/25/01, yes.

Q    What construction cost did Bailey, Banks and Biddle represent, Mr. Fu?

A    I don't recall that.

Q    Do you know what was purchased at Bailey, Banks and Biddle?

A    I don't recall.

Q    Do you believe that this was a check that was written to cover a construction cost for the project?

A    I don't recall that.

Q    Well, I was just asking you if you believe that this is a check written to cover a construction cost for the project?

A    Looking at this specific check, I don't recall what this was for.  It's been so many years.

Q    Uh-huh.

A    I'm sorry.

Q    Do you know what Bailey, Banks and Biddle is?

A    I don't recall that at this point.

Q    Is it a supplier to the construction industry?

A    I'm sorry.  I don't recall this particular check.

Q    If I showed you something from Bailey, Banks and Biddle, would that refresh your recollection as to what type of an organization or vendor Bailey, Banks and Biddle is?

A    Is that a question, I'm sorry?

Q    Yeah.  If I showed you something from that particular vendor, would that refresh your recollection as to what sort of merchandise Bailey, Banks and Biddle sells?

A    I don't know.

Q    You don't know if it would refresh your recollection?

A    I don't know.

Q    Can I show you a copy of the Bailey, Banks and Biddle home page from Baileybanksandbiddle.com?

A    You can show me anything.

Q    And then we'll see if that will refresh your recollection?

A    I don't recall what this is for.

Q    Well, I'll show you a copy of Bailey, Banks and Biddle's home page, just the home page on the Internet and that's a jewelry store; isn't it, Mr. Fu?

A    I think so.  Yeah, according to this home page, yes.

        MR. ROMEO: Do you want to see this?

        THE COURT: I know what they are.

        MR. ROMEO: Okay.

BY MR. ROMEO:

Q     So do you believe that you wrote check number 236 for the purchase of some jewelry on Christmas Day in 2001?

A     I don't recall specifically what that was.

Q     Now you had signing authority on this account, correct?

A     That's correct.

Q     And you used this account also to pay credit cards that were in your name, correct?

A     That's correct

Q     And there's a lot of these checks, Mr. Fu, and just to save time, I wonder if I were to read off the numbers, could you tell me -- I'm going to read them off in serial order, so you can go through the exhibit -- if you can tell me if I am correct about which of those checks go to payment of your personal credit cards.  Would that be a good way to proceed to save some time?

A     I don't know how to answer.

Q     Well, supposing that I was to take all of these checks and there's quite a few of them and read them off to you and you can follow along in the exhibit, can you tell me or affirm to me whether those are the checks that were written to make payments on your personal credit cards?

A     Generally speaking, I can.

Q     Okay.  Let's try that then.  Going to Exhibit MM, let's start with check number 172.  Are you with me so far?

1   A    172?

2   Q    Yes.  Okay.  I'm just going to read them off in

3   numerical order.  172, 173, 174, 184 --

4            THE COURT: Better slow down.

5            MR. ROMEO: Okay.

6   BY MR. ROMEO:

7   Q    185, 186, 187 --

8            THE COURT: Okay.  Slow down.

9            MR. ROMEO: Okay.

10  BY MR. ROMEO:

11  Q    188, 189, 196, 197, 203, 205, 206, 207, 208, 209, 213,

12  218, 219, 220, 221, 223, 224, 226, 227, 231, 232, 233, 234,

13  235, 237, 241, 242, 246, 247, 254, 255, 256, 257, 262, 266,

14  267, 268, 269, 270, 276, 277, 278 and that's it.  Did you

15  look at those checks, Mr. Fu?

16  A    I did.

17  Q    Are those the ones that relate to payments by you from

18  this account on your personal credit card expenses?

19  A    I'm sorry, would you say it again?

20  Q    These were the checks that you wrote off of this

21  account for your personal credit card expenses?

22  A    Yeah, that's correct.

23  Q    And the first time you wrote one of these checks was on

24  October 28th, 2001, starting with check 172.  And it appears

25  that the last check that I read out, 278, was written on

1   February 26th, 2002, correct?

2   A    170 -- I'm sorry?

3   Q    278 written on February 26th, 2002.

4   A    Which number is it, I'm sorry?

5   Q    It's check 278, Mr. Fu.

6   A    278?

7   Q    Yes.

8   A    Was this the first check, you said?

9   Q    The first one that I read which was 172.

10  A    172.  And then the last check?

11  Q    278.

12  A    278.

13  Q    Correct?

14  A    Yeah, that's what it says here.

15  Q    Okay.  And looking at Exhibit PP if you could, the bank

16  statements, I guess if you go to the fourth from the last

17  page, this would be the statement for the period March 1st

18  through March 29th, 2002.  Do you see that?

19  A    See what, I'm sorry?

20  Q    I opened your exhibit book to the statement for March

21  1st to March 29th, correct?

22  A    That's correct.

23  Q    What's the opening balance, Mr. Fu?

24  A    Opening balance, 20,000.

25  Q    $20,658.14?

1    A    Yes.

2    Q    And I believe your testimony this morning was that you

3    were concerned at this time that Mr. Fu -- or Mr. Yan needed

4    to deposit additional funds into the account; is that true?

5    A    Did I say that, at this time?

6    Q    Yes.

7    A    No, I don't believe so.  I mean I did ask him to put

8    money in, that it's not enough.

9    Q    There's not enough to --

10   A    At this particular time, I don't -- did I say that?  I

11   don't know the time for this one.

12   Q    It's true that you expressed -- I believe you testified

13   this morning that you expressed concern to Mr. Yan that

14   there wasn't enough money in the account to cover expenses

15   that were coming down the pike.

16   A    Yeah, that's true.

17   Q    Now, part of your agreement with Mr. Yan was that you

18   made some additional change orders and I think in your

19   deposition you used the term "side deals," correct?

20   A    That's correct.

21   Q    And those came up because Mr. Yan asked for different

22   materials to be used or different configurations to be used

23   in the project in the middle of the construction, correct?

24   A    That one was almost done.

25   Q    Okay.  My question to you is that at certain times

1  during the project, you and Mr. Yan had to have a discussion

2  about a so-called "side deal," correct?

3  A    It was a lot of times.

4  Q    Okay.  And when you had those, you told Mr. Yan that

5  there had to be a change order, correct?

6  A    Side deal and change order is the same thing.

7  Q    Okay.  So --

8  A    I'm sorry, like when that happening.

9  Q    Right.  And based on your experience as a contractor,

10  when you have a side deal or a change order, either term,

11  that usually means that there's been a change in the

12  materials or the construction that requires an additional

13  expense to be paid by the owner, correct?

14  A    Actually, change order and side deal is quite

15  different.  I mean in this case -- I know I have side deals

16  with Demas because we're partners, so we make deals.

17  Q    Okay.  At one point, for example, I think that you made

18  what you call a side deal with Mr. Yan where he had to pay

19  you additional monies for some flooring that he wanted that

20  you didn't want to use because of the additional expense,

21  correct?

22  A    Could you show me where is it?

23  Q    I'm just asking independently of a document right now.

24  You said there were side deals with Mr. Yan many times.

25  A    Many side deals, yes.

1  Q    And in the many side deals, you asked him to pay

2  additional expenses because he requested a different finish

3  in the interior or different framing configuration or things

4  that were going to incur additional expense for the project,

5  correct?

