1  G                    UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                        (SAN FRANCISCO DIVISION)

4  In re:

5  DEMAS WAI YAN aka DENNIS YAN,        Case No. 04-33526

6                                       Chapter 11

7                                       San Francisco,California
                                        December 1, 2005
8          Debtor.                      9:49 a.m.
   _____/
9  DEMAS WAI YAN aka DENNIS YAN,

10         Plaintiff,

11     v.                               A.P. No. 05-3257

12 DONG FU, aka TONY FU, et al.,

13         Defendants.

14 _____/

15 WEI SUEN,

16         Plaintiff,

17     v.                               A.P. No. 05-3257

18 DEMAS YAN, et al.,

19         Defendants.
   _____/
20 STELLA CHEN,

21         Plaintiff,

22     v.                               A.P. No. 05-03236

23 DEMAS WAI YAN aka DENNIS YAN,

24         Defendant.

25 _____/

**VOLUME II**
**PHASE 2**

TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE THOMAS CARLSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | LAW OFFICES OF MARK J. ROMEO |
| | BY: MARK J. ROMEO, ESQ. |
| | 130 Sutter Street, 7th Floor |
| | San Francisco, California 94104 |
| | |
| For Wei Suen: | CORPORATE COUNSEL LAW GROUP |
| | BY: JOHN CHU, ESQ. |
| | 505 Sansome Street, Suite 475 |
| | San Francisco, California 94111 |
| | |
| For Tony Fu: | TONY FU, pro se |
| | |
| For Stella Chen: | STELLA CHEN, pro se |
| | |
| Court Recorder: | JANE GALVANI |
| | GORDON HOM |
| | UNITED STATES BANKRUPTCY COURT |
| | 235 Pine Street |
| | San Francisco, California 94104 |
| | |
| Transcription Service: | Jo McCall |
| | Electronic Court |
| | Recording/Transcribing |
| | 3946 Pyle Avenue |
| | Santa Rosa, California 95407 |
| | Telephone: (707) 545-1838 |

1                              I N D E X

2

3   Debtor's Adverse Witness:  Direct  Cross  Redirect  Recross

4   Wuen, Wei

5        By Mr. Romeo            11                24
                                                   27
6
         By Mr. Chu                        22                    26
7                                                               30
    Debtor's Witnesses:
8
    Tjoe, Maoe K.
9
         By Mr. Romeo            32
10
         By Mr. Chu                        38
11