6  A    That's correct.

7  Q    And so you wanted him to pay additional money in

8  addition to the 300,000 so that you would do the change that

9  he requested, right?

10  A    Correct.

11  Q    And that happened many times during the construction.

12  True?

13  A    Yes.

14  Q    Okay.  Now --

15          THE COURT: Now we're talking about Chenery.

16          MR. ROMEO: Yeah, Chenery.  I'm sorry, if I didn't

17  make that clear, Mr. Fu.

18          THE COURT: Well, I'm just confirming that.  I

19  thought you did, because there was other things that they

20  worked on.

21  BY MR. ROMEO:

22  Q    In your testimony this morning, you told the Court that

23  in your view Mr. Yan had only put in 200,000 of the 300,000

24  that he originally promised, correct?

25  A    Yes.

Q    And if I understand your testimony, the way that we get
to the $200,000 figure is that he made $235,000 of deposits
into the SFBP account over the period in which it was in
existence, true?

A    That's true.

Q    And then he wrote you four checks you said that were
supposed to be a remuneration or compensation for an
entirely different project, being a lot on Majestic Avenue,
correct?

A    Correct.

Q    And the checks that you said were paid for that totaled
$36,000?

A    That's correct.

Q    And that was four payments of 9,000 each?

A    That's correct.

Q    And if you could open the exhibit book -- or let me do
it for you.  Let me go to Exhibit MM again.  By the way,
these are -- you've looked through this exhibit now, and
verified that these are the checks from the SFBP account;
haven't you?

A    I kind of look at it.

Q    Do you have any reason to doubt that these are the bank
copies of the checks?

A    No, I have no reason to doubt this.

Q    Okay.

1    MR. ROMEO: Your Honor, this is as good a time as
2  any.  I'd like to move MM into evidence before I forget.

3    THE COURT: Any objection?

4    MR. CHU: Not really, but since we're doing
5  housekeeping, I'd like to do one of my own.

6    THE COURT: I think it's a good idea not to forget.

7    MR. CHU: Yeah.

8    THE COURT: MM is admitted.

9                    (Whereupon, Debtor's Exhibit MM,
10                   copies of checks used for the
11                   Chenery Street project, is admitted
12                   into evidence.)

13    MR. CHU: MM.  I don't think PP has been moved in
14  yet.  Those were the bank statements.  I'd like to move
15  those in.  Also Exhibit 119, the Tapp Architectural Report.
16  I'd like to move that in.

17    THE COURT: I think that was admitted, but I'm not
18  sure.  I know they were marked --

19    MR. CHU: I didn't recall moving it in.

20    THE COURT: Is there any objection to 119 or PP?

21    MR. ROMEO: I'd actually like to hear a little
22  more -- I'd like to examine the witness about 119 before
23  I --

24    THE COURT: Okay.  Any objection to PP?  It's your
25  exhibit.

1    MR. ROMEO: Right.  I have no objection to that.

2                    (Whereupon, Debtor's Exhibit PP,

3                    bank statements, is admitted into

4                    evidence.)

5    MR. ROMEO:   And I believe III has been referred

6 to in Mr. Suen's deposition.  I don't think we moved that

7 one in.  That's the assignment of Proof of Claim that's on

8 file with the Court.

9    THE COURT: There are a lot of things here that I

10 don't know have been admitted.  Why don't we just go through

11 what I've got here and --

12    MR. ROMEO: Okay.

13    THE COURT:  Just to make sure, okay?  ZZ.  ZZ is

14 admitted.  CCC is admitted.  Okay.  I've got that.  And MM

15 is admitted.

16    MR. ROMEO: NN was referred to in Mr. Fu's

17 testimony.

18    THE COURT: Let me just --

19    MR. ROMEO: Sorry.

20    THE COURT: Let me sort of --

21    MR. CHU: NN, I'm going to object to, Your Honor.

22    THE COURT: PP has been admitted.  NN, let me look

23 at NN.

24    MR. CHU: NN, like in Nancy?

25    THE COURT: Yeah, that's a summary.

1        MR. CHU: It's a summary.

2        THE COURT: We need more documentation for -- more

3   foundation for that.

4        Okay.  Triple A.  Is AAA admitted?  And if so, is

5   there any objection?  We actually have a whole bunch of

6   them.  EEE, XX, YY, ZZ, AAA, III.

7        MR. CHU: Tripe A, I have that discovery objection

8   on triple A and triple B as well.

9        THE COURT: I don't know that we -- I don't have it

10  marked here one way or the other.

11       Okay.  NN, there's an objection to that.  And I

12  have to sustain that at this point until it's further

13  established.  VV --

14       MR. CHU: I'm sorry, Your Honor --

15       THE COURT: VV, Victor, Victor.  That's the

16  defendant's responses to interrogatories.  I don't know

17  what -- the only question could be whether they're the

18  correct ones, if it's a true copy.

19       MR. CHU: I have no objection on behalf of Mr.

20  Suen, but those responses were prepared by Mr. Fu in pro

21  per.  I don't know if he -- he may have objections.

22       THE WITNESS: I object to that, because I'm told

23  that this is not, what is it, how should I say, because Mr.

24  Yan disregard even the sanction.  He don't produce

25  documents.  I know that I was cooperating fully, and produce

1 whatever he asks, and -- I don't know.  I feel like --
2       THE COURT: This is a statement by you.  I think
3 it's admissible.
4       THE WITNESS: Okay.
5                      (Whereupon Debtor's Exhibit VV,
6                      defendant's responses to
7                      interrogatories, is admitted into
8                      evidence.)
9       THE COURT: That leaves III on which you wanted to
10 have some questions and there's a couple objections
11 outstanding.  I think that's everything we've dealt with so
12 far.  And 119, there was -- what was it with III?  Was it
13 III or was it 119?
14       MR. ROMEO: I have more questions about 119 I'd
15 like to ask.
16       THE COURT: Yeah, but III is --
17       MR. ROMEO: Proof of Claim, or Assignment of Proof
18 of Claim in this court.  I think I'd ask for request for
19 judicial notice.
20       MR. CHU: No objection on Triple III.
21                      (Whereupon, Debtor's Exhibit III,
22                      Assignment of Proof of Claim, is
23                      admitted into evidence.)
24       THE COURT: Okay.  So it's just -- it's AAA and
25 VVV, NN, that there are objections to and then you have a

couple questions about 119 that you're going to take up

right now I understand.

        MR. ROMEO: Well, in a bit.

        THE COURT: Or shortly.  Okay.

        MR. ROMEO: I don't want to get off the track.

        THE COURT: All right.

        MR. ROMEO: I'm sorry.  I didn't mean to divert us.

        THE COURT: Go right ahead.

        MR. CHU: There was one additional exhibit I had

that provisional exhibit to, Your Honor.  It was the

certificate of the Department, the State Contractor's

License Board.

        MR. ROMEO: EEE.

        MR. CHU: EEE, that's the one.

        THE COURT: EEE?

        MR. ROMEO: Yeah, that was a discovery objection.

        MR. CHU: I'm going to withdraw the objection to

Triple E, Your Honor.

        THE COURT: Okay.  That's admitted then.