12  Plaintiff's Witnesses:

13  Fu, Tony

14       By Mr. Romeo                      40                    183

15       By Mr. Chu                                145
                                                   214
16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S
```

Debtor's Exhibits:                                    Evid.

ZZ    Application for Building Permit               39

CCC   Alarm system permit                          39

EEE                                                46

AAA   Original Electrical Permit                   51

BBB Plumbing and mechanical permit                 52

MM    Copies of checks for expenses of Chenery
      Street project                               95

PP    Bank Statements                              96

VV    Defendant's responses to interrogatories     98

III   Assignment of Proof of Claim                 98

EEE   State Contractor's License Board Certificate 99

HH and II  - Two accountings by Mr. Yan           137

QQ    Exemplar of Mr. Fu's receipts               227

AAA and BBB                                        228


Plaintiff's Exhibits:

119   Tapp Architectural Report                   134

120 - 125                                          226

P R O C E E D I N G S

December 1, 2005                                    9:49 a.m.

—oOo—

THE COURT: All right.  Are you ready to go now?

MR. CHU: Yes, Your Honor.

THE COURT: Mr. Fu was on the stand, and Mr. Romeo

had finished with him.  Is that still the case?

MR. ROMEO: That's correct, Your Honor.

THE COURT: Okay.  Thank you.

Go ahead, Mr. Chu.

MR. CHU: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. CHU:

Q    Mr. Fu, I'm going to take you back to your testimony

yesterday where you testified about four checks that were

written by Demas Yan.  If I can refer you back to Exhibit

MM, check 106.

A    Yes.

Q    Now you testified yesterday that you filled in the

information on that check, correct?

A    Correct.

Q    Where did that occur?

A    You mean fill in the information?

Q    Where did you do it, at your office, at your house?

A    No, at Chenery.  At Chenery.

1 Q    This occurred at the Chenery project?

2 A    Correct.

3 Q    Who else was there?

4 A    Mr. Yan.

5 Q    Did you have any discussions with Mr. Yan before you

6 filled in that information?

7 A    Yes, we did.

8 Q    Now at the lower left-hand corner of Exhibit -- of

9 check 106 where it says the word "Pay."

10 A    Yes.

11 Q    How did you come to use that word?

12 A    Mr. Yan and I had an agreement like a verbal agreement

13 that he would pay me like 50/50, the money he earned from

14 Majestic so in here like -- I mean like the check here it

15 really doesn't say pay Majestic, but the reason was he told

16 me -- he asked me to write it this way.

17 Q    So he was the one who told you to fill it out this

18 way?

19 A    Yes.

20 Q    Who came up with the $9,000 number?

21 A    Mr. Yan.

22 Q    And why was it that -- what did he say as far as

23 telling you to fill it out this way?

24 A    We have a discussion -- I mean that discussion was

25 also related to he come back and forth to talking to his

1  friend Florence Fung, that he knew that Florence -- I mean

2  he told me Florence Fung is going to cause trouble and it

3  might be better, the money I pay you back in this way.

4  Q    Were you entitled to any payment from San Francisco

5  Building Professionals for any work that you did?

6  A    My best understanding is I -- he don't pay me a penny,

7  and I did not earn a penny for -- I mean I did not bill him

8  for the --

9  Q    Were you entitled to any monthly salary from the

10  company?

11  A    No.  No.

12  Q    Thank you.  So this $9,000 check did not represent any

13  salary to you?

14  A    No.

15  Q    Now, I notice that the check was signed by Mr. Yan and

16  not by yourself.

17  A    Yes.

18  Q    Now the two of you were there at the same time.

19  A    Yes.

20  Q    You filled out the rest of the check.

21  A    That's correct.

22  Q    Why did you just sign the check yourself?

23  A    Because we have agreement that the checks that I sign,

24  it's a way to distinguish, like distinguish -- and also I

25  mean -- I go back, I'm sorry.  We have agreement he is not

1    supposed to sign any check for the construction costs.   So

2    I'm the one to sign checks for the construction for the

3    company account, and he is going to deposit -- like deposit

4    the money to the account so he is not supposed to sign any

5    check.

6    Q    For what?

7    A    For the construction of the project.  And that was our

8    agreement.  I'm the one sign the checks and if he sign the

9    check, that really distinguished his obligation, and the

10   account was set up to establish -- like distinguish his

11   obligation and contribution.

12   Q    Let's stop.  Stop.  What does it mean to you if he

13   signs the check?  What does that mean?

14   A    It means he's paying his obligations.

15   Q    Okay.  So if you sign the check, then it's

16   construction cost?

17   A    That's correct.

18   Q    And if he signs the check, it's not?

19   A    Yes.

20   Q    All right.  Let me take you now to check number 112.

21   Where was this check prepared, if you recall?

22   Q    The same place, pretty much -- yeah, the same place,

23   yes.

24   Q    At the Chenery project.

25   A    At Chenery, yes.

1  Q    And again, you filled out the check?

2  A    That's correct.

3  Q    And then what did you do with the check after you

4  filled it out?

5  A    I have -- Mr. Yan endorsed it.

6  Q    You gave it to him?

7  A    Yes.  Actually, we were sitting on the table.

8  Q    Then what did you do?

9  A    This is like a second check, because we have oral

10 agreement that he would --

11 Q    Did he sign it and give it back to you?

12 A    Yes, he did.

13 Q    Is that the same with the other two checks as well,

14 checks 131 and 144?

15 A    That's correct.

16 Q    There were two other $9,000 checks that were paid to

17 you out of the Bank of America account.

18 A    Yeah, that's correct.

19 Q    But you didn't -- you signed those yourself?

20 A    Correct.

21 Q    Not Mr. Yan.

22 A    No.

23 Q    Why is it that you didn't have Mr. Yan sign those

24 checks?

25 A    Because the four checks he pays already fulfill the

1  agreement we had.  And I was simply -- doing that was

2  keeping his plan -- keeping his plan running.

3  Q    Pardon me?

4  A    To keep his plan running.  If I had to, I can show it,

5  like he told me, I can show it that it looks like I work

6  for the company.  In fact, it was not.

7  Q    Oh, you said keep his plan running.

8  A    Yes.

9  Q    You mean continue on with his plan to make it look

10  like you were getting a salary?

11  A    Correct.

12  Q    But you were not entitled to salary?

13  A    No.

14  Q    And Mr. Yan knew you were not entitled to salary.

15  A    Yes.

16         MR. ROMEO: Objection.  Calls for speculation.

17         THE COURT: Sustained.

18  BY MR. CHU:

19  Q    Your agreement with Mr. Yan -- well, let me ask you

20  this.  You had the October 18th, 2000 agreement which speaks

21  for itself.

22  A    Yes.

23  Q    Okay.  Did you ever have any other agreements with Mr.

24  Yan where you were actually entitled to recover payment for

25  salary?

1  A    No.

2  Q    Did you have any agreements with him where you were

3  entitled to be compensated for the work that you did?

4  A    We had some side deals.

5  Q    Those were all -- those were all --

6  A    Totally separate.

7  Q    Separate.

8  A    From the contract, yes.

9  Q    But aside from those side deals, on the main Chenery

10  project itself, did you have any agreements with him where

11  you could get paid for your work?

12  A    No.

13  Q    Did you have any agreements with him where you could

14  get paid for materials that you paid for?

15  A    No.

16  Q    Now you just mentioned side deals.  Did you keep track

17  of all the side deals?

18  A    No, I did not.

19  Q    Can you remember any of them as you're sitting there?

20  A    Yes.

21  Q    Why don't you tell me about the ones you remember

22  then.

23  A    The one, for example, is like the commercial unit.

24  Usually the commercial unit was built with nothing on it,

25  and the new owner or whatever, who wants the business, will

1  come in and furnish it to their own specifications.  But

2  during the construction, Mr. Yan, approaching me, and told

3  me he had a good idea.  The commercial space could be

4  rented as a massage business because he was so enjoying a

5  massage in China.  And since then, or something like that,

6  he told me it was really a lucrative business and would be

7  good and why don't we go ahead and furnish that.  And I --

8  then I discussed with him the costs was shared half and

9  half in that respect.  Then we agree and he reimburse me

10 for like the cost to do that extra work was about $30,000.

11 We agree the point and so he compensate with $15,000,

12 something like that.  But it was not fully -- like a

13 written contract or something.

14 Q    Okay.  Let me back up a little bit now.  Now under the

15 original agreement, under the October 18th, 2000 agreement,

16 were you supposed to build out the commercial unit?  That

17 wasn't included?

18 A    What do you mean by "build out"?

19 Q    Well, you know, put in all the improvements.

20 A    No, no.

21 Q    You just said that normally it's bare and then you let

22 the buyer build it out the way he wants.

23 A    Yes.  That was the original understanding for the

24 contract.

25 Q    So then Mr. Yan asked you to build it out?

1  A    Yes.

2  Q    And that was going to cost extra money?

3  A    Correct.

4  Q    Okay.  For that extra money, did he pay -- did he pay

5  you or did he pay some of the suppliers himself?

6  A    I remember there was two checks he wrote out to the

7  supplier.  Actually I was quite frankly physically

8  accompanied him to, one is like ACE, to pay that bill, and

9  then --

10 Q    What's A-C-E?

11 A    It's selling some kind of hardware store.

12 Q    Ace Hardware?

13 A    Yeah, Ace Hardware.  So he pay for the bill and

14 remaining like 8,000.  Maybe later on we talk if it's

15 washed out with some other things.  That's why I don't have

16 a detail agreement on this.

17 Q    Okay.  That was one side deal.

18 A    Yes.

19 Q    Do you recall any other side deals?

20 A    The other side deal -- okay, like the unit at 663

21 Chenery, well, I mean, one day it was built, frame-out,

22 according to the blueprint, the plan, and he had a better

23 idea.  Then it changes.  And throw out the thing already

24 built.  Then -- I mean I discussed it with him, when he

25 discussed it with me, well, I want it this way, this way,

1  this way.  I said, well, everything is already built out.

2  No problem.  I pay for it.  So it's like that was little,

3  something pretty little like -- oh, okay, today's work is

4  like wasted, and something like, okay, it's 600 or 700,

5  then okay I'm going to pay 500, how about that?  And then

6  something like that, and then he later on, he may pay

7  something else.

8  Q    All right.  I'm going to change subjects now.

9  Yesterday you were questioned about Mr. Ming Fong.  Do you

10  recall that questioning?

11  A    Yes.

12  Q    Counsel also read from your deposition where you were

13  asked questions about Ming Fong.  Do you recall that?

14  A    Yes.  Yes.

15  Q    At your deposition, even though you wrote checks to

16  Mr. Fong totaling $80,000, you told Mr. Romeo that you

17  couldn't recall who Ming Fong was.  Do you recall that at

18  your deposition?

19  A    I did.

20  Q    Were you telling the truth at that time?

21  A    No.

22  Q    Okay.  Can you explain why it is that you didn't tell

23  the truth at the deposition?

24  A    Because at that point, I object to it and also I was

25  very mad about the guy, Mr. Yan sitting on the other side

1 of the table, looks like he don't even know Ming Fong, and

2 he -- I mean like what they pay him, it's like I'm paying

3 the guy in Hong Kong. I was so mad, so I was not

4 cooperating. I did apologize that I'm sorry. And it's not

5 proper, but I did not deceive anyone, and I did not harm

6 anything at all, so it's just harming myself, I concede to

7 it.

8 Q    Why is it that you didn't think you were deceiving

9 anyone as far as denying the memory about Ming Fong?

10 A    I thought it's totally irrelevant, but at that point I

11 just was mad and sometimes you can see, I don't even answer

12 your questions, so I'm so sorry.

13 Q    Do you know whether Mr. Yan knows Ming Fong or not?

14 A    Oh, he knew him very well, yes.

15 Q    Did Mr. Yan ever see Ming Fong at the job site?

16 A    Oh yeah.

17          MR. ROMEO: Objection. Calls for speculation.

18 How can he know what Mr. Yan saw? He may have --

19          THE COURT: You can rephrase the question.

20 Sustained as is, but you can rephrase it, I'm sure.

21 BY MR. CHU:

22 Q    Were you ever at the job site where Mr. Ming Fong and

23 Mr. Yan were both present?

24 A    Yes. Many times.

25 Q    And did you have discussions with Mr. Yan where you

1  identified Mr. Fong for him?

2  A     Yes.  Introduced to him long time ago.

3  Q     At the job site?

4  A     Yes.

5  Q     And did you tell Mr. Yan that Mr. Fong was working on

6  the project?

7  A     Definitely.

8  Q     Now the $80,000 that you paid to Mr. Fong from the

9  Bank of America account?

10  A     Yes.

11  Q     What was that money for?

12  A     That money was for the Chenery construction.  It

13  was -- yeah.

14  Q     What was Mr. Fong's role at the job site?

15  A     His role was like, as I testified, he's helping me