                (Whereupon, Debtor's Exhibit EEE,

                State Contractor's License Board

                Certificate, is admitted into

                evidence.)

        THE COURT: Okay.  I think we're at least we've

done all we can do for the moment.  So go ahead please.

BY MR. ROMEO:

Q    Okay.  Are we back in Exhibit MM, Mr. Fu?  Do you have

it open?

            THE COURT: MM, right?

            MR. ROMEO: MM.

BY MR. ROMEO:

Q    You said that the checks -- there were four checks for

$9,000 that were written to you, and that was supposed to

satisfy some obligation to compensate you for a lot on

Majestic Avenue, correct?

A    No.  No.  What you're saying is not correct.  It's a

50/50 partnership deal that he gave me back the 50 percent,

the profit he earned after selling the lot.

Q    Okay.  But you used the term in your testimony,

"compensation," but I'll be happy to use your term.  You say

it was a 50 percent profit on that lot, correct?

A    That's correct.

Q    And that was a vacant lot that Mr. Yan had purchased?

A    Mr. Yan and I purchased it, yes.

Q    Okay.  But it was only in Mr. Yan's name though,

correct?

A    That was correct.

Q    And Mr. Yan purchased that vacant lot on Majestic

Avenue in 1998, correct?

A    I believe it's 1999.

Q    Well, let me ask you this --

A    Because that's the one next to Chenery, so it was just before Chenery.

Q    Okay. Just before Chenery, meaning just before you two got involved in developing Chenery.

A    Yeah. It's about almost concurrent when getting the deal with Winky, yeah, maybe '99, yeah.

Q    Okay. So he sold it 1999 and purchased it in 1998, correct?

A    I believe it was sold in 2000 or something. I believe it would be -- I need to check.

Q    Okay. You're not sure about the date, but you believe that it was before you got involved in Chenery.

A    Yeah, just before I got involved with Chenery, and at the time, it involved in Chenery, I think.

Q    Okay. And in Exhibit MM, can you tell me if you would if you can identify the $9,000 checks that are supposed to go to this compensation or this profit on the Majestic Avenue, which you've talked about this morning.

A    Could you say a shorter sentence?

Q    Which one of these checks in Exhibit MM are the four checks for the $36,000 that Mr. Yan diverted from the account to pay to you the Majestic Avenue profit?

A    He signed all these four checks. Whatever his signature is on that, that's the four checks.

Q   All right.  So you're telling me that those checks are
for Majestic Avenue, correct?

A   Yes.

Q   Now let's take a look at them.  The first check that
Mr. Yan signed, this check number 106, do you see that; do
you have that one in front of you?

A   I have that one, yes, correct.

Q   And there's a memo line on that, Mr. Fu.  The memo line
says "pay," correct?

A   Correct, yes.

Q   And then the next check for $9,000 that Mr. Yan signed
was check number 112, July 9th, 2001?  Am I correct?

A   Yes.

Q   And on the middle line, it says "Pay - July."  Correct?

A   Correct.

Q   And that's signed by Mr. Yan, correct?

A   That's correct.

Q   By the way, apart from the signature, isn't the check
number 106 which we just looked at, isn't that all in your
handwriting?

A   It looks like my handwriting, yes.

Q   The same question about check number 112.  Except for
Mr. Yan's signature, isn't that check entirely in your
handwriting?  Did you hear my question?

A   I think so, yes.

1   Q    And the question is, isn't check 112 in your

2   handwriting?

3   A    Yes.

4   Q    Except for Mr. Yan's signature?

5   A    Yes.

6   Q    And check 131, is that the next one that you were

7   referring to?

8   A    I'm sorry, what was the question?

9   Q    Is check number 131 the next $9,000 payment you were

10  referring to that was signed by Mr. Yan from this account?

11  A    That's correct.

12  Q    And is that -- I notice that's kind of a bad copy, but

13  is that check also, except for Mr. Yan's signature, also

14  entirely in your handwriting?

15  A    I think so.

16  Q    And I know it's real difficult to read, but doesn't

17  that say "Pay" in the bottom left-hand corner?

18  A    Yes.

19  Q    On the memo line?

20  A    Yes.

21  Q    And then going to check 144, that's the next $9,000

22  payment that you say relates to Majestic?

23  A    Yes.

24  Q    And on the memo line, is that your handwriting, "Pay of

25  September, S-e-p-t."?

1   A    I think so.

2   Q    And the rest of the check is in your handwriting; isn't

3   it?

4   A    Yes.

5   Q    Except for Mr. Yan's signature, correct?

6   A    Yes, correct.

7   Q    And then there's some additional checks also made out

8   to Tony Fu in the amount of $9,000 in this exhibit.  I

9   wonder if you could turn to check number 244.

10          THE COURT: There are actually some in-between.

11  Did you mean to skip those?

12          MR. ROMEO: Of $9,000 payments to Tony Fu.  I'm

13  only -- there's only six that meet that description.  I'm

14  just going to ask you about the last two.

15          THE COURT: Oh, I see.  Okay.

16          MR. ROMEO: 244.

17          THE COURT: In that amount, I see, yes.

18          MR. ROMEO: Right.

19  BY MR. ROMEO:

20  Q    Are you at 244, Mr. Fu?

21  A    Yes.

22  Q    And was this check written out by you?

23  A    Yes.

24  Q    And it's signed by you?

25  A    Yes.

1    Q    And on the memo line it says "Pay to Jan," J-a-n.  I

2    guess that means January?  Correct?

3    A    I guess so.

4    Q    And that's dated 1-11-02, correct?

5    A    Yes, correct.

6    Q    And then if you'd go to check number 253, it's a little

7    further in.  It's another check that's dated February 1st,

8    2002 in the amount of $9,000 and it says –- and this is also

9    entirely in your handwriting, correct?

10   A    That's correct.

11   Q    And on the memo line, it says "Pay - Feb," which I

12   assume means February, correct?

13   A    Yes.

14   Q    And it's signed by you?

15   A    M-hm.

16   Q    Yes?

17   A    Yes.

18   Q    Okay.  So there's actually six checks made payable to

19   you in the amount of $9,000 and they all say "Pay;" don't

20   they?

21   A    Yes.

22   Q    They don't say anything about Majestic; do they?

23   A    Did I say –- yeah.

24   Q    Okay.  Take a look at Exhibit SS, please.  Do you

25   recognize this document?

1  A    Yes.  Yes.

2  Q    This is a check that's payable to Dong Fu dated 6-1-99

3  on Demas Yan's account to you for $13,000, correct?

4  A    That's correct.

5  Q    And on the memo line it says, if I'm reading this

6  correctly, it says "P-r-o-f for 430 Majestic Avenue." Do you

7  see that?

8  A    I'm sorry?

9  Q    Doesn't that say P-r-o-f for 430 Majestic Avenue?

10  A    P-r-o-f?

11  Q    Yes.

12  A    What is that, p-r-o-f –- professional fee.

13  Q    Okay.

14  A    Is that what it say?

15  Q    It's a professional fee.  Okay.  So that says

16  professional fee 430 Majestic Avenue?

17  A    430 Majestic.  I don't know 430.

18  Q    Okay.

19  A    I don't know why that 430 gets to here.

20  Q    Okay.  What about the $13,000, does that ring a bell

21  with you?