16  with all kinds of things.  He's like a supervisor, and --

17  but a little more than that, that I would just leave him

18  for the job.  For example, the $35,000 check, it was pretty

19  much specifically to compensate his work for the whole

20  entire foundation.  If I give it out to somebody else

21  outside, it cost about a hundred thousand dollars, and he

22  help me to do the whole thing.  And also paying out

23  laborers.

24  Q     How about the other payments to Mr. Fong, the same

25  thing?

1   A    Same thing for the other part of the key structure for

2   the building, that we have a deal on it.

3   Q    You testified yesterday about buying the Toyota Tundra

4   truck.

5   A    Yes.

6   Q    Where was that truck purchased from?

7   A    It's from a dealership, Toyota dealership.

8   Q    Toyota dealership.

9   A    Yes.

10  Q    In San Francisco?

11  A    San Francisco.

12  Q    San Francisco Toyota on Geary Street?

13  A    Correct, yes.

14  Q    Now whose idea was it to buy a truck in the first

15  place?

16  A    Mr. Yan.

17  Q    At the time you bought that truck, did you already

18  have a truck yourself?

19  A    I have a brand-new truck, a GMAC.

20  Q    When did you buy it?

21  A    Early -- early that same year.

22  Q    Let me refer you to check 165 in Exhibit MM.  The date

23  of that check is October 14th, 2001?

24  A    That's correct.

25  Q    Does that refresh your recollection as to when you

1 bought your other truck?

2 A    The Toyota?  Yes.

3 Q    No, no.  You said you had another truck.

4 A    Oh, the GMAC, yes, correct.

5 Q    GMAC truck?

6 A    Yes.

7 Q    GMAC?

8 A    Yes.

9 Q    And you bought that earlier in the year?

10 A    Yes.   That one is a couple months earlier.

11 Q    Why did Mr. Yan -- what did Mr. Yan tell you as far as

12 buying another truck at this time?

13 A    He approached me with a very good idea.  I accept it.

14 So we went out and because he told me that --

15 Q    What was the good idea?

16 A    The good idea was, when a company, like a million

17 dollar company and you should have -- we should have a good

18 company -- a big -- a good and big company truck that it

19 looks like American company.

20 Q    What else did he tell you?  How was the truck supposed

21 to be paid for?

22 A    The truck was supposed to be paid for half/half,

23 because we are partners.  So one company, and that company

24 is just only two of us.

25 Q    So 50/50.

1  A    Yes.

2  Q    Who was at the dealership at the time you bought the

3  truck?

4  A    Mr. Yan and I.

5  Q    So the two of you went to the dealership together?

6  A    That was correct.

7  Q    Was Mr. Yan there when you paid for the truck?

8  A    Yeah, we sit in the same table.

9  Q    There are two checks here to San Francisco Toyota,

10 number 165 and 166.

11 A    Yeah, that's correct.

12 Q    Why did you make the payment with two checks not just

13 one?

14 A    Because we have an oral agreement before we even go

15 for it.

16 Q    Who's "we"?

17 A    Mr. Yan and I.

18 Q    What was the agreement?

19 A    The agreement was, a company truck so we half and

20 half.

21 Q    Half and half, I understand.  Why did you make two

22 checks?

23 A    Well, because when the negotiation was done and the

24 contract was -- I mean that's the final price over there,

25 lay on the table, and I fill out the first check.  The

1  first check I fill out and I wrote out the other check and

2  then ask him to sign, he change his mind at that point.

3  Q    So you were going to have Demas Yan sign the second

4  check?

5  A    Yes.  I intend to.

6  Q    And why was it that you wanted to have him sign a

7  separate check, because of this agreement?

8  A    Because in our general agreement -- you know, and the

9  whole thing is the check for this account is to distinguish

10 his contribution.  And any check he sign, it should not

11 count to his contribution.  He know very well, so he said,

12 oh, no, no, I better back off and I don't think it's a good

13 idea at this point.

14 Q    So the $13,000 -- so the check that you signed to the

15 Toyota dealership was not going to count towards -- would

16 count toward his contribution; is that correct, his

17 300,000?

18 A    It would not count if he sign it.

19 Q    If he signed it, but if you signed it, then it counts?

20 A    If he sign it --

21 Q    If you sign it, not him, if you sign.

22 A    It doesn't count.

23 Q    If you sign it, it counts, correct?

24 A    If I signed it?

25 Q    Yes.

1  A    Then it counts, yeah, definitely.  Yes.

2  Q    Okay.  That's what I asked you.  Now if he signs it,

3  then it doses not count.

4  A    Yes.

5  Q    Okay.  So this check signing, this took place, what,

6  in the dealer's office?

7  A    In the dealer's office, correct.

8  Q    And you -- what did Mr. Yan do after you handed him

9  the check for him to sign?

10 A    He simply change his mind, and saying that I don't

11 want to -- I don't want to -- I don't think I want to do

12 that.  And I said why?  It would be confusing the account.

13 That's why -- at that time, he told me.  And I feel that

14 because it would save like five or six thousand dollars.

15 The salesman really giving us a good discount, and I really

16 like it.  I just go ahead and sign it, and pick that up.

17 Q    And was Mr. Yan still there when you signed the other

18 check?

19 A    Yes.

20 Q    So you decided to go ahead and buy the truck even

21 though Mr. Yan backed out?

22 A    Yes.

23 Q    So for this money that was used to buy the truck,

24 would count towards his $300,000 contribution, right?  Is

25 that -- that's the way it works?

1  A    Yes.  Yes.  Definitely.

2  Q    I'm going to change subjects, Mr. Fu.  Yesterday

3  you -- counsel read -- yesterday, counsel read a list of a

4  lot of checks that were issued to pay your personal credit

5  cards.

6  A    That's correct.

7  Q    Do you recall those?

8  A    Yes.

9  Q    Why is it that you would use the San Francisco

10 Building Professionals' account to pay your personal credit

11 cards?

12 A    Because on the one hand, I use all my credit cards and

13 charge cards to pay the construction materials and all

14 kinds of costs and expenses, hundreds and hundreds of

15 thousand dollars, it was incurred for those charges, and I

16 feel that those are for the construction costs.  And also,

17 even some of them are for my personal, and I don't feel any

18 harm to it because I've been paying hundreds and hundreds

19 thousand dollars and I don't deduct any penny that he

20 contribute to it, and like as you can see, the Bank of

21 America account.

22 Q    Did Mr. Yan know that you were using your personal

23 credit cards to buy construction costs?

24 A    Definitely.

25 Q    You told him?

1  A    I believe I told him, yes.

2  Q    Now on Exhibit GGG, that's the Proof of Claim that you

3  filed in the Bankruptcy Court?

4  A    That's correct.

5  Q    When you filed that claim, were you filing that claim

6  for yourself?

7  A    No, for Mr. --

8  Q    Who were you filing it for?

9  A    I'm filing for Mr. Wei Suen.

10  Q    Did Mr. Suen give you permission to file that claim?

11  A    We have discussed -- I would say Mr. Suen was even

12  mentioned it to me to go ahead and -- just go ahead and do

13  it.  I feel that it was like the procedure, but I don't

14  know; I may be wrong.

15  Q    Your agreement with Mr. Suen, did it require you to

16  help him collect his money?

17  A    Yes.  At least I feel obligated to.

18  Q    Mr. Fu, I'd like you to turn your attention now to

19  Exhibit HH.  Now that's a fax cover sheet and a

20  spreadsheet.  I think you testified earlier that Mr. Yan

21  faxed this to you?

22  A    That's correct.

23  Q    The handwriting on the second page and the third page,

24  all the handwriting across the lines, the notations, whose

25  writing is that?

1  A    I believe it's mine.

2  Q    Did you ever give a copy of the annotated spreadsheet

3  back to Mr. Yan?

4  A    No, I never.

5  Q    So when you made these notes, were these notes for

6  your own purpose?

7  A    Yes.

8  Q    You never communicated them to Mr. Yan?

9  A    I did talk to him, like at the time I see the charges,

10 he put it on the spreadsheet, I was very angry about it,

11 but we were on good terms.  I thought it was just a simple

12 mistake.  So I just mention it to him, hey, how can that

13 be?  Your $8,000 on the second item, it's very, very

14 specific for your 547 - 23 Avenue project.

15 Q    When was the first time that you gave Mr. Yan a copy

16 of the spreadsheet with your notes on it?

17 A    I believe I --

18         MR. ROMEO: Well, I'm going to object to the

19 question.  It mischaracterizes his testimony.  He says he

20 never gave it to Mr. Yan.  So why would he now be asking a

21 question about when is the first time you gave it to him.

22         MR. CHU: I'll withdraw and rephrase, Your Honor.

23         THE COURT: Okay.

24 BY MR. CHU:

25 Q    Was there ever a time when you gave Mr. Yan a copy of

1  the spreadsheet with your notes on it?

2  A    I believe you handed it to him during the deposition.

3  Q    So not until discovery in the litigation.

4  A    That's correct.  May I add something, John?

5         THE COURT: No, you have to wait for counsel's

6  questions.

7         THE WITNESS: Your Honor, because I want to add

8  something to the question.

9         MR. CHU: The prior?

10        THE WITNESS: I just remember.

11        THE COURT: Well, your counsel will help you get

12 this out.

13 BY MR. CHU:

14 Q    The question I asked you before was, whether you

15 recall ever providing Mr. Yan with a copy of this.

16 A    For this first one, I did.  The second one I did not,

17 that's a hundred percent sure, because we sit down and talk

18 about that.

19 Q    The second one, you're referring to Exhibit II; is

20 that what you're referring to?

21 A    Yes.  Yes.

22 Q    Okay.  So when do you recall -- when was it that you

23 gave Mr. Yan a copy of the spreadsheet with your

24 annotations on it?

25 A    For this first one?

1  Q    This first one.

2  A    HH?

3  Q    HH.  We're talking about HH.

4  A    Yes.  I remember I see it, I was pretty upset about

5  it, and then I talked with him.  On the second one, as you

6  can see --

7  Q    No, I'm not talking about the second one yet.  I asked

8  you a question about when you gave him the first one.

9  A    I don't recall clearly.

10  Q    How soon after you received it did you give it to him?

11  A    I don't have a specific recollection on this.

12  Q    A month?  Two months?

13  A    I don't -- I'm sorry.  I get back to him on the phone

14  pretty fast.  That was -- but I don't --

15  Q    Why don't you take a look at Exhibit II.  What's the

16  date on II?

17  A    The date on II is a couple months later.  I think it's

18  September.

19  Q    Okay.  You think you gave him back your annotated copy

20  of HH before you got II back?

21  A    Yes.

22  Q    So it was between a month and two months then?

23  A    I don't recall --

24  Q    It was less than two months.

25  A    I'm sorry, I don't recall the exact time.

1  Q    Okay.  You said that you were upset when you received

2  this fax.  What was it about the fax that made you upset?

3  A    The fact that the expenses for 547 - 23 Avenue is put

4  in, and also his father's remodeling expenses for his

5  father's house in Pacifica.

6  Q    You mentioned the expense for 543?

7  A    547 - 23 Avenue.

8  Q    547 - 23rd Avenue?

9  A    Yeah, that's correct.

10 Q    Which item are you talking about?

11 A    That's the item on line -- the second line on line 2.

12 Q    You're talking about the one dated March 23rd, 2001?

13 A    That's correct.

14 Q    And it says Tony $8,000?

15 A    Yes.

16 Q    Now how did you -- so you objected to that item?

17 A    Yeah, definitely.

18 Q    And you're saying that was for 547 - 23rd Avenue?

19 A    That's correct.

20 Q    How did you know that?

21 A    I have all the paper, all kinds of paper to prove it.

22 Q    Well, let me show you a copy of a check stub.

23 Unfortunately I only have this one copy.  I'll show it to

24 Mr. Romeo.

25            MR. CHU:  May I have her mark this exhibit next

1  in order, Number 120?

2          THE COURT: Yes.  You can hand it to me, Jane.

3          MR. CHU: I'm sorry, Your Honor, that's the only

4  copy I could find.

5          THE COURT: Okay.

6          MR. ROMEO: Are you going to mark that as an

7  exhibit?

8          MR. CHU: Yes.

9          THE COURT: Yes, it is.  It's marked No. 120.

10 Jane, can you hand this back to him, please?  Thank you.

11 BY MR. CHU:

12 Q    Exhibit 120 is a copy of a check stub.  It's a check

13 dated March 23rd, 2001 in the amount of $8,000 payable to

14 Dong Fu.  The remitter is Mr. Demas Yan.  The reference is

15 for materials, labor 547 - 23rd Avenue.  Mr. Fu, could I

16 have you take a look at this exhibit, please?

17 A    Yes.

18 Q    Do you recognize that?

19 A    Yes.

20 Q    Is that a copy of a check stub that was in your

21 possession?

22 A    Yes.

23 Q    And where did you get this from?

24 A    He got this with his Pay Pal account or something.

25 Q    When you say "he got this" --

1  A    He gave it to me through the American -- what is it?

2  Express payment something.

3  Q    So when you said he gave it to you, you're talking

4  about --

5  A    Mr. Yan gave it to me, yes.

6  Q    So Mr. Yan paid you $8,000 there for something that

7  you did on 23rd Avenue, correct?

8  A    That's correct.

9  Q    And in this accounting, HH, you saw that he was

10  charging you for the same thing; is that what you thought?