22  A    Thirteen thousand dollars, it was the Majestic Avenue,

23  192 Majestic.  That lot required engineering, and the permit

24  fee to the City so –- and that Mr. Yan was like reimburse me

25  for that $13,000.

1  Q    Okay.  So that was payment to you for Majestic Avenue,

2  correct?

3  A    Because I make the up-front cost -- up-front -- I pay

4  the money to do the blueprint and the engineering.

5  Q    To get a permit for development.

6  A    And also, yeah -- and also have initial permit and

7  those are things and that was the money, it was reimbursed.

8  That was not -- just -- there was no project involved in

9  that.

10  Q    Okay.  So the address is wrong, but it's for the

11  Majestic Avenue lot that you're discussing, correct, the

12  $13,000?

13  A    That's true, but I don't know why that -- maybe it's

14  other project Mr. Yan was getting into it.

15  Q    So as I understand it then, as far as Mr. Yan breaching

16  your contract of October 18th, 2000, you're saying that he

17  underfunded by not -- by only putting in 235,000, correct?

18  A    Say that question -- I mean, it's too long a question.

19  Q    Okay.  So you said that broke the contract because he

20  only put in 235,000 when he was supposed to put 300,000 into

21  the account, correct?

22  A    That was the one way I look at it, yes.

23  Q    Okay.  And then today you're telling us that in

24  addition to that, he diverted $36,000 out of the account to

25  Majestic by the four checks that say for "Pay," correct?

1    A    Correct.

2    Q    When you filed -- if you look at -- so I guess what it

3    means is that he would have underfunded the account or had

4    underfunded the whole project by about $96,000; is that what

5    you're saying?  Sixty thousand and thirty-six is ninety-six,

6    right?

7    A    I'm sorry?

8    Q    Well, 65,000 and 36 is actually 101,000, correct?

9    Because you're saying he underfunded the project by 101,000.

10    A    Around a hundred thousand, yes.  That's when I looked

11    at the books.

12    Q    Okay.  In the State Court litigation, you sued Mr. Yan

13    for breach of contract in a cross-complaint; didn't you?

14    A    Yes, that's the procedure I was -- performed.

15    Q    Okay.  And do you recall that you sued Mr. Yan for a

16    specific amount in a breach of contract action in the State

17    Court action?

18    A    I did make that counter-claim, yes.

19    Q    Yes.  And I've got the petition for removal here.  I

20    just wondered if I could show this to you real quick.  Part

21    of it is Exhibit E to the petition for removal.  It's your

22    cross-complaint filed against Mr. Yan in the State Court

23    litigation on April 12th, 2004, correct?

24    A    That's correct.

25    Q    And this is a cross-complaint for breach of the October

1  18th, 2000 contract, correct?

2  A    He underfunded -- yeah, that's what he --

3  Q    That's what you claimed, correct?  And it says here

4  that you want damages of $60,000, correct?

5  A    Yeah, when I look at the books, yes.

6  Q    Okay.  So you weren't asking for a hundred thousand;

7  you were asking for 60,000 on April 12th, 2004, correct?

8  A    I'm sorry.  What did you say again?

9  Q    You weren't asking for a hundred thousand; you were

10 asking for $60,000 when you filed that cross-complaint on

11 April 12th, 2004, correct?

12 A    That's correct.

13 Q    And then more than a year later, if you look at Exhibit

14 GGG -- I'll flip it over for you -- you filed a Proof of

15 Claim in this court before the bar date, correct, on April

16 20th, 2005?

17 A    That's correct.

18 Q    And you filled this out in your own handwriting; didn't

19 you, Mr. Fu?

20 A    That's correct.

21 Q    And you signed it, correct?

22 A    That's correct.

23 Q    And the amount of your claim is $60,000, correct?

24 A    That's correct.

25 Q    Not a hundred thousand dollars, correct?

1    A    No, yeah, correct.

2    Q    So two different times, a year apart, you've said that

3    he underfunded by $60,000, correct?

4    A    That's correct.

5    Q    Now you're saying today, you're telling the Court that

6    he underfunded by really a hundred thousand dollars,

7    correct?

8    A    That's what it looked -- looked into the number, yes.

9    That's the number we look into it.

10   Q    After you looked into it, you decided that it was

11   underfunded by an additional 36,000, correct?

12   A    No, it's not that.  It's like undisputable on the

13   account, it's 60,000.  I thought this is the procedure I

14   have to follow to file it.

15   Q    By the way, Mr. Suen was here this morning and he

16   testified about your contract with him where you assigned

17   all of your interest in the Chenery project to him.  Do you

18   recall that?

19   A    Yes.

20   Q    And is that true?  Did you in fact assign all of your

21   right, title and interest to Mr. Suen?

22   A    Yeah, that's true.

23   Q    On February 23rd, 2004?

24   A    Yes.

25   Q    So when you filed this Proof of Claim, you really

1  didn't own the claim; did you?

2  A    I thought it was the procedure I had to follow at that

3  point.

4  Q    But at the time that you filed the Proof of Claim, you

5  had no right, title and interest in the contract with Mr.

6  Yan; did you?

7  A    I don't know how to answer this question.

8            THE COURT: When was the assignment?

9            MR. ROMEO: February 23rd.

10           THE WITNESS: The assignment was February 23rd.

11           THE COURT: 2/23 --

12           THE WITNESS: '04.

13           MR. ROMEO: '04.

14           THE COURT: And the Proof of Claim was filed?

15           MR. ROMEO: April 20th, 2005.

16           THE COURT: Is that a writing?  The assignment, is

17 it in writing?

18           THE WITNESS: Yes.

19           MR. ROMEO: It's part of Exhibit III.

20           THE COURT: Oh yes.  Yes.  Well, this is a

21 writing -- page 1.  It's June.  Is there another writing?

22           MR. ROMEO: It's attached to Exhibit III.

23           THE COURT: Oh yes, okay.  That's Exhibit A to it,

24 yes, I see.

25           MR. ROMEO: Okay.

1  BY MR. ROMEO:

2  Q    You do understand the question, Mr. Fu, because in

3  Exhibit III at paragraph 13, you said:

4        "On February 23rd, 2004, for consideration, I

5        assigned all of my rights under the agreement to

6        Wei Suen."

7  Correct?

8  A    Correct.

9  Q    You understood that statement when you made it to this

10 Court under penalty of perjury; didn't you?

11 A    Yes.

12 Q    Okay.  So you understand my question too, which is,

13 that you, as of February 23rd, had assigned all of your

14 right, title and interest to Mr. Suen, correct?

15 A    That's correct.

16 Q    And you didn't own the claim at the time that you filed

17 the Proof of Claim; did you?

18 A    I thought that's the procedure, as I testified to you.

19 Q    I wonder if you could open your book to Exhibit RR

20 please.

21 A    Okay.

22 Q    There you go.  Can you look at both pages of Exhibit

23 RR, Mr. Fu?

24 A    M-hm, yes.  I'm looking at RR, yeah.

25 Q    Look at the second page, was Anvil Iron Works a vendor

1   to the Chenery project?