11  A    It was the same thing.

12  Q    Okay.  So did you tell him?

13  A    I told him, yes.

14  Q    What did he say?

15  A    I don't remember what he said, but the second

16  spreadsheet, he took that out.

17  Q    You're talking about II?

18  A    I'm talking about II, yes.

19  Q    So are you saying that Exhibit II is something he

20  prepared after you gave him all your comments and

21  objections?

22  A    That's correct.

23  Q    And so he did take it out?

24  A    He did, yes.

25  Q    What about all these other items that you have

1 annotated?

2 A    Like if you come down here on one, two, three, four,

3 five, six, seven, eight, nine, ten -- on line ten, the $500

4 cost -- I mean that I have, you know, a comment here,

5 that's the brother of Demas, that $500 is the removal of

6 the roofing -- the old roof that he -- I mean that he paid

7 him and he also put it in here.

8 Q    Did you tell Mr. Yan that all the other items that you

9 didn't mark up were okay?

10 A    No.

11 Q    So for instance, the item, the third item down, in the

12 "Construction-Related Expenses" category, there's a third

13 item down dated May 9th, 2001.  I think it says G clean up.

14 A    Also that the general clean-up --

15 Q    General clean-up.

16 A    General clean-up, yes.

17 Q    Now that's for fourteen hundred dollars.

18 A    That fourteen hundred dollars is also for 23 Avenue.

19 Q    But you didn't tell him that at this time?

20 A    When I talk to him, I was like when I mark -- and I

21 had a temper; I'm so sorry.  Then I mark and then I talk to

22 him and it was somehow skipped, but I did have -- I did

23 have a -- later, I did recall that that's for the 23

24 Avenue.

25 Q    When did construction start on the -- well, when was

1  the demolition on the Chenery project?

2  A    May 28th, '01.

3  Q    Is there any reason why you would have had the

4  property cleaned up before the demolition?

5  A    No, no, no.  No that's -- I mean make no sense because

6  I was helping him to clean up the 547, and I have -- I

7  think I have the invoice for them.  I really think I have,

8  but I couldn't find them.

9  Q    I think you answered my question some time ago.

10 A    I'm sorry.

11 Q    So you're positive that that fourteen hundred dollar

12 clean-up cost would have had nothing to do with Chenery.

13 A    No, nothing.

14 Q    Now like I said, did you go through and examine each

15 of these items carefully before you talked to Mr. Yan about

16 them?

17 A    No.

18 Q    And you never told him that -- well, did you ever tell

19 him that all of the other items were acceptable?

20 A    No.

21 Q    I'd like you to take a look at another large item.

22 It's towards the bottom of the spreadsheet, one, two,

23 three, four, five, six -- it's the sixth item from the

24 bottom, the October -- I think it's dated October 5, 2001.

25          MR. ROMEO: Your Honor, I'd like counsel to

1  clarify what spreadsheet he's looking at.

2          MR. CHU: Oh, I'm sorry.  HH.

3          THE COURT: Fifth from the bottom?

4          MR. CHU: Yes, from the bottom.  Sixth item from

5  the bottom.

6          THE COURT: What's the date?

7          MR. CHU: The date is October 5th, 2001.

8          THE COURT: Okay.

9          MR. CHU: And the type -- it says SFBP.  The

10  amount is 14,505.  And it's three convenience checks, AMEX,

11  numbers 6001 and I can't read the other numbers, but --

12  BY MR. CHU:

13  Q    Can you see that item, Mr. Fu?

14  A    I see it.  I do not remember what that's for.

15  Q    Was that a deposit into the San Francisco Building

16  Professionals Bank of America account?

17  A    I don't think so.  But I did not really carefully look

18  up this one.

19  Q    Now you had a lot of other notations on the third page

20  of this exhibit.  Did you give this page to Mr. Yan as

21  well?

22  A    Yes.  I believe so.

23  Q    And you talked about it with him?

24  A    I talk about it, but I don't recollect what is this

25  for.  I don't remember.

1  Q    These notations that you made, did you make them when

2  he was with you or did you do them by yourself?

3  A    I believe he was with me.

4  Q    So you were there at the same time talking about it?

5  A    I believe so.

6  Q    Okay.  Later on you received Exhibit II, correct?

7  A    Correct.

8  Q    Was that faxed to you?

9  A    Yes, it was.

10  Q    Those numbers down the left-hand column, numbers 1

11  through 63, is that your writing?

12  A    Yes.

13  Q    So you added that after you received the fax?

14  A    Yes.

15  Q    And the column to the right where sometimes it says

16  "not agree," "not agree," that's your writing too?

17  A    Yeah.  I -- yes.

18  Q    Okay.  Then there's dash marks to the left of all the

19  consecutive numbers.

20  A    M-hm.

21  Q    What do those dash marks mean?

22  A    I don't remember because this spreadsheet when I --

23  the minute I took it, I feel quite frustrated and it just

24  caught my eye.  I said, well, what's going on here?  For

25  example, like the first line is Steve Law.  It is the

1  lawyer -- he went out and consult something, and then he

2  put it on the first -- especially I already mentioned it to

3  him -- and still he just say, oh, he charged me $600.  We

4  are partners.  You pay half.

5          MR. ROMEO: Your Honor, I'd like to move to strike

6  his response.  His answer is non-responsive, after he said

7  "I don't remember."  I think he answered the question at

8  that point and the rest of this is gratuitous and non-

9  responsive.

10         THE COURT: I'm inclined to grant that.

11         MR. CHU: No objection, Your Honor.  I just asked

12  him if he knew what those dash marks were.

13         THE COURT: Yes.  I understand.

14  BY MR. CHU:

15  Q    Can you look at the bottom of page 2.

16  A    Yes.

17  Q    There's writing there.  There's a dash mark and it

18  says "not agree."

19  A    Yeah.

20  Q    Did you write that there?

21  A    I believe so, yes.

22  Q    Okay.  Now looking at that writing at the bottom, does

23  that refresh your recollection as to what those dash marks

24  might mean?

25  A    Before I -- I mean it caught my eye.  I said this is

1   ridiculous.  Maybe I just make a mark or something.  I

2   don't recall specifically what I intended it for.

3   Q    Did you -- was there ever a time when you provided Mr.

4   Yan with a copy of this spreadsheet, double I, with your

5   annotations on it?

6   A    I don't think so.  I don't think -- but quickly -- I

7   mean I call him just like, I said this is --

8   Q    You answered the question.  How about during

9   discovery?

10  A    Yes.

11  Q    During discovery, you gave him a copy of this.

12  A    Yes.

13  Q    Okay.  Now after you received it, you made some marks

14  on it, and you were describing your mental process as you

15  were doing it.  Why don't you go ahead and finish out that

16  testimony.

17        MR. ROMEO: I'm going to object to the question as

18  vague and ambiguous.  I have no idea what he's asking him

19  to elucidate.

20        MR. CHU: I can rephrase.

21        THE COURT: Okay.

22  BY MR. CHU:

23  Q    What was your reaction when you received this

24  spreadsheet?

25  A    I felt upset.

1  Q    You were upset.  Okay.  Did you start going down the

2  line items?

3  A    No.

4  Q    You reviewed it though.

5  A    I reviewed them.  I take a look and I don't -- to my

6  recollection, on the right-hand side, what XT means.  I

7  don't even know what that means and I just -- I said, oh my

8  God, I don't know even -- I mean a lot of things I don't

9  even know about.

10  Q    So there were obviously some items here that you

11  objected to.

12  A    Yes.

13        MR. ROMEO: I'm going to object to the question as

14  leading.  I mean it isn't obvious to me what he objected

15  to.

16        MR. CHU: All right.  I'll withdraw and rephrase.

17        THE COURT: It is somewhat leading.

18  BY MR. CHU:

19  Q    What do you mean when you say "not agree," when you

20  mark it next to the item?

21  A    It was totally wrong at the point I took a look at it.

22  Q    Okay.  And did you -- were there items here that you

23  didn't understand at all?

24  A    Yes.  Just like I just mentioned to you, I marked it

25  like HD, what's that mean; I don't even know.

1  Q   How about the items that you didn't mark, does that

2 mean that you were agreeing to them?

3  A   No, no, no, because I did not go through them --

4 really go through -- I mean go through them and talk to him

5 and I don't think this one get to sit down and talk.

6  Q   Did you contact Mr. Yan after you finished reviewing

7 and marking up this exhibit?

8  A   I did.  I received it and I took a look and I call him

9 back right away.

10  Q   What did you tell him?

11  A   Well, he's very easy -- I mean that was his style.

12 And oh, don't worry about it, maybe --

13  Q   I said what did you tell him, not what he said.

14  A   Oh, I told him that was ridiculous, and like very

15 clearly, you know, Steve Law does not belong to it and you

16 put it in.  Oh yeah, I went to the law office and consulted

17 the thing for Chenery and you pay half.

18  Q   Was this conversation on the telephone?

19  A   Yes.

20  Q   During that conversation, did you talk about every

21 line item that you didn't --

22  A   No, I didn't.

23  Q   Well, okay, you talked about this first item, this

24 Steve Law?

25  A   Yes.

1    Q    What else did you talk about?

2    A    I talk about the P.G. & E., for example.  Here's it's

3    put it into the -- like a half and I mentioned it to him.

4    At the most it should be a quarter, not half, something

5    like that.  And then it's just like, oh yeah, let's talk

6    and something like that and we straighten it out; no

7    problem with that.  And so we don't really get into it.

8    Q    So what did Mr. Yan tell you?  So you suggested that

9    you get together and try and talk about these items?

10   A    Yes.

11   Q    What did Mr. Yan say?

12   A    He said, oh yeah, no problem.  We get together, but it

13   really never happened to get it straightened out so that he

14   can continue, deposit more money into the account.

15   Q    Could you take a look at Item No. 22 which is on the

16   second page?  That's dated January 30th, 2002.

17   A    I'm sorry.  Would you say it again?

18   Q    It's No. 22, your No. 22.

19   A    Yes.

20   Q    That's an entry dated January 1 -- pardon me, January

21   30th, 2002 for tax.

22   A    M-hm.

23   Q    Did you understand what tax he was referring to?

24   A    The property tax.

25   Q    The property tax on Chenery?

1  A     Yes.  Yes.

2  Q     So he was charging you one-quarter of it?

3  A     That's correct.

4  Q     And was that acceptable to you?

5  A     As a matter of fact, my discussion at the beginning

6  with him was, look, when you want me not charge you, not

7  let you pay, and how come you make me pay?  And oh, your

8  quarter percent interest, you supposed to pay.

9  Q     Quarter percent?

10 A     The ownership, so since you are the 25 percent and

11 that's a quarter, you supposed to pay.  I accept that.

12 Q     Okay.  When you said quarter percent, you meant 25

13 percent.

14 A     Twenty-five percent, yes, I'm sorry.

15 Q     Let's see, the last spreadsheet entry here is dated

16 June 29th, 2002; do you see that?

17 A     Line item, I'm sorry?

18 Q     The last one.

19 A     The last one, Chenery Street?

20 Q     Yes.

21 A     M-a-t-i, I guess is for material.

22 Q     Oh.  I'm more curious about the date.

23 A     It's June 29, '02.

24 Q     This is June of 2002.

25 A     Yeah, that's correct.

1 Q    What stage of completion was the project in at the

2 time?

3 A    It was fairly completed.

4 Q    Percentage-wise, what's your best estimation?

5 A    Ninety something percent.

6 Q    At some point you were going to have a meeting with

7 Mr. Yan to iron out all the accounting though, correct?

8 A    Yes.

9 Q    Did you ever try and schedule that meeting with him?

10 A    Actually a couple of times we talk and some kind of

11 interference.  I don't remember what specifically what

12 happened, and it kind of get delayed and delayed, but I

13 don't specifically -- I mean after this one, we have quite

14 an argument with the spreadsheet and, I mean the

15 contribution that he contribute.  And also at the --

16 Q    I think the only question I asked was were you ever

17 able to get together with him and have that meeting to iron

18 out the accounting?

19 A    We will get together a couple of times, but we

20 never -- we don't have an end result.

21 Q    Okay.  How about through -- even in 2003, you never --

22 did you get together by then?

23 A    We did get together, but I just -- I'm sorry I don't

24 really specifically recall how and can iron out everything.

25 So it did not happen.

1  Q    At the time the litigation was filed, had you had

2  that -- any accounting with Mr. Yan as far as how much he

3  owed or how much you owed, for that matter?

4  A    Could you say it again, I'm sorry?

5  Q    At the time the litigation commenced in early 2004,

6  were there any meetings then?

7  A    After the litigation?

8  Q    Yeah.

9  A    I don't think so.

10  Q    Could you take a look at Exhibit QQ please, Mr. Fu?

11  Do you have it?

12  A    Yes.

13  Q    Can you describe what these are?

14       MR. ROMEO: Your Honor, I'm going to object.  This

15  is outside the scope of direct and outside the scope of

16  cross as well.  This was never introduced by them.

17       MR. CHU: Actually, Your Honor, it is within the

18  scope of direct.  I think there was a question during