2   A    He did some iron work, yes.

3   Q    And did you receive this check to convey to Anvil Iron

4   Works from Mr. Yan's father in September '02?

5   A    I did not recall this one because I paid him myself.

6   Q    What about the memo line; is that in your handwriting,

7   Mr. Fu?

8   A    Memo line, is that for 663 Chenery, labor?

9   Q    Yes.

10  A    No, that's not -- then I see --

11         THE COURT: I'm sorry, what number?

12         MR. ROMEO: On the line number it says -- or on the

13  memo it says 663 Chenery.

14         THE COURT: Oh, I see.

15         THE WITNESS: Labor here, that's Demas'

16  handwriting, Mr. Yan's handwriting.

17  BY MR. ROMEO:

18  Q    Okay.

19  A    I can see.

20  Q    Let's go to the first page of this.  Do you recognize

21  this check?

22  A    Which one?

23  Q    The first page of Exhibit RR.

24  A    The first page is -- the bank?

25  Q    Yeah.

1  A    No, I don't.

2  Q    You don't have any idea what that's for?

3  A    No, I don't.

4  Q    You did not have an account with Ocwen Federal Bank at

5  this time?

6  A    I don't recall that.

7  Q    All right.  So you don't deny it.  But you don't recall

8  it.

9  A    No, I don't recall.

10 Q    Okay.  What about the loan number down there in the

11 memo line.  Do you recall if you had -- does that refresh

12 your recollection that you had a loan with Ocwen Federal

13 Bank on or about this date?

14 A    No, I don't have -- I don't have a loan.

15 Q    Okay.  You deny that you had a loan with Ocwen Federal

16 Bank?

17 A    No.

18 Q    You don't recall it?

19 A    No.

20 Q    You don't recall it one way or the other.

21 A    No, I don't recall that.

22 Q    Okay.  Is any of this check -- the first page of the

23 exhibit, is any of that in your handwriting?

24 A    No.

25 Q    You deny that?

A    None of this in my handwriting.

Q    Okay.  Now at the time that you entered into this project, this agreement, with Mr. Yan, isn't it the case that you were in some bit of financial distress?

A    I'm sorry, what --

Q    Weren't you in financial distress at the time that you entered into this contract with Mr. Yan?

A    You are calling this October 18th, 2000 agreement --

Q    Right.

A    I mean in 2000?

Q    Right.

A    I don't recall that.

Q    Let's take a look at your deposition, Volume I, page 136 -- oh no, I should have said Volume II, excuse me, page 136.  And starting on line 13, I was asking you a question about the Winky Wong deal, and the question was:

          "Question: So Winky Wong owned the property one
          hundred percent at one point, correct?
          "Answer: Wait a minute.  Yes, he owned one hundred
          percent, and then we moved in having the contract
          signed at the time, we taking as the 50 percent
          owner, in fact, because we have to input a lot of
          time and effort into moving the project forward.
          So we were responsible for -- I mean whatever it
          takes to build a new building.  And I don't have a

1  penny, and I was risking my time and energy."
2  Do you remember saying that testimony to me in June?

3  A    Yes.  And also I remember that it's everybody here and
4  Mr. Farrer was telling you that that should be -- I don't
5  earn a penny.

6  Q    Earn a penny, correct.

7  A    Yes.

8  Q    So after you looked at your testimony, you decided that
9  you wanted to change "I don't have a penny," to "I don't
10 earn a penny."  Correct?

11 A    I don't know how to answer your question.

12 Q    Well, your first testimony was, "I don't have a penny."
13 Correct?

14 A    It was -- my best recollection is that should be a
15 typo.

16 Q    Okay.  I understand.  Now, in regard to SFBP account,
17 it's your testimony that all of the expenses had to go
18 through that account, true?

19 A    I'm sorry?

20 Q    You said that Mr. Yan could not pay any expenses except
21 through that account, correct?

22 A    He should not; otherwise it's confusing.

23 Q    Okay.  So it's your testimony that he's not allowed to
24 pay any expenses directly, true?  Is that true?

25 A    It was our agreement.  I am the one paying it.  That's

1   our oral agreement.

2   Q    Let's look at your deposition at Volume II.  So you're

3   saying there was a specific agreement, correct?

4   A    It was a specific oral agreement to set up that

5   account, yes.

6   Q    Okay.  In your deposition, Volume II, page 182, line

7   18, starting with the question:

8            "Question: You mentioned there were certain

9            conditions under which Mr. Yan could take credit

10           for things paid outside of putting money into the

11           account.  And all I was asking was, if you had an

12           agreement, if that was ever discussed, and you

13           guys shook hands on it or made some verbal

14           agreement on that.

15           "Answer: The answer is no."

16  So in your deposition, you told me that there was no verbal

17  agreement, and today you're telling me there is a verbal

18  agreement, correct?  That's your testimony; isn't it?

19  A    Okay.  That's true.  And also because we don't have --

20  because you're saying that that's agreement.  What is it?

21  I'm sorry.

22  Q    I just read you your testimony.

23  A    Yes.

24  Q    Was that your testimony?

25  A    Yes.

1  Q    Okay.  That's all I needed to ask.

2         Now during the course of this project, Mr. Yan in

3  fact gave you numerous times a running accounting in

4  progress of what the expenses were that he was paying,

5  correct?

6  A    Not numerous times.  Two times.

7  Q    You're saying there were only two times.

8  A    Yes.

9  Q    And you got them during the course of construction,

10 correct?  Is that true?

11 A    I got them two times, available, yes.

12 Q    Let's take a look at Exhibit -- go to the very front of

13 the book and look at Exhibit HH.  Is this one of the

14 accountings that you said you got from Mr. Yan during the

15 course of the construction?

16 A    Yes.

17 Q    And did you receive this from Mr. Yan on or about

18 January 28th, 2002?

19 A    I think so, yes.

20 Q    And it says here that the construction-related expenses

21 now total $250,117.  Do you see that?

22 A    Yes.

23 Q    And then going to the next page, you went through this

24 and read it through, correct?

25 A    I kind of when I -- I mean I kind of read it.  I was

1  very angry about it.

2  Q    Okay.  Well, regardless of how angry you were or not,

3  this is your handwriting on page 2; isn't it?

4  A    That's correct.

5  Q    And so you did study it long enough or for sufficient

6  duration to make these comments, these handwritten comments

7  on it, correct?

8  A    I should say no, because you said that normally enough

9  time or whatever, because I looked at it and I was very mad,

10  and I pick out the one that Demas intentionally tried to

11  cheat on me.

12  Q    Now let me ask you this, Mr. Fu, on this accounting,

13  you didn't say anything to Mr. Yan about payments to

14  Majestic as not being part of the construction expenses; did

15  you?  There's not one word about Majestic.

16  A    Because it is done.

17  Q    I understand that part, but he had paid those -- he had

18  paid those from the account; hadn't he?

19  A    He paid from the account, correct.

20  Q    And what you say are the four payments for Majestic,

21  had all been made by the date of this accounting, correct?

22  A    I'm sorry, by the date of the accounting?

23  Q    By the date of this accounting, you had received what

24  you say were the four checks for Majestic, correct?

25  A    What was the date for the checks of Majestic, or

1  whatever, but when I looked at this one, I was very angry

2  about it and particularly like he tried to cheat on me for,

3  like 8,000, for example.