19  direct about whether Mr. Fu had an accounting as to these

20  expenses that he incurred on the project, and this exhibit

21  goes to that question.

22       THE COURT: Okay.  You may proceed.

23       THE WITNESS: I'm sorry?

24  BY MR. CHU:

25  Q    Do you recognize these documents?

1  A    It may be from the big stack of receipts that I did

2  give you, and I don't -- I really don't have a -- I mean a

3  specific recollection.

4  Q    Do you recall being deposed by Mr. Romeo in the case?

5  A    Yes.

6  Q    Do you recall bringing a large stack of receipts to

7  the deposition with you?

8  A    I did, yes.

9  Q    And those receipts were provided to Mr. Romeo?

10 A    Yes.

11 Q    Do you remember those?

12 A    Yes.

13 Q    Do these documents look like they came from that?

14 A    They came from that, yes.

15 Q    Okay.  So are these -- what are these receipts for?

16 A    It's for the construction of Chenery and the expenses.

17 Q    So you did keep all the receipts that you obtained.

18 A    Yeah.  Yeah.  Yes.

19         MR. CHU: I don't have anything else, Your Honor,

20 although I would like to have Mr. Fu authenticate the

21 original receipts that these came from.  I'd like to do

22 that later in the afternoon, though.

23         THE COURT: Okay.  Any questions, Mr. Romeo?

24         MR. ROMEO: Yeah, just a little bit of recross.

25 ///

1        RECROSS-EXAMINATION

2    BY MR. ROMEO:

3    Q    Earlier in your testimony today, Mr. Fu, you were

4    discussing the four $9,000 checks that you say were given

5    to you for compensation for your profit on the lot on

6    Majestic.  Do you remember that?

7    A    Yes.

8    Q    And you were also asked about the additional two

9    checks that were also written out but signed by you rather

10   than Mr. Yan, correct?

11   A    That was correct.

12   Q    And as I understand it, the -- if you could open the

13   exhibit book to MM.  The four checks -- excuse me, the six

14   checks that are in question, the $9,000 checks, are -- they

15   were checks 106 -- can you turn to that check?  The date of

16   that check is June 22nd, correct?

17   A    That's correct.

18   Q    The next check is 112, and the date of that check is

19   July 9th, correct?

20   A    Correct.

21   Q    And then the next check is 131.  The date of that

22   check is August 1st, correct?

23   A    Correct.

24   Q    And then the next check is check number 144.  Do you

25   see that?

1  A    I see that.

2  Q    September 4th, 2001?

3  A    Yes.

4  Q    And then the next check is 244, 1/11/02.  The date of

5  that is January 11th, 2002?

6  A    Yes.

7  Q    And then the next check is 253, and that's February

8  1st, 2002?

9  A    Yes.

10 Q    Isn't it the case, Mr. Fu, that these checks were

11 written periodically at times when you were actually

12 actively working on the project?

13 A    That was correct.

14         THE COURT: What do you mean by "the project"?

15         MR. ROMEO: The Chenery project.  Excuse me, Your

16 Honor.

17 BY MR. ROMEO:

18 Q    Because the Chenery project really got going you said

19 in May 2001.

20 A    May 2001, that's correct.

21 Q    Okay.  And that's why we see the first check for

22 $9,000 written in June 2001, correct?

23 A    That's correct.

24 Q    And if I understand your testimony, you're saying that

25 when you and Mr. Yan discussed the first four checks, that

1  it was his direction to write "pay" on them to make it

2  appear as if they were pay checks as opposed to payments

3  for Majestic, correct?

4  A    I'm sorry.  Would you say it again?

5  Q    If I understand your testimony, you were saying that

6  putting on the memo line of each check "pay," was at Mr.

7  Yan's direction?

8  A    That's correct.

9  Q    To make it look like it was pay?

10  A    Like I was earning a company salary.

11  Q    Okay.  And you said that was another side deal or side

12  agreement with Mr. Yan?

13  A    That was correct.

14  Q    In your deposition at page 196, starting at line 8,

15  you gave the following testimony.

16           "I'd like to point out, I hope you don't mind,

17           and that will be the whole story.  That is why it

18           break into 9,000, 9,000 and 9,000, 9,000, the

19           four checks.  Somehow initially we talk about

20           having a project in the future and running a big

21           company and what I am supposed to be entitled to.

22           Well, that should be the fair pay for me for the

23           9,000."

24  Do you remember giving that testimony, Mr. Fu?

25  A    Yes.

1  Q    And is it true that you had a discussion in which you

2  decided that 9,000 would be the fair pay for you for your

3  services for the company?

4  A    You are reading just one part of it, and the other

5  part I was specifically telling you, and I said that -- I

6  explained that it was for Majestic.

7  Q    Okay.  Let's read the rest --

8  A    And that was --

9  Q    I'll continue on from line 15 on page 196:

10              "So let's be doing that if -- I mean the other

11              future project running, you just go ahead because

12              you are the supervisor.  You have the hang-on

13              experience.  Get the 9,000 just like the formal

14              company.  We run the company.  Should be like

15              multi-billion dollar business.  So you should be

16              the one entitled to that pay."

17 Was that your testimony, Mr. Fu?

18 A    That was correct.  It's a partial testimony.

19 Q    So the other agreement really was that 9,000 would be

20 fair pay for you; wasn't it?

21 A    No.

22 Q    You deny that testimony now?

23 A    No, no, no.  That was Mr. Yan told me.  That's his

24 idea for running a future company, and that would be -- so

25 that it left you -- it looks -- it's compensation for

1    company.  When Florence Fung cause trouble, I mean, I have

2    things to show.  But that was -- if I don't say it concise

3    or clearly, that was Mr. Yan told me -- I mean what -- that

4    was what Mr. Yan told me.

5    Q    Okay.  I understand.  So you're saying that you wanted

6    to make it look like you were getting paid because you were

7    worried about Florence Fung trying to collect money against

8    you, correct?

9              MR. CHU: Objection.  That mischaracterizes his

10   testimony.

11             THE COURT: I don't understand.

12             MR. ROMEO: I'm trying to clarify the Florence

13   Fung connection in this.

14             THE COURT: Just ask about the Florence Fung

15   connection and not what he said previously, and you won't

16   run into the problem.

17             MR. ROMEO: Okay.

18   BY MR. ROMEO:

19   Q    Mr. Fu, you brought up Florence Fung having something

20   to do with writing "Pay" on the checks, correct?

21   A    Because Mr. Yan going back and forth and he told me

22   Florence Fung is going to cause trouble, and he was worried

23   about it.

24   Q    So it's my understanding -- is it your testimony then

25   that you decided to make periodic payments of $9,000

1  labeled "pay" in order to somehow foil Florence Fung?

2  A    It was Mr. Yan's idea, and tell me that was a good

3  idea for him to pay me back that way, pay me back on

4  Majestic in a way like this.

5  Q    Oh, okay.  I understand.  But you're saying that the

6  testimony I just read was just words out of Mr. Yan's mouth

7  and not an agreement; is that what you're saying?

8  A    Oh, that was correct, yes.

9  Q    Okay.  Well then let's look at the question above,

10 page 196, line 7:

11         "Question: It was another oral agreement with Mr.

12         Yan?

13         "Answer: That's correct."

14 And the passage that I just read to you, the testimony that

15 follows your answer that that's correct.  Is that your

16 testimony, Mr. Fu?

17 A    Say it again, please.

18 Q    I'll read the entire passage, okay, starting on line

19 6:

20         "Question: It was another oral agreement with Mr.

21         Yan.

22         "Answer: That's correct.  I'd like to point out,

23         I hope you don't mind, and that will be the whole

24         story.  That is why I break into 9,000, 9,000 and

25         9,000, 9,000, the four checks.  So now initially

1          we talk about having a project in the future and

2          running a big company and what I'm supposed to be

3          entitled to.  Well, that should be the fair pay

4          for me, the 9,000.  So let's be doing that if --

5          I mean the other project running, you just go

6          ahead because you are the supervisor; you have

7          the hang-on experience.  Get the 9,000 just like

8          the formal company.  We run the company.  It

9          should be like a multi-billion dollar business.

10         So you should be the one entitled to that, to

11         that pay."

12    Is that your testimony?

13    A    Yes, that was and you just --

14    Q    And so you went and you explained to me, you said -- I

15    asked you if that was an oral agreement, correct?

16    A    No.  No.

17    Q    And you said that's correct.

18    A    The oral agreement was in the future to run the

19    company.

20    Q    So breaking out the checks in periodic payments was

21    your attempt -- your and Mr. Yan's attempt to make it look

22    like you were receiving regular pay for providing services

23    to the Chenery project, correct?

24    A    That's correct.

25    Q    And when you were paying people on the Chenery

1  project, such as Zhuo Rong Li or some of the other

2  workers, their pay was also broken out into periodic

3  payments as they performed the services, correct?

4  A    They provide service; I paid them, yes.

5  Q    So it was your custom and practice in that company

6  then when people provided services to pay them periodically

7  as the services were performed, correct?

8  A    Yeah.  People perform service, you pay them, yes.

9  Q    Oh, but you agree with my question that if someone was

10 providing services or performing labor at the Chenery

11 project, you paid them periodically as they performed the

12 services, correct?

13 A    That's correct.

14 Q    Now but in the case of Ming Fong, you didn't do that;

15 did you?

16 A    I paid Fong according to our deals.

17 Q    Okay.  You testified yesterday that Ming Fong who is

18 in Hong Kong worked full time six days a week from May 2001

19 until June 2002.  Do you recall that testimony?

20 A    Yes.  He -- yes.

21 Q    And that he was your valuable right-hand man, correct?

22 A    Yes.

23 Q    And all the payments that you made to Mr. Fong

24 totaling $80,000 occurred between August 16th, 2001 and

25 September 21st, 2001, an approximately one-month period, a

1  little more than a month, correct?

2  A    That's correct.

3  Q    You were testifying this morning about the Toyota

4  truck that you purchased at San Francisco Toyota with the

5  two checks, 165 and 166; do you recall that testimony?

6  A    Yes.

7  Q    And it's your testimony that Mr. Yan helped you pick

8  out that truck and went to the dealership with you?

9  A    Yes.

10  Q    Who's the registered owner of the Toyota truck?

11  A    I am the owner of the -- I had the DMV register,

12  yeah.

13  Q    Oh, you had the DMV register the truck?

14  A    Yes.  Yes.  I have -- Mr. Chu can provide it for you.

15  Q    Well, but is the registration in your name, Mr. Fu?

16  A    I have -- Mr. Chu --

17  Q    I don't need to look at it.  You can just answer the

18  question.

19  A    Yes.

20  Q    It is in your name?

21  A    It is registered in my name, yes.

22  Q    Dong Xing Fu.

23  A    Correct.

24  Q    Are you still open to Exhibit MM?  Yesterday I was

25  asking you about some of the credit card payments that were

1  made, and you affirmed that various check numbers that I

2  read off to you were payments on your personal credit card

3  account; do you recall that testimony?

4  A    Yes.

5  Q    And I think what you were telling us was that you had

6  used some of those personal credit cards for expenses on

7  the project; is that correct?

8  A    Mainly for the project, and I didn't know how to

9  reimburse myself for some of the -- some of the expenses

10 that I pay for myself, yes.

11 Q    Okay.  And in regard to each one of these credit card

12 payments that was a reimbursement of an expense for the

13 project, you haven't given us a receipt to back up each one

14 of those credit card payments; have you?

15 A    Back up the credit card -- I don't -- I don't need to.

16 It's -- I mean all my understanding is Mr. Yan need to

17 prove his contribution for the 300,000, and I don't have to

18 because I incur hundreds and hundreds thousand in my own --

19 from my own pocket.

20 Q    Let me ask you, looking at, for example, check 207 to

21 Macy's.  What did Macy's supply to the project that you

22 were reimbursing yourself for that expense?

23 A    For the Macy's -- I mean there's one occasion that the

24 worker broke his pen.  I went down there and I buy a

25 replacement.  I did things like that.

1  Q    Okay.  What about check 242 also to Macy's.  What did

2  Macy's supply to the project that you were reimbursing

3  yourself for on this credit card?

4  A    I don't recall that, but I recall I mention it to you.

5  I may purchase a small gift or something or something,

6  yeah.  One thing I'd like to mention to you if you allow

7  me.

8  Q    I'm sorry, Mr. Fu, but I have to --

9            THE COURT: You have to wait for questions.

10           THE WITNESS: Okay.

11           MR. ROMEO: I have to ask you a question before

12  you can answer.

13  BY MR. ROMEO:

14  Q    Can you go to Exhibit HH, Mr. Fu.

15  A    Yes.