4  Q    And then you called Mr. Yan, and you two discussed what

5  was proper and what was improper and what went into the

6  project, correct?  In other words, this wasn't -- you had a

7  discussion about this with Mr. Yan, correct?

8  A    I did, yes.

9  Q    And he was -- he made himself available to you to

10 discuss your objections and problems that you had with this

11 accounting; didn't he?

12 A    That was after.  That was a couple months later.

13 Q    Okay.  And also on this, I notice that there's no --

14 there's nothing in the writing here that says that all of

15 the -- that objects to any expenses that weren't paid

16 through the SFBP account; is there?

17 A    I'm sorry?

18 Q    There's nothing in here objecting to any of these

19 expenses that were paid outside of the SFBP account,

20 correct?

21 A    No, no, no.  This is just a very rough draft that I

22 thought he was giving me some kind of a -- wrong stuff, but

23 then I discussed with him a couple months later, yes.

24 Q    Okay.  Let's look at Exhibit II, the one that you said

25 you received a couple months later.  Do you see that?

1   A    I see that.

2   Q    And it's very faint, but you can see at the top in the

3   little fax header, it looks like it was sent on 9/1/02,

4   September 1st, '02.

5   A    I think so.  I have a better one, yes.

6   Q    Okay.  And on this particular accounting, we see your

7   handwriting on it; don't we, Mr. Fu?

8   A    Yes.

9   Q    And your handwriting is specifically the numbers going

10  down the left-hand side of the page numbering each item of

11  expense, correct?

12  A    I'm sorry, say that again?

13  Q    You put these numbers down the side of the construction

14  related expenses down here, correct?

15  A    I guess so, yes.

16  Q    Okay.  And then also on this exhibit on the first page,

17  that's your handwriting where opposite three entries, it

18  says "not agree."

19  A    Yeah, there's words here, yes.

20  Q    Okay.  So those were the items that you objected to in

21  this accounting; weren't they?

22  A    No, no.  When I just pick it up -- I just pick it up

23  and I thought, oh, this we have to discuss, so when I

24  started it, then I already had started it and tried to talk

25  to him.  So I remember when I talked to him, he even telling

1  me you're terminated for 547 - 23 Avenue or something.  I

2  terminate the contract or whatever.

3          MR. CHU: I object.

4          THE WITNESS: I'm sorry.

5          MR. CHU:  I don't even remember what the question

6  was.

7          THE WITNESS: I'm sorry.  I'm so sorry.

8          THE COURT: I don't either.

9  BY MR. ROMEO:

10  Q    The question, Mr. Fu, is this.  You wrote "not agree"

11  three times on this accounting, correct?

12  A    That's correct.

13  Q    And you wrote that there opposite these three items to

14  convey to Mr. Yan that you didn't agree that those were

15  construction-related expenses of this project.

16          MR. CHU: Objection.  Lacks foundation.  There's no

17  evidence that this was ever conveyed to Mr. Yan.

18          THE COURT: It doesn't matter, I don't think.  It's

19  his writing.  He can ask what it means.

20          MR. CHU: They may have been personal notes, I

21  don't know.  I think implicit in the question was the

22  assumption that these comments were conveyed to Mr. Yan.

23          THE WITNESS: As I just testified --

24          THE COURT: There's no question.  There's no

25  question.

1        THE WITNESS: I'm sorry.

2        THE COURT: The objection is overruled.  Restate

3    the question, though, because I don't think he remembers it.

4    BY MR. ROMEO:

5    Q    Okay.  Mr. Fu, you wrote down "not agree" three times

6    on page 1 of this exhibit to convey to Mr. Yan that you

7    disagree with these items being a construction-related

8    expense for Chenery.

9    A    That's correct.

10   Q    Okay.  And by the way, in marking up this particular

11   accounting in September 2002, you didn't say anything to Mr.

12   Yan about backing out $36,000 which was really a Majestic

13   expense; did you?

14   A    Would you say the question again?

15   Q    You've never -- you didn't write on this accounting

16   anything about backing out $36,000 for an expense, for a

17   Majestic expense, Majestic Avenue expense.

18   A    I did not say anything there?

19   Q    No, you didn't.

20   A    In this paper?

21   Q    Yeah, about the Majestic --

22   A    Yeah, in this paper, yes, I agree.

23   Q    Okay.  In this paper, you didn't say -- in fact, you've

24   never made a written objection to Mr. Yan about the 36,000

25   diversion until your assignment of the Proof of Claim in

1 June of this year to Suen.

2 A    That's what you are saying.

3 Q    That's the first time you've ever --

4 A    That's not true.

5 Q    You don't have any writing to Mr. Yan saying that

6 36,000 is attributable to Majestic; do you?

7 A    What kind of writing are you saying, I'm sorry.

8 Q    Some sort of written objection to Mr. Yan, a fax, any

9 kind of communication?  You didn't write it on this; did

10 you?

11 A    Because we don't get to -- how should I say -- I'm

12 sorry.

13 Q    Well insofar as these accountings go, you didn't write

14 anything to Mr. Yan objecting to them because of expenses

15 being paid outside the SFBP account; did you?

16 A    Yes.

17 Q    You made no objection whatsoever on these accountings

18 to Mr. Yan saying they don't count because they didn't go

19 through the SFBP account.

20 A    But the way you construct it, I'm not agreeing, but to

21 answer your question, yes.  I don't -- yes.

22 Q    All right.  You agree with the statement of the

23 question, correct?  You made no objection that they were

24 paid outside the --

25 A    I don't agree with you, but how should I say, I just --

1  I have to say yes or no, then I say it.

2  Q    Now when Mr. Yan signed the agreement with you on

3  October 18ᵗʰ, 2000, I think your testimony this morning was

4  that he stepped into the shoes of Winky Wong; is that

5  correct?

6  A    That's correct.

7  Q    And when you wrote your agreement -- well, let's take a

8  look at that.  It's part of Exhibit III.  Looking at -- are

9  you there yet?

10  A    III?

11  Q    Yeah.  Let me -- I'll get you to the page.

12  A    Yes, is that the correct one?

13  Q    Yeah.  Where it attaches a copy of the agreement

14  between you and Mr. Yan, which has also been marked as

15  Exhibit B in this case.

16  A    That's correct.

17  Q    Paragraph 3 says:

18        "The said property is either up for sale or for

19        rent.  The proceeds shall distribute according to

20        the ownership percentage."

21  Do you see that phrase?

22  A    Yes.

23  Q    And so what you intended to split if the property was

24  sold was the proceeds, correct?

25  A    That's correct.

1  Q    And that means the proceeds after costs of sale and

2  satisfaction of liens; doesn't it?

3  A    Costs of sale -- costs of sale, you refer to the escrow

4  costs and the commissions that's paid out?

5  Q    Sure.

6  A    It that correct?

7  Q    Yes.

8  A    Yeah, that's all right.

9  Q    Okay.  And when you say "proceeds" -- well, you have a

10 real estate broker's license; don't you, Mr. Fu?

11 A    I do.

12 Q    And so you understand how real estate transactions work

13 quite well; don't you?

14 A    I do understand that.

15 Q    Okay.  And you understand that when someone sells a

16 property, then they get the seller's proceeds, correct?