16  Q    Whose fax number is that on page 1?

17  A    I'm sorry?

18  Q    Whose fax number is that on page 1?

19  A    The fax number -- I can't see it in here.

20  Q    Page 1 of Exhibit HH.

21  A    Oh, I can't see it in here, but apparently Mr. Yan

22  faxed it to me, this one.

23  Q    No, right here, written in -- first of all --

24  A    Oh, this one, it's --

25  Q    The middle of the page, that's your handwriting; isn't

1  it?

2  A    Yeah, I believe so.

3  Q    And that's Mr. --

4  A    Mr. Yan's.

5  Q    -- that's Mr. Yan's fax number; isn't it?

6  A    That's correct, yes.

7  Q    Because you sent it back to him marked up; didn't you?

8  A    I think so, yeah.

9  Q    Now on Exhibit HH, you said that you objected to an

10 $8,000 entry which you said was for work on Mr. Yan's

11 brother's house in Pacifica, correct?

12 A    That's correct.

13 Q    And do you have Exhibit 120 -- I'm afraid we only have

14 one copy.

15 A    Exhibit 120.  Oh, this is for 547.

16 Q    So this was the $8,000 item that you objected to in

17 HH?

18 A    That's correct.

19 Q    And then Mr. Yan took that $8,000 item out of the

20 accounting in Exhibit II, correct?

21 A    Took it out -- he did later, yes.

22 Q    Counsel was asking you this morning about an item on

23 Exhibit HH, page 2, the $14,505 item dated 10/5/01.  Do you

24 recall that testimony?

25 A    I don't recall.

1  Q    Okay.  Do you see --

2  A    I see the three -- yeah, the three convenience checks

3  here.

4  Q    And that's an expense that you question, correct?

5  A    I don't have a specific memory to this one.

6  Q    You have no specific memory as to this.

7  A    Yes.

8  Q    Are you saying then that this 14,505 should be

9  disallowed?

10  A    No, no.  I don't -- I told you --

11  Q    So these were convenience checks that were written to

12  third parties; is that what you're saying?

13  A    I don't have specific recollection, as I just -- I

14  mean pop up to me.

15  Q    Could you look at Exhibit L, page 21 -- or excuse me,

16  page 20.  The numbers are in the lower right-hand corner.

17  LL, it's the next exhibit.

18           MR. CHU: II?

19           MR. ROMEO: LL.

20           THE WITNESS: Yes.  Yes, LL.  Is that three L?

21           MR. ROMEO: There's numbers within the exhibit.

22  They're in the lower right-hand corner.  They're a little

23  faint, but -- the page I'm going to is Exhibit 20.

24           MR. CHU: Oh, page 20?

25  ///

1    BY MR. ROMEO:

2    Q    Do you see some handwriting on that page?

3    A    Yes.

4    Q    And that's your handwriting; isn't it?

5    A    I don't recall that.

6    Q    You deny that that's your handwriting?

7    A    I'm not positive.

8    Q    You're not positive it's not your handwriting, and

9    you're not positive it is your handwriting.

10   A    I'm not positive.

11   Q    Now the check numbers and the total appears to be the

12   same one that you were talking about in your testimony in

13   Exhibit H, page 2, fifth item from the bottom, 14,505,

14   correct?

15   A    That's correct, yes.

16   Q    Okay.  But you're not objecting to that; are you?

17   A    I mentioned that I don't have a specific memory and I

18   need to look it up.

19   Q    And as far as Exhibit II, that's the September 1st,

20   2002 accounting, correct?

21   A    That's correct.

22   Q    That's the last accounting that you got from Mr. Yan

23   prior to this litigation?

24   A    I think so.

25   Q    Okay.  Let me ask you to take a look at Exhibit QQ

1  which your counsel was asking you to examine earlier.  Now

2  as I understand it, you think that QQ is at least part of

3  the receipts that you had kept from your construction

4  expenses for the Chenery project, correct?

5  A    That's correct.

6  Q    And you produced those exhibits at my office.

7  A    That's correct.

8  Q    As part of your deposition.

9  A    Yes.

10  Q    The original exhibits.

11  A    Yes.

12  Q    And there's a far greater amount of receipts than just

13  what appears here in QQ, correct?

14  A    Yes.  That's what is in Mr. Chu's hand.

15  Q    I see.  On Exhibit QQ, do you see the page numbers

16  that are written on the bottom of the page?

17  A    I see that.

18  Q    Okay.  Using those, let's take a look first of all at

19  page 1, the very first page of the exhibit.

20  A    QQ?

21  Q    QQ.  Yes, sir.

22  A    Okay.  Yes.

23  Q    Do you see that?

24  A    Yes, I see that.

25  Q    Okay.  Do you see on the information at the top of

1 this receipt that it says "Ship to Raun, R-a-u-n,

2 Construction"?

3 A    That's correct.

4 Q    Go to page 2.

5         MR. CHU: Sorry, counsel, what exhibit and what

6 page number are we at?

7         MR. ROMEO: QQ.  The second page.  I'm sorry, this

8 one doesn't have numbers.

9         MR. CHU: Mine don't have numbers.

10         MR. ROMEO: Just number them serially.  They go 1

11 through 70.  I'm not going to ask about too many of them,

12 but I'm going to ask about a few.

13 BY MR. ROMEO:

14 Q    Same question as to page 2.  It says "ship to," and it

15 says –– I can't read the name but it looks like PX Ruan,

16 R-u-a-n.

17 A    Yes.

18 Q    And by the way there's a signature at the bottom of

19 that.

20 A    M-hm.  Yes.

21 Q    It's not your signature; is it?

22 A    Not my signature, yes.

23 Q    If you go to page 3, same thing.  It says to "Ship to

24 PX Ruan." (This is Qi X Ruan.)

25 A    That's correct.

1  Q    And that's also not your signature on the receiving

2  line?

3  A    That's correct.

4  Q    Go to page 4, it says it was -- whatever this item

5  is -- it says it was sold to a Bay Steel.

6  A    M-hm, yes.  I see that.

7  Q    Not San Francisco Contractor's Association or Tony Fu.

8  A    No.

9  Q    Page 5, the next one over.  It says "Ship to 1691

10 Construction."  Do you see that?

11 A    I see that.

12 Q    Page 6, invoice and it says "Bill to David Wu" W-u,

13 955 Pacific Avenue, San Francisco, California."  Do you see

14 that?

15 A    I see that.

16 Q    The next one page 7, "Bill to David Wu, 955 Pacific

17 Avenue, San Francisco, California."  Do you see that?

18 A    I see that.

19 Q    Were you being a contractor for David Wu at 955

20 Pacific Avenue on or about this date for this invoice,

21 8/19/02?

22 A    No.  No.

23 Q    Are you saying that's for the Chenery construction,

24 materials billed to David Wu?

25 A    Because a person like Ming Fong, he would give me a

1  stack of receipts and so –– because he was using, as I

2  testified earlier, he pay various people, and also he buy

3  various things for me.

4  Q    Can you refer really quickly to Exhibit UU.  Is that

5  the Certificate of Final Completion on the project?

6  A    That's correct.

7  Q    The date of issuance of that certificate is July 22nd,

8  2003?

9  A    Actually the Certificate of Occupancy, the date should

10  be August 7.  But here there's no ––

11  Q    You just testified that this is the Certificate of

12  Completion, correct?

13  A    The Certificate of Completion issued for –– it's

14  August, and that one is –– it's the fire inspector.

15  Q    Okay.  Are you saying –– well, is that why it says

16  Department of Building Inspection on the top of the

17  exhibit?

18  A    It says Department ––

19  Q    Is that because it's the Fire Department's inspection?

20  A    On the left-hand side is the Fire Department's, when

21  you have the fire system done, then you have them clear it

22  first.

23  Q    So everything though basically was complete by July

24  2003.

25  A    Fairly completed.

1  Q    No, everything was complete by July 2003.  Your

2  testimony this morning I believe was that it was actually

3  completed more around June 2003.  Am I correct?  Most of

4  the work was done.

5  A    Most of the work was done even before that, I should

6  say, I mean most of the work.

7  Q    Okay.  Let's go back to Exhibit QQ then.  Can you look

8  at -- start at page 38, starting with the Beronio Lumber

9  invoice dated -- it looks to me like 7/16 or 7/15/03.  Do

10  you see that?

11  A    The stamp here is August 15, 2003.

12  Q    Okay.  August 15th.

13  A    I see that.  Yes.

14  Q    It says August 15th, 2003, correct?

15  A    Yes.  Yes.  Correct.

16  Q    For decking, correct?  Correct?

17  A    For decking, yes.

18  Q    The next page, August 11th of 2003 for hardwood

19  decking, correct?

20  A    That's what it say, yes.

21  Q    The next page, dated August 14th, 2003 from Beronio

22  Lumber, more hardwood decking, correct?

23  A    That's correct.

24  Q    The next page, 41, Bayshore Supply invoice.  Do you

25  see the order date?  10/24/03, correct?

1  A     That's correct.

2  Q     Sold to incidentally, just cash, correct?

3  A     That's correct.

4  Q     The next page 42, Airgas Supply invoice dated 10/6/03,

5  correct?

6  A     That's correct.

7  Q     The next page, Good View Lumber & Building, dated

8  7/22/03, correct?

9  A     That's correct.

10 Q     The next page, 44, the middle receipt, Home Depot,

11 dated 8/3/03, correct?

12 A     That's correct.

13 Q     The next page, 45, BFI Waste Systems, three receipts,

14 dated 8/6/03, 9/3/03 and 9/22/03.  Do you see those?

15 A     Yeah, I see that.

16 Q     Those are part of your receipts for the Chenery

17 project?

18 A     Yes.

19 Q     The next page 46, lower right-hand corner, Home Depot,

20 dated 8/11/03.

21 A     Yes.

22 Q     Part of your receipts for the Chenery project?

23 A     Yes.

24 Q     The next page 47, BFI Waste Systems, dated 7/10/03,

25 receipt, part of your expenses for the Chenery project?

1  A    I believe so.

2  Q    The next page, 48, Ryan Engineering, Inc.  "Sold to

3  Cash," receipt, correct?

4  A    M-hm.

5  Q    Yes?

6  A    Yes, correct.

7  Q    One is dated 8/20/03 and one is dated 9/2/03, part of

8  your receipts for the Chenery project?

9  A    That's correct.

10  Q    Page 49, two more receipts from Ryan Engineering, Inc.

11  dated 8/20/03 and 9/3/03, part of your receipts for the

12  Chenery project?

13  A    That's correct.  Let me also point out, this one is

14  dumping the garbage, for example, you have a lot of things

15  to get rid of.  Then --

16  Q    Okay.  Same question as to page 50, the next one, Ryan

17  Engineering, Inc.  Dump charges dated 9/3/03 and 9/2/03.

18  A    That's correct.

19  Q    Part of your Chenery expenses?

20  A    That's correct.

21  Q    The next page 51, Beronio Lumber.  It looks like that

22  one's dated 7/22/03 for, if I'm not mistaken, 2 by 6

23  redwood lumber, correct?

24  A    I believe so, yes.

25  Q    Yeah.  And that's part of your expenses for the

1  Chenery project?

2  A    I believe so.

3  Q    The next page 52, bottom middle receipt from Home

4  Depot dated 10 -- excuse me.

5  A    10/19/01.

6  Q    Okay.  Maybe I misread that one.   Now, can you go to

7  page 9 of the exhibit.

8  A    Page 9?

9  Q    Correct.

10  A    Of this exhibit.

11  Q    QQ.  Are you with me?

12  A    Okay.  Yes.

13  Q    These are all photocopies of restaurant receipts;

14  isn't that true?

15  A    That's true.

16  Q    In the lower left-hand corner, one that looks like

17  it's for Koi Palace Restaurant, 365 Gellert Boulevard, Daly

18  City for the total amount of $1,073.40.  Do you see that?

19  A    I see that.

20  Q    Part of your expenses for the Chenery project?

21  A    For the holidays, I took everybody out to have a

22  dinner, yes.

23  Q    For the holidays, you took who out?

24  A    I took the workers out.

25  Q    Okay.  What about the receipt above it, Ton Kiang,

 1  5821 Geary Boulevard.  That's dated 1/15/02.  Is that also

 2  a construction cost, Mr. Fu?

 3  A    You refer to the restaurant bill?

 4  Q    Yeah.  Are all of these construction costs that you

 5  paid that you want credit for?

 6  A    Restaurant bill is not construction cost, yes.

 7  Q    And on page 10, the next page over, copies of a number

 8  of restaurant receipts.  Do you see them?

 9  A    Yes, I see them.

10  Q    For example, for Happy Palace Restaurant, $595.  Do

11  you see that?

12  A    I see that, yes.

13  Q    That's your signature on that?

14  A    That's my signature on it.

15  Q    Okay.  And these are part of your construction costs?

16  A    For that restaurant, I have like a deal with them.

17  Every lunch we go, so they bill me like by the month.  They

18  give me the bill like periodically.

19  Q    Okay.  Let's go to page 61 and 62 of the exhibit.

20  A    62?

21  Q    61 and 62, let's look at those.

22  A    61.

23       MR. CHU: Can you describe them?  I don't have

24  page numbers on my copies.

25       MR. ROMEO: They're more restaurant receipts.  Do

1  you see them?

2          THE WITNESS: I see them, yes.

3  BY MR. ROMEO:

4  Q    It's for such restaurants as Koi Palace Restaurant on

5  Gellert Boulevard.

6  A    That's correct.

7  Q    And Happy Palace Restaurant?

8  A    That's correct.

9  Q    And the next page over, Zaoh Restaurant I believe or

10  Zaoh Restaurant, Z-a-o-h, on 1555 Mission Street, San

11  Francisco?

12  A    That's correct.

13  Q    And there's even over on the far right-hand corner,

14  Daimo Chinese Restaurant in Richmond, California.  Part of

15  your construction costs?

16  A    It's not -- I mentioned it you, it's my expenses.

17  Q    Go to page 11 of the exhibit, Mr. Fu.  There's in the

18  upper left-hand corner, there's a sales draft for Airgas on

19  Third Street for $5,000.  Do you see that?

20  A    I see that.

21  Q    So $5,000 happens to be an expense for I suppose

22  welding supplies for this property?

23  A    I guess so.

24  Q    You don't know for a fact.

25  A    Because for a fact, I testified earlier to you one of