17 A    Yes.

18 Q    And the seller's proceeds are what the seller gets

19 after payment of costs of sale and satisfaction of taxes and

20 other liens against the property, correct?

21 A    That's correct.

22 Q    And that's what the term means in this contract;

23 doesn't it?

24 A    That's what I understand, yes, pay for the escrow

25 costs.

1  Q   No, but you mean the seller's proceeds.  In other

2  words, if he stepped into Winky's shoes, then he took

3  subject to Winky's liens, correct?

4  A   Subject to Winky's liens?  Yeah, he assumed the loans

5  and then he is on Winky's 50 percent, yes, that's correct.

6  Q   Right.  And what he got from Winky was not the full

7  value of the property when he stepped into Winky's shoes; he

8  stepped into Winky's shoes net of the two loans that were

9  already against the property, correct?

10  A   No, no, wait a minute.  On Winky's agreement and our

11  agreement, we fully understand that Winky give the house,

12  the property we developed, the new property, and then, for

13  example, it sell for two million, then it would be one

14  million on each side.  That's what it was the agreed point.

15  Q   You're saying that was expressly agreed, or was it

16  discussed at all?

17  A   I think even in Winky Wong's agreement, it was pretty

18  specific, and that was Mr. Yan's --

19  Q   Okay.  But we're not talking about Winky's agreement

20  now.  We're talking about yours and Demas' agreement, and

21  you said that Demas basically stepped into Winky's shoes,

22  correct?

23  A   That's correct.

24  Q   And Demas didn't get anything greater than what Winky

25  owned, correct?

1   A    That's correct, yeah.

2   Q    Your testimony this morning was that you had spent

3   $400,000 in holding up your end of this agreement, correct?

4   A    Yes.

5   Q    So if Mr. Yan had paid 200,000 then you're saying that

6   the total project cost was 600,000?

7   A    Yes.

8   Q    All right.  Now if Mr. Yan -- now you know Mr. Yan

9   claims that he's paid $367,000 in expenses, correct?

10  A    Yeah, I see that yesterday.

11  Q    Okay.  If Mr. Yan paid $367,000 of expenses and you

12  paid $400,000 of expenses, doesn't it mean that the project

13  cost 767,000?

14  A    That's the math.  That's correct.

15  Q    I want to ask you some questions about Exhibit 119.  Do

16  you have a copy of it there on the witness stand?

17  A    This one here?

18  Q    Yeah, that one there.

19  A    Okay.

20  Q    Thanks.

21  A    Sure.

22  Q    Did this Mr. Tapp, did he actually end up designing the

23  project?

24  A    No.

25  Q    And did he draw any plans that were submitted for

1 construction of the project?

2 A    He draw up the plans -- he drafted the initial -- make

3 that the initial job, like the attached C-1, C-2, something

4 like that.

5 Q    Okay.  But what I'm asking is, did he draw up the plans

6 that actually went to the City for construction of the

7 project?

8 A    I don't think so.

9 Q    Okay.  And as I understand it, Mr. Fu, looking at page

10 2, this -- these estimates are for a 7,750 square foot

11 project?

12 A    That's correct.

13 Q    And the other estimate, the C-2 conceptual design on

14 the next page, that's for a project of 8,220 square feet?

15 A    That's correct.

16 Q    But ultimately, Mr. Tapp didn't do the plans, and the

17 project wasn't built according to any plans that he came up

18 with, correct?

19 A    That's correct.

20 Q    Do you know what the square footage is of the four

21 units as built?

22 A    Today?

23 Q    Yes.

24 A    It's about 9,000.

25 Q    Okay.  Let me ask you this.  Did you see the motions

1   for sale of real property in this case?

2   A    I think I did.

3   Q    Okay.  And you reviewed each one of them, correct?

4   A    I may not.

5   Q    Okay.  Do you remember that the square footage of each

6   one of the units that was sold was represented in those sale

7   motions?

8   A    I don't recall that, but you may have that in there.

9   Q    Okay.

10   A    The living square footage that you were mentioning,

11   maybe.

12   Q    That's what I'm asking you about.  Isn't it the case

13   that the square footage of 70 Wilder Street, one of the

14   residential units is thirteen hundred square feet?

15   A    I cannot -- how can I say -- just off my head.

16   Q    Okay.  So you don't --

17   A    I need to mention, I have the blueprint, I know that.

18   Q    So you don't know the square footage of any of the

19   residential units or the commercial unit as built.

20   A    Roughly, I knew, and to be specific, it would be better

21   if I present the blueprint here tomorrow and then mark on

22   it, if you'd like to.

23   Q    Well, the as-built square footage at 70 Wilder is

24   thirteen hundred square feet.  Do you agree or disagree with

25   that statement?

1    A    I don't know how to say that.

2    Q    Well, you're pretty familiar with the project; aren't

3    you?

4    A    Yes.

5    Q    And you know that 70 Wilder and 663 Chenery are the two

6    larger units, correct?

7    A    70 --

8    Q    70 Wilder Street and 663 Chenery are the two largest

9    units.

10   A    They're almost the same.

11   Q    They're almost the same.

12   A    They're almost the same.

13   Q    And they're larger individually than the other two

14   units, the commercial unit and the small residential unit,

15   665 Chenery, correct?

16   A    Off the top of my head, I don't know how to answer

17   this, about this one, but you need to look at -- from the

18   blueprint for the building structure because when you say

19   that square footage, I don't know that's the total -- I mean

20   talking about the blueprint, the building square footage

21   because you have a lot of the -- the stairs and light well

22   and all that was subtracted, and even the -- the big, what

23   is it, the big deck, 25 by 30 or something, the deck, and

24   they all subtracted for that living space, something like

25   that.

1  Q    Right.

2  A    But the construction for the constructed space

3  according to the construction costs, you would usually go

4  with the blueprint.

5  Q    Okay.  Let me ask you this.  661 Chenery is the

6  commercial unit, right?

7  A    Yes.

8  Q    And as built that was basically built and sold as a --

9  what they call sometimes a vanilla shell.  It was an

10  unimproved commercial space that the user could then build

11  out to his or her specifications, correct?

12  A    I'm sorry.  Say it again?

13  Q    661 Chenery is an unimproved commercial space when it

14  was sold, correct?

15  A    Normally for a commercial space, that's true.  But in

16  Chenery, it was improved.

17  Q    Okay.  In what way was it improved?

18  A    It furnished everything because Demas -- Mr. Yan and

19  Mr. Winky Wong and I, we sit down together and we want to

20  run a massage shop at that time.

21  Q    Okay.  So explain to me what you mean by everything.

22  Did it have light fixtures?

23  A    Every fixture, every -- I mean handicap bath, toilet

24  and facility, it's all in.

25  Q    So you're telling me that when Mr. Santiesteban

1   purchased 661 Chenery, he could simply open a business

2   without doing any improvements in that space?

3   A    That's correct.

4   Q    Okay.  All right.  By the way, Mr. Fu, you said that

5   you spent $400,000 on this project, correct?

6   A    Yes.

7   Q    And have you prepared a formal accounting that you're

8   going to present to the Court to show how you spent that

9   $400,000?

10  A    I prepared a spreadsheet and give it to Mr. Chu.

11  Q    Okay.  I understand that.  But you haven't presented it

12  to the Court; have you?