1  the persons, like Ming Fong, he would present me with a

2  stack of receipts and I write him a check.

3  Q   Oh, I see.  So you would just take the receipts and

4  you didn't go through them.  You just accepted them and

5  paid them.  Is that your testimony?

6  A   It's been a couple years.

7  Q   Because he's your right-hand man, and you trust him so

8  much.

9          I'll withdraw the question.

10          Did you have a house account at Airgas in 2001?

11 A   I'm sorry.

12 Q   Did you have a contractor's account at Airgas in 2001?

13 A   I did not.

14 Q   Let's go to page 34, and for the record, for Mr.

15 Chu's benefit, that is a receipt which is apparently, from

16 what I can see, cut off, so we don't know who the vendor

17 is, but it's a receipt for Brazilian Cherry lumber.  No

18 date.  Do you see that one, Mr. Fu?

19 A   I see that, yes.

20 Q   Now Brazilian Cherry lumber or finished wood wasn't

21 used in this project; was it?

22 A   I do not recall this.

23 Q   This is May 13th, 2003.  You don't recall this.

24 A   I don't recall this.

25 Q   And it's not your signature on the bottom.

1   A      No.

2   Q      The customer.

3   A      That's true.

4   Q      It's certainly not Ming Fong's signature because

5   according to your testimony his work was ended in June

6   2002, correct?

7   A      Yes.

8   Q      Go to the next page.

9           MR. CHU: Do I have the right page?  This invoice

10  appears to be an order date of February 14th, 2002.  Is this

11  the one you're talking about?

12          MR. ROMEO: No.  I'll get you there.  Do you want

13  to just peek over my -- use mine.

14          MR. CHU: Maybe, yes.

15          MR. ROMEO: Why don't we just use that.  I'm

16  sorry.  I apologize.

17          MR. CHU: I'll stand here.

18          MR. ROMEO: Well then you get to look at my notes.

19          MR. CHU: Oh.

20      (Laughter.)

21          MR. ROMEO: That's okay.  Just stand up there.

22          THE COURT: All is revealed.

23          MR. CHU: I'll just stand here and look over --

24          MR. ROMEO: Here.  I'll just put it right here.

25  I'm sorry, Mr. Chu.

1          MR. CHU: I'll bring my staff and just sort of

2     approximate where the page is.

3          MR. ROMEO: Well, I'm at page 35.  This looks like

4     unfinished red oak lumber, delivery approximately $2,294

5     worth.  Do you see that, Mr. Fu.

6          THE WITNESS: Is that on 35?

7     BY MR. ROMEO:

8     Q    Yes, sir.

9     A    Okay, yes.

10    Q    But there's no red oak, unfinished red oak used in the

11    project at Chenery; was there?

12    A    What is unfinished red oak?  I don't even know.  So --

13    Q    Okay.  So you don't recognize this as something used

14    at Chenery.

15    A    Chenery, we got the hardwood floor, it's unfinished.

16    I don't know what that's called.

17    Q    Go to page 36, this looks like an invoice for $870

18    worth of maple stair treads and risers.  There were no

19    maple stair treads or risers used at Chenery; were there,

20    Mr. Fu?

21    A    I don't know.

22    Q    Go to the next page, 37.  This is an invoice for $495

23    worth of Brazilian Cherry unfinished stair treads and

24    risers.  Do you see that?

25    A    I see that.

1  Q    Those weren't used at Chenery Street, were they?

2  A    I don't know.

3  Q    Go to page 58, Mr. Fu.  Do you see the Lowe's receipt

4  in the upper left-hand corner?

5  A    I see that.

6  Q    Dated 1/20/02, correct?

7  A    1/20/02, correct.

8  Q    Right.  Before the -- I believe Mr. Suen was here

9  yesterday testifying that he was still putting in

10  electrical and the walls weren't closed up on 1/20/02,

11  correct?

12  A    I'm sorry, say it again?

13  Q    Well, do you remember Mr. Suen was here yesterday and

14  he was testifying that he was still doing electrical work

15  before February 2002, correct?

16  A    Yeah, his time was stretched --

17  Q    Right.

18  A    -- and I don't specifically --

19  Q    Let me ask you another question.  In January 2002,

20  were the walls even closed up on this project?

21  A    January 2002, the walls is not closed, yes, that's

22  correct.

23  Q    Still being framed, right?

24  A    It is true.

25  Q    Okay.  This looks to me to be a receipt as part of

1  what you claim are expenses you incurred for gas dryer from

2  Lowe's on 1/20/02.  Is that part of your construction

3  expense for Chenery Street?

4  A    I don't think this is –- no.

5       (Pause.)

6  Q    Could you take a look at pages 63 through 68 of QQ?

7  A    Yes, 63, right?

8  Q    Right.  63 through 68.  Do you see those receipts?

9  A    Yeah, I see that.

10 Q    And you see for example at page 63 this looks like a

11 tool purchase for $755?

12 A    That's correct.  That one I purchase for the project.

13 Q    Oh, I see.  Do you still have that tool?

14 A    I do.

15 Q    And the next page 64, a breaker hammer purchased for

16 fourteen hundred twenty-eight dollars.

17 A    I'm sorry?

18 Q    It says "a breaker hammer," that was purchased for

19 fourteen hundred twenty-eight dollars.  Do you see that?

20 A    I see that, yes.

21 Q    And do you still have that tool or was that someone

22 else's tool?

23 A    I think I have that.

24 Q    Okay.  So you just bought tools.

25 A    Yes.

1　Q　　And you consider that a construction expense.

2　A　　I bought a lot of tools, yes.

3　Q　　Okay.  The Home Depot on the next page in the middle

4　center at the top, same question, another tool 1496.88?

5　A　　That's correct.

6　Q　　And you still have those tools?

7　A　　I believe so.

8　Q　　And then the next page, it doesn't say who it was sold

9　to or what was sold, but another cash sale for some kind of

10　power tool for $968.

11　A　　I see that, yes.

12　Q　　And the next page, 67, some more tools?

13　A　　Yes.

14　Q　　Page 69, more tools?  The top one, Home Depot?

15　A　　69 or 68.

16　Q　　I'm on 68.

17　A　　Okay, 68.

18　Q　　Slide saw from Home Depot, $678?

19　A　　That's correct.

20　Q　　Okay.  And you consider that a construction expense

21　for money that you put into Chenery, buying all these

22　tools?

23　A　　I bought all these tools, yes, I did.

24　Q　　Okay.  And you still have those tools?

25　A　　I think so, yes.

1  Q    You get to use them on other projects?

2  A    I could, yes, definitely.

3  Q    Actually in this particular exhibit, Mr. Fu, a number

4  of these invoices from some of the commercial suppliers,

5  they have a signature of a person receiving the products.

6  Do you see -- have you seen that?

7  A    I see that.

8  Q    There's not a single one of Tony Fu's signatures in

9  this entire document; is there?

10 A    That's true.

11        MR. ROMEO: I have no further questions, Your

12 Honor.  Thank you, Mr. Fu.

13        THE WITNESS: Thank you.

14        THE COURT: Any further questions?

15        MR. CHU: Yes, I have some recross, but it's

16 12:00, Your Honor, should we do it --

17        THE COURT: Yes, I think it's a good time.  Okay.

18 You know, the only thing is, I'm having -- I'm meeting

19 somebody for lunch at a quarter after, and it's going to go

20 till a little past 1:00.  If you want to stop now, that's

21 fine.  But I can't start right away at 1:00.

22        MR. CHU: We can go for another ten minutes.

23 Would that be --

24        THE COURT: Okay.  Well, why don't you do that

25 then.  It would be --

1          MR. CHU: We'll use the ten minutes.

2          THE COURT: Okay.  Let's do that.

3               REDIRECT-EXAMINATION (CONTINUED)

4   BY MR. CHU:

5   Q    Do you have your deposition transcript in front of

6   you?

7   A    Deposition transcript -- yes -- not in front of me.

8   Q    Not in front of you?

9   A    I have my -- on the desk.

10  Q    Counsel had I guess asked you some questions about

11  some of your deposition testimony at page 196.  There was a

12  part where he asked you in the deposition: "Do you have a

13  written agreement about this Majestic property with Mr.

14  Yan?"  And then your answer was "No, it was oral

15  agreement."  So when you said "oral agreement," what

16  agreement were you talking about?

17  A    We said 50/50 partnership with Majestic.

18  Q    So you're talking about the Majestic property?

19  A    Yes, correct.

20  Q    Okay.  Later on, I guess the next question, I guess

21  there was no question, you just started talking in your

22  deposition.

23  A    Yeah, I'm sorry.

24  Q    You started talking about this $9,000 deal, and then

25  it says:

1          "I'd like to point out, I hope you don't mind,

2          and that will be the whole story.  That is why it

3          is break into 9,000, 9,000, 9,000, 9,000, the

4          four checks."

5   And then you continue:

6          "Somehow, initially we talk about having a

7          project in the future and running a big company

8          and what I am supposed to be entitled to.  Well,

9          that should be the fair pay for me for the 9,000.

10         So let's be doing that if -- I mean the other

11         future project running, you just go ahead and you

12         are the supervisor.  You have the hang-on

13         experience.  Get the 9,000 just like the formal

14         company."

15  Were you talking about an actual offer, an agreement that

16  Mr. Yan was making to you?

17  A    That was correct.

18  Q    And this was -- so he was offering to pay you 9,000 a

19  month?

20  A    No, he was saying that in the future, if we run a

21  company, then the company should be like a formal company

22  and you work and I mean people work and everybody, like

23  take a pay check and $9,000 should be a fair pay to you.

24  Then we do it that -- and I say, well, that sounds good.

25  Q    But did you have an agreement that you should get

1  9,000 right then and there?

2  A    No, no, not for Chenery.

3  Q    So what was -- what was the significance of the 9,000

4  then?  That was his number?

5  A    That was his number because $36,000 break into four

6  checks is 9,000 and it looks good.

7  Q    Counsel asked you about the registration on the Tundra

8  truck.  I have an exhibit that I'd like to have marked next

9  in order.  It would be 121.  I'd like to show you a copy of

10  a registration on a Toyota vehicle.  I'd like to show it to

11  you.

12  A    Yes.

13  Q    Is that the registration on the Toyota truck?

14  A    That's correct, yes.

15  Q    All the personal credit cards that you sometimes used

16  to charge construction costs for Chenery?

17  A    Yes.

18  Q    Did you have charges for your other personal items on

19  those cards as well?

20  A    I did.

21  Q    But you didn't keep track of how much of the card was

22  personal and how much of it was Chenery; did you?

23  A    No, I did not.

24  Q    Did it make any difference to you?

25  A    No, it made no difference to me, and even though I

1  submit the invoice to try to prove the costs, the expenses,

2  I may, like orders, and it's more than 400,000 on the

3  expenses for the materials, mainly materials, and also

4  meals and all that.  I would say fairly, fair would be the

5  materials is 300,000.  I stated in the deposition, and I

6  mean it would be fair, very fair that labor is about

7  300,000, and so I mean Mr. Romeo can take whatever he like

8  to offset that.

9  Q    I don't know what you're talking about.

10 A    I'm sorry.  I'm sorry.  I'm sorry.

11 Q    I didn't ask you a question.

12 A    Yeah, yeah.

13 Q    But the -- did you ever attempt to bill anyone for any

14 of the expenses that you incurred?

15 A    No.  No.

16 Q    You weren't going to charge anyone for these

17 construction expenses?

18 A    No, no.  It was just a stack -- I just bring the stack

19 in to you and for the document production purpose.

20 Q    A lot of these invoices, it sounds like other people

21 gave them to you; you didn't get them yourself from the

22 vendor, correct?

23 A    Yes, that was true.

24 Q    Other people just gave them to you?

25 A    Yes.

1  Q    And after they gave them to you, what did you do?

2  A    When they -- usually I pay them.  They give me

3  receipts so I pay them.

4  Q    Okay.  And after you paid them, what did you do with

5  the receipt?

6  A    Just put it in the box.

7  Q    You just have one box at home where you throw your

8  invoices?

9  A    Yeah.  Yeah.

10 Q    Okay.

11          THE COURT: Why don't we stop at this point.

12 Let's start about quarter after 1:00; is that okay?

13          MR. CHU: Okay.

14          THE COURT: Now when you're finished -- you're

15 pretty well done here, right?

16          MR. CHU: Yes, I am, correct, a few more minutes I

17 would have finished.

18          THE COURT: Can we finish with Mr. Yan this

19 afternoon?

20          MR. ROMEO: Yes.

21          THE COURT: Okay.  All right.  Quarter after 1:00.

22 See you then.

23          MR. CHU: Thank you, Your Honor.

24          THE CLERK: All rise.

25     (Whereupon, the luncheon recess is taken at 12:07

1 | p.m., and the court is reconvened at 1:24 p.m.)

2 |        THE COURT: Go ahead, please.  Go ahead, Mr. Chu.

3 |        MR. CHU: Yes.  Thank you, Your Honor.

4 | BY MR. CHU:

5 | Q   Mr. Fu, when you were testifying about Exhibit QQ,

6 | which I guess is an excerpt from the invoices that you

7 | brought to the deposition -- well, let me back up.  At the

8 | deposition, you brought all your invoices to the deposition

9 | pursuant to Mr. Romeo's document request?

10 | A   That was correct.

11 | Q   At your deposition, and I'm reading from page 147, at

12 | line 20, you testified as follows:

13 |       "It's a lot of things and I am trying to put -- I

14 |       mean put everything together and give it to Mr.