13  A    I testify.

14  Q    Okay.  So basically it's just your say-so at this point

15  that you spent $400,000 on the project?

16  A    That's correct.

17           MR. ROMEO: No further questions, Your Honor.

18           THE COURT: Do you want to do your examination

19  tomorrow?

20           MR. CHU: Yes.

21           THE COURT: Okay.  I have to leave at 4:30 and I

22  might --

23           MR. CHU: That's 20 minutes.

24           THE COURT: Let's talk about what we have left.

25  Okay?

1    MR. CHU: Before we leave 119, could I renew my

2  motion to move 119 in.

3    MR. ROMEO: I still don't think it's really

4  relevant because it doesn't relate to this project.  It

5  doesn't have plans or estimates that relate at all to the

6  as-built project that's at issue here.  So I don't know what

7  relevance it has.

8    THE COURT: Well, I think he said the actual

9  project was larger than this.

10    THE WITNESS: Much larger.

11    MR. CHU: The relevance, Your Honor, is that it was

12  a budget or estimate that was given to Mr. Fu by Mr. Yan,

13  so --

14    THE COURT: I will allow it in.

15    MR. ROMEO: Okay.

16    MR. CHU: Thank you, Your Honor.

17                      (Whereupon, plaintiff's Exhibit

18                      119, the Tapp Architectural Report,

19                      is admitted in evidence.)

20    THE COURT: Thank you.  What do we -- you want

21  to -- you have more -- Mr. Chu, you have more questions for

22  your client, I assume.

23    MR. CHU: Yes.

24    THE COURT: How much longer do you think you have?

25    MR. CHU: To go over the cross-examination, I would

1  say about an hour at the most.

2        THE COURT: Okay.  Mr. Romeo, what do you have?

3  And that's the entire business.  You don't have any other

4  witnesses.

5        MR. CHU: No, no other witnesses, and it may not

6  even be an hour depending on how long the answers are.

7        MR. ROMEO: Recross of Mr. Fu is what I would have

8  left, and then I would have direct of Mr. Yan, and I'm

9  positive John would have --

10       THE COURT: Oh, I know.  Just roughly, do you have

11 any idea how long it would take?

12       MR. ROMEO: I think we probably could be done by

13 the middle of the day or early afternoon -- well, more like

14 early afternoon tomorrow.

15       THE COURT: Do you think we can finish tomorrow?

16       MR. ROMEO: Yes, absolutely.  No question.  I don't

17 think we'll take all day.

18       THE COURT: That's all I'm getting at.

19       MR. CHU: I think we can finish evidence tomorrow,

20 Your Honor.  I don't think we'll have time to argue,

21 tomorrow, at least that's what I think.

22       THE COURT: That is of less concern.  That can be

23 squeezed in any time.

24       MR. ROMEO: Okay.

25       THE COURT: And in fact, what might be helpful for

1 me is after I hear all the evidence, to review everything,

2 and put that off a little bit longer so I can review

3 everything and ask you folks some questions. I don't know

4 yet though. I have to think about it a little bit.

5         MR. ROMEO: Either way, it's fine with me.

6         MR. CHU: In fact, Your Honor, for argument, I

7 think it might be appropriate -- helpful to have Mr. Farrer

8 back so that we can argue the entire case because --

9         THE COURT: I don't think we've argued part one.

10         MR. ROMEO: We did.

11         THE COURT: We did?

12         MR. ROMEO: Yeah, we did argument.

13         MR. CHU: I think there was argument on it.

14         THE COURT: I don't remember. I have all my notes,

15 which I will go over.

16         MR. ROMEO: Geez, and I thought I did such a great

17 job.

18     (Laughter.)

19         THE COURT: I will go over all my notes again.

20 Yes, you did. I remember because I remember going over and

21 still having some questions, and that's why I wanted to hear

22 all this. I just wanted to make sure I understand all the

23 pieces before I decide any of it. Okay.

24         MR. CHU: It just seems to me that the Court

25 thought this part might be relevant to the first part.

1    THE COURT: Yes, I remember very well what I
2 thought.  And I remember now that we had argument and I went
3 through everything carefully and I still had some questions
4 and that's why I wanted to hold off till I heard this.  I
5 don't know that I need more from counsel on the first matter
6 because I will go over the arguments again all very
7 carefully, given the passage of time.

8    So will we do well enough if we start at 9:30?

9    MR. ROMEO: I think we'll be fine.

10   THE COURT: Okay.  Well then let's just continue
11 again at 9:30.

12   MR. ROMEO: I think before we break though, we
13 ought to just go back over the exhibits that were used in
14 Mr. Fu's examination.  I want to move --

15   THE COURT: Yes, you may do that.  That's a good
16 thing to do right now.  There were some new ones.

17   MR. ROMEO: I would like to move -- and I'll just
18 take them in order, HH and II.  Those were the two
19 accountings.

20   MR. CHU: No objection, Your Honor.

21   THE COURT: Okay.

22          (Whereupon, Debtor's Exhibits HH and II,
23          two accountings prepared by Mr. Yan, are
24          received into evidence.)

25   THE COURT: And you had SS too, had we done that

1  previously?

2       MR. ROMEO: I have not asked that to be moved into

3  evidence.

4       THE COURT: Okay.  All right.  Any more?

5       MR. ROMEO: RR.

6       MR. CHU: RR has not been authenticated, Your

7  Honor.

8       THE COURT: I've got to remember again what RR is.

9       MR. ROMEO: It's the Ocwen Federal Bank and the

10 Anvil Iron Works.

11      MR. CHU: SS no objection.  RR, object because no

12 foundation.

13      THE COURT: Yes.  Well, we know what it is, but we

14 don't know what it was for because we don't have the maker

15 of the check.

16      MR. ROMEO: Okay.  I probably -- I can reserve for

17 foundation and get -- address that with Mr. Yan.

18      THE COURT: Okay.  So I'll hold off on that for the

19 moment.  All right.  Anything else?

20      MR. CHU: Is that it?

21      MR. ROMEO: Let me see.  We had PP, we've already

22 gotten in.

23      THE COURT: III, you talked about that.  That's

24 already in.

25      MR. ROMEO: VV is in.

1    THE COURT: Mr. Fu, we're done with you.  You can
2 step down.  This is just housekeeping.
3    MR. CHU: I don't think there were any other
4 exhibits according to my notes.
5    And is it okay to leave our materials here, Your
6 Honor?
7    THE COURT: Yes.  I may have a phone conference
8 involving a Chapter 13 case, but I think it's all going to
9 be on the phone.
10   MR. ROMEO: Okay.  No, I think that's it.
11   THE COURT: Okay.  All right.  Then I will see you
12 at 9:30.  Thank you.
13   MR. FU: Good night, Your Honor.
14   MR. CHU: Thank you, Your Honor.
15   MR. ROMEO: Do you want the tables cleared, though?
16   THE COURT: No.
17   MR. ROMEO: Okay.
18   THE COURT: Not at all.
19   (Whereupon, the matter is recessed at 4:16 p.m.)
20
21
22
23
24
25

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a correct transcript from the digital sound recording of the proceedings in the above-entitled matter.

DATED: July 16, 2007

By: ___/s/ Jo McCall_____