15 |       Chu by Monday or Tuesday, and I would try to put

16 |       everything together, and with the receipts and

17 |       all that, and I will try."

18 | Were you talking about these receipts at the time?

19 | A   I did talk about -- yeah, the box of receipts, yes.

20 | Q   Then you go on, and it says:

21 |       "But I'd like to mention such a short time was

22 |       given and they contain errors.  I tried to do my

23 |       best."

24 | What did you mean by saying "they contain errors"?

25 | A   What I mean is the receipts, and I have so many, so

1  I'm not able to have the time to go through each one of

2  them and also I don't know -- I mean the one -- this one is

3  for really a specific job or that one for which job it was

4  something, and it would contain errors.  That's why I

5  testify the receipts I brought in, it's about four hundred

6  some thousand dollars, and I would say maybe I would like

7  to take off about a hundred thousand maybe.

8  Q    Let me show you something.  You see here a stack of

9  receipts in my hand.

10  A    Yes, that's true.  That's correct.

11  Q    Does that look like the stack of receipts you brought

12  to the deposition?

13  A    Yes.

14  Q    Okay.

15        MR. CHU: For the record, this is about a four-

16  inch stack of receipts.  I don't think I want to have it

17  entered as an exhibit.

18  BY MR. CHU:

19  Q    So your testimony today is that that stack of receipts

20  may contain some receipts that were not related to the

21  Chenery project.

22  A    That's true.

23  Q    How many projects were you working on from say May of

24  2002 to August of 2003?

25  A    I was working on 547 - 23 Avenue first, then come to

1  Chenery, then I did some work for 28th Avenue, and I was

2  help with some work for Emily, but that was pretty much

3  after Chenery.

4  Q    After Chenery.

5  A    Yes.

6  Q    When you say after Chenery, you mean after August '03?

7  A    No, not really, but I mean Chenery was fairly

8  completed in May, I mean the main work, major work, was

9  fairly completed in '03.

10 Q    Okay.  Well, from -- as far as being 100 percent

11 complete, what percentage would you say was complete in

12 May?

13 A    You mean on Chenery.

14 Q    On Chenery.

15 A    I would say it would be fair, 90 something percent

16 finished.

17 Q    Now you mentioned you were working on 547 - 23rd Avenue

18 before you started the Chenery project?

19 A    What on the Chenery project?

20 Q    Didn't you just sit there and tell me you were doing

21 some work on 547 - 23rd before you started the Chenery

22 project?

23 A    Oh, that's correct.

24 Q    And that was Mr. Yan's property?

25 A    That's correct.

1 Q    Okay.  Were you working on 23rd much after you started

2 the Chenery project?

3 A    Pretty much right after because --

4 Q    No, no, no.  That's not my question.  I asked you if

5 you were working on 23rd anymore after you started Chenery?

6 A    No.  No.  Not anymore.

7 Q    How about you mentioned a 28th Avenue project?

8 A    Yeah, 28th Avenue.  I did some help over there, yes.

9 Q    Whose property was that?

10 A    It's my ex-wife's property.

11 Q    Now in June of 2003, I guess when the Fire Department

12 signed off on the Certificate of Occupancy?

13 A    I believe so.

14 Q    Let me take a look.  I think we're talking about

15 Exhibit UU.  I'm sorry.  In July, it looks like the Fire

16 Department signed off on July 22nd, 2003.

17 A    That's correct.

18 Q    According to Exhibit UU.

19 A    Yes.

20 Q    As of July 22nd, was there any remaining work that

21 needed to be done on Chenery?

22 A    Yeah, some punch list.

23 Q    What's a punch list?

24 A    I don't remember specifically.

25 Q    No, no, no.  I didn't ask you what was on the punch

1  list.  I just asked you in general, what is a punch list?

2  A    I don't remember specifically.  It's fairly done.

3  Q    No, that's not my question.  What is a punch list in

4  general, not what was on the punch list.

5  A    Oh, some little stuff here and little stuff over

6  there.

7  Q    How about the floors?  Had the floors been installed

8  yet?

9  A    Yeah, it was installed.

10  Q    In August of 2003, was there any remaining work to be

11  done?  By August of 2003, you already had the Certificate

12  of Occupancy.

13  A    Yes.

14  Q    Was there any work that needed to be done after that?

15  A    Yeah, some work.

16  Q    What kind of work?

17  A    It just still remaining some punch list, and I don't

18  recall exactly.

19  Q    That property -- did that property -- did the Chenery

20  project have any decks on it?

21  A    There was two decks, yes.

22  Q    These are outdoor decks?

23  A    Outdoor decks, correct.

24  Q    All the various invoices that you kept on the Chenery

25  project and other projects as well, I guess, were you

1  billing anyone for the Chenery project invoices?

2  A    No.

3            MR. CHU: Your Honor, may I have one moment to

4  confer with Mr. Fu before I close out my questioning?

5            THE COURT: Any objection?

6            MR. ROMEO: No objection, Your Honor.

7            THE COURT: Okay.

8       (Pause.)

9            MR. CHU: I have no further questions, Your Honor.

10           THE COURT: Any further examination?

11           MR. ROMEO: No questions, Your Honor.

12           THE COURT: Okay.  Thank you, Mr. Fu.

13           THE WITNESS: Thank you, Your Honor.

14           THE COURT: You may step down.

15           THE WITNESS: Your Honor, may I run to the

16  bathroom real quick?

17           THE COURT: Yes.

18           THE WITNESS: Thank you.

19           THE COURT: We're going to swear the other witness

20  while you're there, okay?

21           THE WITNESS: Okay.

22      (The examination of Mr. Yan, previously transcribed,

23  is not contained in the transcript by this transcriber.)

24

25

1       THE COURT: You may give me those depositions, and

2  then we need to figure out when we're going to have

3  argument.  Okay.  Thank you, Mr. Fu.

4       MR. FU: Thank you, Your Honor.

5       THE COURT: Oh these are -- you've copied this.

6       MR. FU: I copied this.

7       THE COURT: Okay, and I think I have the originals

8  anyway, so I will -- I can check them against that.  Okay.

9       MR. ROMEO: Excuse me, Your Honor, may I know

10  which deposition and pages that you --

11       THE COURT: Why don't I make -- why don't I show

12  this to you for a moment.  Okay.  Let me see what we have.

13       Al right.  I think we're done, right, with the

14  testimony?

15       MR. ROMEO: I want to just make sure that we clean

16  up on the --

17       THE COURT: The exhibits, right.

18       MR. ROMEO: The exhibits, and if I can just get to

19  my list.  Actually there's exhibits for both plaintiff and

20  defendant that are sort of hanging right now.

21       THE COURT: There are.

22       MR. ROMEO: AAA.

23       THE COURT: Okay.  Let me get to that.  Okay.

24  Tell me the ones you're offering at this point.

25       MR. ROMEO: AAA and BBB, those are the only ones

1  that we marked that we didn't --

2          THE COURT: Previously get in?

3          MR. ROMEO: Right.  Mr. Chu, you had several.

4          MR. CHU: Yes, 121 to 125 or 120.

5          MR. ROMEO: Should be 120 to 125, Your Honor.

6  They were all marked in questioning.  120 is the one I

7  think is only -- we only have one copy on the stand.  They

8  can all come in.

9          THE COURT: Okay.

10                      (Whereupon, plaintiff's Exhibits

11                      120 through 125 are admitted into

12                      evidence.)

13          THE COURT:  Is there any objection to triple A

14  and triple B?

15          MR. CHU: I would have no objection to the

16  originals of those coming in.  They're supposed to be

17  certified copies of public documents, but --

18          MR. ROMEO: We have them here if you need those or

19  if you want to review them.

20          MR. CHU: I would like to review the originals,

21  just to make sure, because --

22          THE COURT: Yeah, take a look at them now, because

23  I don't want to take the originals unless there's a real

24  question.

25          MR. CHU: All right.

1        THE COURT: So why don't we just take a moment.
2   It shouldn't take very long.
3        MR. ROMEO: Oh, QQ was referred to by both
4   parties.
5        THE COURT: QQ.
6        MR. ROMEO: That was the -- an abstract of Mr.
7   Fu's receipts that we asked about in cross-examination
8   earlier this morning.  I guess we put those -- I'll offer
9   those into evidence.
10       THE COURT: QQ also.
11       MR. ROMEO: Yes, sir.
12       MR. CHU: These are -- QQ is the invoice
13  exemplars?
14       THE COURT: Exactly.
15       MR. CHU: No objection.
16       THE COURT: Okay.
17                      (Whereupon, Debtor's Exhibit QQ, a
18                      exemplar of Mr. Fu's receipts, is
19                      admitted into evidence.)
20       MR. ROMEO: Here, the certification is on the
21  back.
22       MR. CHU: Okay.
23       THE COURT: Take a moment to look at those
24  certified copies.
25       MR. CHU: I see the original certified copies of

1  AAA and triple B.  I have no objection to their admission.

2        THE COURT: Okay.  And they're the same as the

3  copies in the folder.

4        MR. CHU: Yes.

5        THE COURT: Okay.  Then we'll use the copies in

6  the folder and they can keep their originals.

7                    (Whereupon Debtor's Exhibits AAA

8                    and BBB, are admitted into

9                    evidence.)

10        THE COURT: We need to set a time for argument.

11        MR. ROMEO: Does Your Honor want oral argument or

12  would you --

13        THE COURT: I'd much rather have oral argument.

14        MR. ROMEO: Okay.

15        THE COURT: That's the way it's usually done.  And

16  I want to start -- I want to really delve into this next

17  week.  I have a couple days without any trials, and I want

18  to go back through all this stuff.  So I would like to get

19  the argument tomorrow if we can.

20        I could give you each a half an hour at 11:00.

21  Would that work?

22        MR. ROMEO: Tomorrow morning?  I don't have my

23  calendar here, but I'm just thinking to myself why is that

24  a problem.  I guess it's not.  I could do 11:00 o'clock

25  tomorrow.

1          THE COURT: I could also check into Monday for

2     you, if you think that's easier.  It won't matter for me

3     between the two as long as the calendar is clear.  Stay

4     seated and I'll be back and I'll try to give you choices so

5     you can think about how you want to prepare.

6          MR. ROMEO: Okay.  Thank you.

7          THE COURT: Be right back.

8          (The Judge exits the courtroom.)

9          MR. ROMEO: I'll take tomorrow if I can leave all

10    this stuff here.

11       (Pause.)

12         THE COURT: I'm afraid Monday is not really going

13    to work.  There's a long calendar and some of the matters

14    are going to be complicated.

15         MR. ROMEO: And you have trial days on Tuesday,

16    Wednesday, Thursday?

17         THE COURT: I want to use those trial days to work

18    on this, so I'd rather hear the argument before then.  I

19    mean if you really can't do it till Tuesday morning, I

20    could hear it first thing Tuesday.  But I want to get to

21    start working on this stuff Tuesday, so --

22              That would be available.

23         MR. CHU: I'm available Tuesday morning, Your

24    Honor.  That's the 6th?

25         THE COURT: Yes.  How about tomorrow?

1          MR. CHU: I'm available tomorrow as well.

2          MR. ROMEO: I could do it tomorrow morning.

3          THE COURT: Let's do it at 11:00, half an hour

4    each.

5          MR. ROMEO: Okay.

6          THE COURT: Will that work for you?

7          MR. ROMEO: Yeah.  I just as well while it's fresh

8    in my mind.

9          THE COURT: I think you're probably right.  Okay?

10          MR. CHU: That works, Your Honor.

11          THE COURT: And I will be ready for you at 11:00.

12          MR. ROMEO: Okay.

13          THE COURT: I have a couple other matters, but

14    they'll be done by then, be done before then.

15          MR. CHU: Could we come a little bit before 11:00

16    then and perhaps maybe we can start early.  I have a

17    feeling it may take more than an hour.

18          THE COURT: Why don't you -- I have a matter at

19    10:30 but it may not take longer than a few minutes.  I'm

20    sure it won't take more than a half an hour, but it may

21    take no more than a few minutes.  If you want to come then,

22    I'll be glad to give you the time if we can finish early.

23          MR. CHU: 10:30 is acceptable to me.

24          THE COURT: Do want to do that, Mr. Romeo?

25          MR. ROMEO: Okay.

1    THE COURT: And you'll take potluck then on how

2 much time I have then.

3    MR. ROMEO: Okay.

4    THE COURT: And I will give you equally, like say

5 if we finish at 20 to, you'll each get an extra ten minutes

6 that way.

7    MR. CHU: That sounds good to me, Your Honor.

8    THE COURT: All right.  And you can root me on to

9 make a quick decision.

10    (Laughter.)

11    We'll see you then.

12    THE CLERK: All rise.

13    (Whereupon, the matter is adjourned at 4:20 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7

8          I certify that the foregoing transcript which was

9   transcribed by me (excluding excerpts) is a correct

10  transcript from the digital sound recording of the

11  proceedings in the above-entitled matter.

12

13

14  DATED: July 18, 2007

15

16                    By: /S/ Jo McCall_____

17

18

19

20

21          MR. ROMEO:

22

23

24

25